# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

BYRON TODD,

       Plaintiff,

vs.                                                                                    No. CIV 10-0106 JB/WPL

TOMAS MONTOYA,
RON TORRES, Director of the Metropolitan Detention Center,
and THE BOARD OF COUNTY COMMISSIONERS
OF BERNALILLO COUNTY,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Joint Motion for Summary Judgment or in the Alternative Motion to Disqualify Legal Counsel, filed March 26, 2010 (Doc. 16)("Joint Motion").  The Court held an evidentiary hearing on November 4, 2010.  The primary issues are: (i) whether the Court should exercise its inherent powers and sanction Plaintiff Bryon Todd, because his attorney, Ryan Villa, and investigator, Gary Ainsworth, allegedly violated the New Mexico Rules of Professional Conduct; and (ii) whether the Court should preclude Todd from pursuing his theories of liability under the doctrine of equitable estoppel, based on Mr. Villa's and Ainsworth's alleged misconduct.  The Court finds that neither Mr. Villa nor Ainsworth violated the New Mexico Rules of Professional Conduct.  The Court therefore will not exercise its inherent powers to impose sanctions on Todd.  The Court also finds that neither Mr. Villa nor Ainsworth made false representations to Defendant Tomas Montoya or concealed material facts from T. Montoya; the Court therefore will not preclude Todd from pursuing his claims under the doctrine of equitable estoppel.

## FINDINGS OF FACT

There are disputed issues of fact. Before the Court can accurately apply the applicable law, the Court must therefore determine what the facts are. To determine the facts, the Court held an evidentiary hearing.

1.      The Metropolitan Detention Center ("MDC") in Albuquerque, New Mexico employed T. Montoya as a corrections officer from October 2007 to January 2008. See Transcript of Hearing at 33:10-21 (taken November 4, 2010)(Quinones, T. Montoya)("Tr."); Affidavit of Tomas Montoya ¶ 1, at 1 (executed March 18, 2010), filed March 26, 2010 (Doc. 16-1).

2.      At the time of the incident underlying Todd's Complaint, January 13, 2008, T. Montoya was assigned to oversee inmates in a pod at the MDC. See id. ¶ 2, at 1.

3.      On October 14, 2009, Ainsworth, a private investigator, contacted and approached Vincent Montoya, T. Montoya's father, at V. Montoya's home, and informed V. Montoya that he was trying to contact T. Montoya. See Tr. at 34:1-13 (Quinones, T. Montoya); id. at 123:9-13 (Ainsworth); T. Montoya Aff. ¶ 3, at 1; Affidavit of Gary Ainsworth ¶¶ 8-9, at 2 (dated March 30, 2010), filed April 16, 2010 (Doc. 21-1).

4.      Ainsworth did not tell V. Montoya that T. Montoya needed to talk to him and did not imply that T. Montoya had to call him. See Tr. at 123:14-19 (Johnson, Ainsworth).

5.      Ainsworth gave V. Montoya his business card so that T. Montoya could contact him. See Tr. at 123:12-13 (Ainsworth); T. Montoya Aff. ¶ 3, at 1; Ainsworth Aff. ¶ 9, at 2.

6.      Later that day, V. Montoya informed T. Montoya that Ainsworth was trying to contact him, and T. Montoya soon thereafter contacted Ainsworth by telephone. See Tr. at 34:1-4, 34:14-23 (Quinones, T. Montoya); id. at 57:4-16 (Johnson, T. Montoya); T. Montoya Aff ¶ 4, at 2; Ainsworth Aff. ¶ 11, at 2.

7.     Ainsworth recorded part of the telephone call, but not the beginning of the call, because he answered the call on a blue tooth connection in his vehicle and could not start recording until it was safe to do so.  See Tr. at 123:20-124:8 (Johnson, Ainsworth); Ainsworth Aff. ¶ 11, at 2.

8.     Before Ainsworth began recording the conversation, he informed T. Montoya that he was a private investigator, that Todd's attorneys hired him to investigate an incident that happened while T. Montoya was working at MDC, and that he wanted to get a statement from T. Montoya.  See Tr. at 34:25-35:10 (T. Montoya); id. at 57:17-22, 57:25-58:14 (Johnson, T. Montoya); id. at 124:9-125:5 (Johnson, Ainsworth); T. Montoya Aff. ¶ 4, at 2; Ainsworth Aff. ¶ 12, at 2.

9.     Ainsworth informed T. Montoya that the lawyers for whom he worked were going to sue the Board of County Commissioners of Bernalillo County ("Bernalillo County").  See Tr. at 37:4-11 (Quinones, T. Montoya); id. at 115:18-20 (Baker, Ainsworth); id. at 126:1-2 (Johnson, Ainsworth).

10.     In response to T. Montoya's question whether he would be sued or whether he had been sued, Ainsworth informed T. Montoya that Todd's lawyer had not filed a lawsuit, but that T. Montoya was involved and that the lawsuit that Todd's lawyers planned to file involved and centered around T. Montoya's actions regarding Todd.[1]  See id. at 120:19-25 (Ainsworth); id. at 124:15-125:3, 125:21-126:5 (Johnson, Ainsworth); Ainsworth Aff. ¶ 12, at 2.

11.     After Ainsworth began recording the telephone conversation, he reviewed a report of the incident that occurred on January 13, 2008.  See Transcript of Telephone Call from Tomas

---

[1] At the hearing, T. Montoya testified that Ainsworth never told him that he was involved. See Tr. at 56:20-21 (Johnson, T. Montoya).  The Court credits Ainsworth's testimony over T. Montoya's testimony, because, at the hearing, it appeared that Ainsworth had a clearer recollection of the events than T. Montoya.  At the time of the events in question, T. Montoya was twenty years old and was concerned whether he would be in trouble if he did not give a statement. These circumstances may have affected some of T. Montoya's recollections of the events.

Montoya to Gary Ainsworth at 3 (placed October 14, 2009), filed April 16, 2010 (Doc. 21-2);

Ainsworth Aff. ¶ 13, at 2.

> 12.    Ainsworth stated:

> And I'm not a lawyer so I--, I don't want to give you any legal advice or anything
> but I can tell you that the New Mexico state code, it's NMSA 1978 41-4-20, says it
> shall be the duty of governmental entities to cover every risk for which immunity has
> been waived under the previsions [sic] of the tort claims act or any liability imposed
> under section 41-4.

Transcript of Telephone Call at 3.  See Tr. at 63:9-15 (Johnson, T. Montoya); id. at 115:21-24

(Baker, Ainsworth).

> 13.    Mr. Villa had previously given Ainsworth a copy of Section 41-4-20 of the New

Mexico Statutes.  See Tr. at 94:8-10 (Baker, Villa).

> 14.    Section 41-4-20 of the New Mexico Statutes states:

> A. It shall be the duty of governmental entities to cover every risk for which
> immunity has been waived under the provisions of the Tort Claims Act or any
> liability imposed under Section 41-4-4 NMSA 1978 as follows:

>> (1) local public bodies shall cover every such risk or liability as follows:

>>> (a) for a risk for which immunity has been waived pursuant to
>>> Sections 41-4-9, 41-4-10 and 41-4-12 NMSA 1978, the local public
>>> body shall cover the risk, and for any commercially uninsurable risk
>>> for which public liability fund coverage is made available, the local
>>> public body may insure the risk in accordance with the provisions of
>>> Section 41-4-25 NMSA 1978;

>>> (b) for excess liability for damages arising under and subject to the
>>> substantive law of a jurisdiction other than New Mexico, including
>>> but not limited to other states, territories and possessions and the
>>> United States of America, the local public body shall provide
>>> coverage in accordance with the provisions of Subsection B of
>>> Section 41-4-27 NMSA 1978, if coverage is available; and

>>> (c) for a risk or liability not covered pursuant to Subparagraphs (a)
>>> and (b) of this paragraph, the local public body shall purchase
>>> insurance, establish reserves or provide a combination of insurance

-4-

> and reserves or provide insurance in any other manner authorized by
> law; and
>
> (2) for state agencies, the risk management division shall insure or otherwise
> cover every such risk or liability in accordance with the provisions of Section
> 41-4-23 NMSA 1978. Coverage shall include but is not limited to coverage
> for all such liability arising under and subject to the substantive law of a
> jurisdiction other than New Mexico, including but not limited to other states,
> territories and possessions and the United States of America.

NMSA 1978, § 41-4-20 (footnote omitted).

15.    Mr. Villa told Ainsworth that, if T. Montoya had concerns about his liability,
Ainsworth should read him the statute.  <u>See</u> Tr. at 94:19-23 (Baker, Villa).

16.    T. Montoya asked Ainsworth several times what the statute meant.  <u>See</u> Transcript
of Telephone Call at 4 ("[W]hat is that, like, you know, kind of speak English to me.  What does that
mean, though?"; "[W]hat you just said about something about the New Mexico State, what does that
mean?"); Tr. at 36:7-13 (Quinones, T. Montoya); <u>id.</u> at 116:16-23 (Baker, Ainsworth); Ainsworth
Aff. ¶ 12, at 3.

17.    In response to T. Montoya's questions, Ainsworth stated:

> Well, I'm not a lawyer so I really --, I can't really give advice but I can quote --
> . . . .  It means that it shall be the duty of the governmental entities to cover every
> risk for which immunity has been waived under the provision of the tort claims act.
> So, you know, I really--, I can--, I can kind of tell you where it says --.  I'm not a
> lawyer, I can't tell you wh--, you know, what it means other than the fact that it's a
> duty of the government to cover the risk, you know, is what it states, so.

Transcript of Telephone Call at 4.  <u>See</u> Ainsworth Aff. ¶ 13, at 2.

18.    Ainsworth told T. Montoya he was not a lawyer and that T. Montoya could call a
lawyer to ask him the meaning of the statute.  <u>See</u> Transcript of Telephone Call at 4 ("I mean, you
can call a lawyer, you know, and ask him what [the statute] means since I'm not a lawyer, I can't
give advice on that but."); Ainsworth Aff. ¶ 14, at 3.

19.     Ainsworth told T. Montoya he wanted to get his version of what happened.  <u>See</u> Transcript of Telephone Call at 5 ("I was just trying to get [a version of the incident] in your words, you know, what happened."); Ainsworth Aff. ¶ 15, at 3.

20.     At no time did Ainsworth ever represent or suggest that T. Montoya's statement was mandatory or that adverse consequences would result if he did not give a statement.[2] <u>See</u> Transcript of Phone Call at 5 ("I was just trying to get in your own words, you know, what happened."); <u>id.</u> at 6 ("I just kind of wanted to get it from, you know, the attorneys asked me to, you know, interview you and take your statement.  I wanted to hear kind of in your own words what happened."); <u>id.</u> at 7 ("Would --, maybe we could --, could we set up a time where we can come in and take a look at the videotape?"); Tr. at 65:17-24 (Johnson, T. Montoya); Ainsworth Aff. ¶ 15, at 3.

21.     T. Montoya told Ainsworth that he did not remember the incident.  <u>See</u> Transcript of Telephone Call at 6 ("I don't --.  I can't recall anything.  I don't know what to tell you.  That's a long way --, that's a ways back."); Tr. at 35:4-7 (T. Montoya); T. Montoya Aff. ¶ 5, at 2; Ainsworth Aff. ¶ 16, at 3.

22.     Ainsworth asked T. Montoya whether reviewing a videotape would refresh his recollection, to which T. Montoya responded that it might and that he would call Ainsworth later.  <u>See</u> Transcript of Telephone Call at 6-7; Tr. at 36:14-20 (T. Montoya); Ainsworth Aff. ¶ 16, at 3.

23.     T. Montoya did not call a lawyer after speaking to Ainsworth.  <u>See</u> Tr. at 64:16-17

---

[2] In his affidavit and on direct examination, T. Montoya stated that Ainsworth told him that he really needed to give a statement.  <u>See</u> T. Montoya Aff. ¶¶ 5-6, at 2; Tr. at 35:3-8 (T. Montoya). On cross-examination, however, T. Montoya testified that, while he recalled Ainsworth telling him that he needed to give a statement, upon reflecting and listening to the recording of their conversation, he conceded that is not what happened.  <u>See</u> Tr. at 65:21-68:15 (Johnson, Montoya). The Court will therefore credit Ainsworth's statement that he did not tell T. Montoya that needed to give a statement.

(Johnson, T. Montoya).

24.     T. Montoya called his father, however, to get advice whether he should agree to the

interview, because he was unsure what to do.  See id. at 38:8-9 (T. Montoya); T. Montoya Aff. ¶ 7,

at 2.

25.     T. Montoya's father told him that he should give a statement so that he would not get

into trouble.  See Tr. at 38:8-11 (T. Montoya).

26.     T. Montoya similarly believed that as a witness he was obligated to provide

information about the incident.  See Tr. at 38:12-19 (T. Montoya); T. Montoya Aff. ¶ 7, at 2.

27.     T. Montoya called Ainsworth and left a voicemail message.  See Tr. at 38:20-21

(Quinones, T. Montoya); id. at 69:23-70:1 (Johnson, T. Montoya); Ainsworth Aff. ¶ 17, at 3.

28.     In the voicemail, T. Montoya stated:

> [T]hings are just starting to come back to my head right now.  I actually do
> remember that day.  I don't think I can forget that day.  It was the scariest day of
> (Unintelligible).  I'm actually not going to go to school.  I rather just go and I'll give
> you whatever --, go and watch the video and try to get --, to enhance my memory
> more.  So give me a call back so I can head over there right now and we'll get this
> thing situated and stuff. All righty?  Bye.

Transcript of Voice Message from Tomas Montoya to Gary Ainsworth at 11 (placed October 14,

2009), filed April 16, 2010 (Doc 21-2).  See Tr. at 39:1-5 (T. Montoya).

29.     Soon after, Ainsworth returned T. Montoya's telephone call and left T. Montoya a

voicemail message, asking T. Montoya to call him back and stating: "[W]e can meet whenever, at

your convenience."  Transcript of Voice Message From Gary Ainsworth to T. Montoya at 3 (placed

October 14, 2009), filed April 16, 2010 (Doc. 21-3).  See Tr. at 39:6-11 (Quinones, T. Montoya);

Ainsworth Aff. ¶ 18, at 3-4.

30.     T. Montoya called Ainsworth back, and they agreed to meet that day at a parking lot

on Lomas Boulevard in Albuquerque so that T. Montoya could follow Ainsworth to Mr. Villa's office where his statement would be taken.  <u>See</u> Tr. at 39:11-22 (Quinones, T. Montoya); <u>id.</u> at 127:4-16 (Johnson, Ainsworth); Ainsworth Aff. ¶¶ 19, 21, at 4; T. Montoya Aff. ¶¶ 8-9, at 2.

31.    At no point did Ainsworth tell T. Montoya that he would be in trouble if he did not speak to him.  <u>See</u> Tr. at 73:16-24 (Johnson, T. Montoya).

32.    T. Montoya believed that he would be in trouble -- specifically, T. Montoya was concerned that he would have to go to jail -- if he did not give a statement.  <u>See</u> Tr. at 72:23-74:9 (Johnson, T. Montoya).

33.    T. Montoya and Ainsworth met in the parking lot around 3:20 p.m. on October 14, 2009, and T. Montoya followed Ainsworth to Mr. Villa's office.  <u>See id.</u> at 39:19-40:2 (Quinones, T. Montoya); Montoya Aff. ¶ 9, at 2; Ainsworth Aff. ¶ 21, at 4.

34.    When T. Montoya and Ainsworth arrived at Mr. Villa's office, Mr. Villa was waiting at the entryway.  <u>See</u> Tr. at 41:2-8 (T. Montoya); T. Montoya Aff. ¶ 10, at 3.

35.    Mr. Villa introduced himself as a lawyer representing Todd and escorted T. Montoya to his office after T. Montoya stated that he would be comfortable giving a statement.  <u>See</u> Tr. at 41:4-8 (T. Montoya); <u>id.</u> at 102:12-21 (Villa, Johnson); <u>id.</u> at 127:17-24 (Johnson, Ainsworth); T. Montoya Aff. ¶ 10, at 3; Ainsworth Aff. ¶ 22, at 4; Affidavit of Ryan J. Villa ¶ 10, at 2 (dated April 16, 2010), filed April 16, 2010 (Doc. 21-3).

36.    At no time did Mr. Villa threaten T. Montoya or tell him that, if he did not give a statement, he would be in trouble.  <u>See</u> Tr. at 107:8-15 (Johnson, Villa).

37.    Mr. Villa took T. Montoya to his office and sat behind his desk.  <u>See id.</u> at 41:16 (T. Montoya); T. Montoya Aff. ¶ 11, at 3.

38.     Mr. Villa asked T. Montoya if he wanted to sit, and T. Montoya chose his seat.[3] See Tr. at 103:9-14 (Villa); Villa Aff. ¶ 11, at 8.

39.     Ainsworth sat beside T. Montoya.  See Tr. at 41:19 (T. Montoya); T. Montoya Aff. ¶ 11, at 3.

40.     Before giving his statement, T. Montoya did not ask whether he needed an attorney or needed to consult with an attorney.[4] See Tr. at 129:18-21 (Johnson, Ainsworth); Ainsworth Aff. ¶ 26, at 5; Villa Aff. ¶¶ 14, 16, at 8.

41.     Neither Ainsworth nor Mr. Villa told T. Montoya that he did not need an attorney.[5] See Tr. at 130:8-11 (Johnson, Ainsworth); Ainsworth Aff. ¶ 26, at 5; Villa Aff. ¶ 15, at 8.

42.     Both Ainsworth and Mr. Villa told T. Montoya to seek advice from his own attorney

---

[3] In his affidavit, T. Montoya stated: "I was asked to sit by the window . . . ." T. Montoya Aff. ¶ 11, at 3.  At the hearing, T. Montoya stated that Mr. Villa motioned towards the seat next to the window, and that he went and sat there.  See Tr. at 41:16-18 (T. Montoya).  At the hearing, Mr. Villa testified that he has two chairs in front of his desk, that he did not tell T. Montoya where to sit, and that T. Montoya chose to sit in the chair by the window.  See id. at 103:9-14 (Villa).  The Court believes that it is more likely that Mr. Villa gestured towards the chairs in front of his desk, including the seat next to the window, and that T. Montoya chose a seat than it is likely that Mr. Villa directed T. Montoya to sit in a certain chair.

[4] At the hearing, T. Montoya testified that, before he gave his statement, he asked whether he needed a lawyer.  See Tr. at 42:5-8 (T. Montoya).  See also T. Montoya Aff. ¶ 11, at 3 ("I asked Mr. Villa if I needed a lawyer because I had never before been in this type of situation.").  The Court credits Ainsworth's testimony and Mr. Villa's sworn statement over T. Montoya's testimony, because it appears to the Court that Mr. Villa and Ainsworth have clearer recollections of the events than T. Montoya.

[5] At the hearing, T. Montoya testified that Mr. Villa stated he did not need a lawyer.  See Tr. at 42:6-7 (T. Montoya).  See also T. Montoya Aff. ¶ 11, at 3 ("Mr. Villa told me that I did not need a lawyer and that they just wanted me to give a statement about the incident involving Bryon Todd.").  The Court credits Ainsworth's testimony and Mr. Villa's sworn statement over T. Montoya's testimony, because it appears to the Court that Mr. Villa and Ainsworth have clearer recollections of the events than T. Montoya, and because their version is more probable given Mr. Villa's professional training and duties.

before T. Montoya gave his statement.[6]  See Transcript of Telephone Call at 5:23-25; Tr. at 104:13-15 (Johnson, Villa); id. at 105:22-25 (Villa)(stating that he informed T. Montoya that he could not give him any advice except the advice to get his own attorney); Ainsworth Aff. ¶¶ 14, 24, at 3, 4; Villa Aff. ¶ 12, at 8.

43.     Before taking T. Montoya's statement, Mr. Villa advised T. Montoya that he would be sued and named in the lawsuit that he planned to file on Todd's behalf.[7]  See Tr. at 104:11-25, 105:17-20 (Johnson, Villa)(stating that there is no doubt in Mr. Villa's mind that he advised T. Montoya he would be named in the lawsuit); Ainsworth Aff. ¶¶ 23, 24, at 4; Villa Aff. ¶ 12, at 8.

44.     Mr. Villa also read and gave T. Montoya a copy of Section 41-4-20.[8]  See Tr. at 45:14-46:1 (Quinones, T. Montoya); id. at 103:21-104:10 (Johnson, Villa); Ainsworth Aff. ¶ 25, at 5; Villa Aff. ¶ 13, at 8.

45.     Mr. Villa gave T. Montoya a copy of Section 41-4-20 to put him on notice that he would be sued and to ease any of this concerns about his liability.  See Tr. at 99:25-100:7 (Villa).

_____

[6] T. Montoya testified that Mr. Villa did not tell him that he needed a lawyer.  See Tr. at 76:2-6 (Johnson, T. Montoya).  The Court credits Mr. Villa's testimony over T. Montoya's testimony, because it appears to the Court that Mr. Villa has a clearer recollection of the events than T. Montoya, and because of Mr. Villa's professional training and duties.

[7] At the hearing, T. Montoya testified that Mr. Villa stated only that Todd was going to file a lawsuit against Bernalillo County.  See Tr. at 42:15-21 (Quinones, T. Montoya).  He also testified that Mr. Villa never informed him he was going to be named in the lawsuit.  See Tr. at 43:1-3 (Quinones, T. Montoya); id. at 75:24-76:1 (Johnson, T. Montoya).  The Court credits Villa's testimony over T. Montoya's testimony, because it appears to the Court that Villa has a clearer recollection of the events than T. Montoya.

[8] On direct examination, T. Montoya testified that Mr. Villa gave him a copy of Section 41-4-20 in the middle of the interview, but on cross examination, T. Montoya acknowledged that the transcript of the interview did not reflect that Mr. Villa gave him a copy of Section 41-4-20 in the middle of the interview.  See Tr. at 81:1-82:10, 83:20-84:5 (Johnson, T. Montoya).  The Court therefore credits Mr. Villa's account of when he read and gave T. Montoya a copy of Section 41-4-20.

46.     Ainsworth then turned on a tape recorder, and Mr. Villa began the interview.  See

Transcript of Interview of Tomas Montoya at 2:1-2 (taken October 14, 2009), filed March 26, 2010

(Doc. 16-2).

47.     Mr. Villa told T. Montoya:

I represent Bryon Todd.  We're investigating a civil rights suit against the jail
involving the incident where he was beat up . . . .  And we want to ask you to talk to
us about what happened.  It's always my practice to try and talk to everybody
involved in this case.  You know, so if you're willing to talk to us, you know, I'd like
to get your side of it to see, you know, what you remember, what you saw.

Transcript of Interview at 2:19-20.

48.     Mr. Villa and Ainsworth then proceeded to show T. Montoya a series of MDC

records related to the assault, including the MDC incident report, and asked T. Montoya questions

concerning a vast array of topics, including but not limited to: (i) T. Montoya's job training,

see Transcript of Interview at 13:16-19:24, 33:1-3, 35:16-36:14; (ii) the details of the incident itself,

see id. at 7:2-11:8, 24:16-26:15, 31:13-32:19; and (iii) T. Montoya's resignation, see id. at 4:3-6:1,

11:16-13:8.  See also Tr. at 43:8-12 (T. Montoya); T. Montoya Aff. ¶ 12, at 3 ("Villa . . . ask[ed] me

questions about my employment with the MDC, including but not limited to my training . . . , the

population of the housing units, whether supervisors oversaw my work, the circumstances

surrounding the fight between . . . Todd and another inmate, the fight itself, and my response to the

fight[.]").

49.     After Mr. Villa and Ainsworth questioned T. Montoya for approximately thirty

minutes, Mr. Villa asked T. Montoya if he had any questions.  See  Transcript of Interview at 39:23;

T. Montoya Aff. ¶ 15, at 4.

50.     T. Montoya stated: "I guess, like you said, I have to go get a lawyer now?"

Transcript of Interview at 39:24-25.  See Tr. at 45:2-11 (Quinones, T. Montoya); T. Montoya Aff.

¶ 15, at 4.

51.     Mr. Villa stated: "No, not right now."  Transcript of Interview at 40:1.  Mr. Villa then began to explain what was "going to happen," but turned the tape recorder off.  Transcript of Interview at 40:1-2.  See Tr. at 45:11-13 (T. Montoya).

52.     Mr. Villa informed T. Montoya that he and Todd's other attorney would file a lawsuit,  and that T. Montoya would be a named defendant in the lawsuit.  See Tr. at 46:6-47:2 (T. Montoya); T. Montoya Aff. ¶ 16, at 4.

53.     Mr. Villa gave T. Montoya the telephone number of Bernalillo County's Legal Department.  See Tr. at 46:6-13 (Quinones, T. Montoya); Montoya Aff. ¶ 16, at 4.

54.     Later that day, T. Montoya called Bernalillo County's Legal Department, where an employee informed him that no lawsuit had been filed, but to call when he received a summons and complaint.  See Tr. at 47:13-24 (Quinones, T. Montoya); id. at 85:1-7 (Johnson, T. Montoya); T. Montoya Aff. ¶¶ 18-19, at 4.

55.     T. Montoya again called Bernalillo County's Legal Department when he received a summons and complaint, where an employee gave him Jeffrey L. Baker's phone number and told T. Montoya to call Mr. Baker.  See Tr. at 85:8-10 (Johnson, T. Montoya); T. Montoya Aff. ¶ 20, at 5.

56.     Shortly thereafter, an employee at the Bernalillo County Legal Department contacted T. Montoya and told him that Carlos Quinones would represent him, because Bernalillo County had identified a potential conflict between T. Montoya and the other named Defendants.  See id. ¶ 22, at 5.

57.     On October 14, 2009, T. Montoya was twenty years old.  See Tr. at 32:11-12 (Quinones, T. Montoya).

58.   At all times in his dealings with T. Montoya, Ainsworth was acting under the direction of Todd's attorneys.  See id. at 112:4-8 (Quinones, Villa); id. at 118:19-21 (Quinones, Ainsworth).

## PROCEDURAL BACKGROUND

On January 11, 2010, Todd filed a Complaint against T. Montoya, Defendant Ron Torres, the Director of the MDC, and Defendant Board of County Commissioners of Bernalillo County in the Second Judicial District Court.  See Complaint for Civil Rights Violations, Tort Claims and Damages, filed February 8, 2010 (Doc. 2-1).  On February 8, 2010, the Defendants filed a Notice of Removal, asserting that the Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).  See Notice of Removal at 1-2, filed February 8, 2010 (Doc. 2).

On March 26, 2010, the Defendants jointly moved for summary judgment, or, in the alternative, to disqualify Todd's legal counsel.  See Joint Motion (Doc. 16).  The Defendants argue that Mr. Villa's and Ainsworth's alleged misconduct resulted in irreparable harm to the Defendants, because the information obtained through the alleged misconduct served as the basis of Todd's claims.  See Joint Motion at 5.  The Defendants contend that Mr. Villa's and Ainsworth's alleged misconduct has tainted the entire case such that only dismissal of the suit with prejudice or disqualification of Todd's counsel can repair the damage caused.  See Joint Motion at 1.  The Defendants also argue that Todd is equitably estopped from pursuing his theories of liability, because of Mr. Villa's and Ainsworth's alleged misconduct.  See id. at 21.

Todd filed his Response on April 16, 2010.  See Plaintiff's Response in Opposition to Defendants' Joint Motion for Summary Judgment or in the Alternative Motion to Disqualify Legal Counsel and Plaintiff's Request to Strike Defendants' Motion and for Sanctions, filed April 16, 2010 (Doc. 21)("Response").  In his Response, Todd argues that the Defendants' Joint Motion is not the

proper subject of a summary judgment motion, but is more properly characterized as a motion for sanctions under the Court's inherent power.  <u>See</u> Response at 6.  Todd also argues that Mr. Villa and Ainsworth did not violate the Rules of Professional Conduct in the course of taking T. Montoya's statement, because they advised T. Montoya that they represented Todd regarding an incident at MDC, that Todd was going to sue as a result of the incident, that T. Montoya would be sued and named as a Defendant, and because they advised T. Montoya to seek legal counsel.  <u>See</u> Response at 8.  Todd asserts that equitable estoppel does not bar him from pursuing his theories of liability, because neither Mr. Villa nor Ainsworth violated ethical rules, and because T. Montoya's statement was knowing, voluntary, and intelligent, and was not taken under duress or through coercion. <u>See</u> Response at 16.  Todd further argues that the Court should strike the Defendants' Joint Motion from the record, because it contains false allegations of professional misconduct, and asks the Court to award Todd attorneys' fees and costs associated with defending against the Defendants' Motion. <u>See</u> Response at 18.

The Defendants replied on May 10, 2010.  <u>See</u> Defendants' Reply to Plaintiff's Response to Defendants' Joint Motion for Summary Judgment or in the Alternative Motion to Disqualify Legal Counsel, filed May 10, 2010 (Doc. 23)("Reply").  In their Reply, the Defendants state that, "since Plaintiff's counsel has raised issues of material fact by submitting opposing affidavits, summary judgment appears impractical to resolve this matter."  Reply at 5.  The Defendants, however, reiterate their request for relief under "the Court's inherent obligation to manage the conduct of attorneys who appear before it and to ensure that the fair administration of justice occurs in this case."  Reply at 5-6.  The Defendants also argue that a hearing is necessary to determine whether Mr. Villa and Ainsworth violated the Rules of Professional Conduct and whether the relief that they are seeking is warranted. <u>See</u> Reply at 6.  The Defendants further argue that, because Todd

requested that the Court strike the Defendants' Joint Motion in his Response and not in a motion, the Court should either require Todd to file a motion or allow the Defendants a full opportunity to brief the issue.  See Reply at 11.  The Defendants argue that the same problem exists with Todd's request for attorneys' fees.  See Reply at 11.[9]

At the hearing, it became apparent that both parties wanted the Court to hold an evidentiary hearing whether Mr. Villa and Ainsworth violated the rules of professional conduct.  See Reply at 6; Tr. at 20:12-15 (Johnson).  The Court asked Jeffrey Baker, Defendants Ron Torres and Board of County Commissioners of Bernalillo County's attorney, whether T. Montoya's statement to Mr. Villa and Ainsworth is different from what he will testify in a deposition.  See Tr. at 13:1-10 (Court).  Mr. Baker stated that he did not know whether T. Montoya will say something different in his deposition, but that T. Montoya would have been better prepared for the questions if he had a lawyer.  See Tr. at 14:1-5 (Baker).  The Court held an evidentiary hearing in which T. Montoya, Mr. Villa, and Ainsworth testified.

## RELEVANT LAW REGARDING FEDERAL COURTS' INHERENT POWERS

The Supreme Court of the United States has recognized that "'[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot

---

[9] At this time, the Court will not strike the Joint Motion or grant Todd's request for attorneys' fees and costs.  At the hearing, neither party submitted arguments on these issues.  Given that the parties have now had a full opportunity to argue on the Defendants' Join Motion, the Court sees no sound reason to strike it.  Also, the Court does not generally strike motions.  See Lane v. Page, No. CIV 06-1071 JB/ACT, 2010 WL 2854481, at *7 (D.N.M. 2010)(Browning, J.)("Moreover, [o]nly material included in a pleading may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly.  Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike."  (alteration in original)(internal quotation marks omitted)(quoting Dubrovin v. The Ball Corp. Consol. Welfare Ben. Plan for Employees, No. 08-CV-0563-WYDKMT, 2009 WL 521048, at *1 (D. Colo. Dec. 23, 2009)).  Moreover, because the Defendants' Joint Motion is not without a basis in the law or facts of the case, the Court will deny Todd's requests for fees and costs.

be dispensed with in a Court, because they are necessary to the exercise of all others.'"  Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)(quoting United States v. Hudson, 7 Cranch 32 (1812)). "For this reason, 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.'"  Chambers v. NASCO, Inc., 501 U.S. at 43 (quoting Anderson v. Dunn, 6 Wheat. 204, 227 (1821)).  "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  Chambers v. NASCO, Inc., 501 U.S. at 43 (quoting Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962)).  A court's inherent powers must be exercised with restraint and discretion because "of their very potency."  Chambers v. NASCO, Inc., 501 U.S. at 44 (citing Roadway Exp., Inc. v. Piper, 447 U.S. 752, 764 (1980).  "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."  Chambers v. NASCO, Inc., 501 U.S. at 44-45.

The United States Court of Appeals for the Tenth Circuit has recognized that "[t]here is strong precedent establishing the inherent power of federal courts to regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate circumstances." Tripati v. Beaman, 878 F.2d 351, 352 (10th Cir. 1989)(citations omitted).  The conditions a court imposes on a litigant must be "designed to assist the district court in curbing the particular abusive behavior involved," but "cannot be so burdensome . . . as to deny a litigant meaningful access to the courts."  Tripati v. Beaman, 878 F.2d at 352 (citations omitted).  "Although the district court has discretion to dismiss, it must be exercised with some restraint."  Chavez v. City of Albuquerque, 402 F.3d 1039, 1044 (10th Cir. 2005).  "Because dismissal is such a harsh sanction, it is appropriate only in cases of 'wilfullness, bad faith, or [some] fault of petitioner.'"  Chavez v. City of Albuquerque,

-16-

402 F.3d at 1044 (citations omitted).  The Tenth Circuit has articulated several factors "that may inform the district court's discretion in determining whether dismissal is an appropriate sanction." Chavez v. City of Albuquerque, 402 F.3d at 1044.  These factors are: (i) "the degree of actual prejudice to the [party];" (ii) "the amount of interference with the judicial process;" (iii) the culpability of the litigant[;]" (iv) "whether the court warned the party in advance the dismissal of the action would be a likely sanction for noncompliance[;]" and (v) "the efficacy of lesser sanctions." Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir. 1992).  "The list is not exhaustive, nor are the factors necessarily equiponderant."  Chavez v. City of Albuquerque, 402 F.3d at 1044.

"Within the inherent supervisory powers of the court is the discretionary authority to control attorneys." Koch v. Koch Indus., 798 F. Supp. 1525, 1530 (D. Kan. 1992)(citing Redd v. Shell Oil Co., 518 F.2d 311, 314 (10th Cir. 1975)).  See Weeks v. Indep. Sch. Dist. No. I-89 of Okla.County, Okla. Bd. of Educ., 230 F.3d 1201, 1208 (10th Cir. 2000)(stating that "[o]rdinarily the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge, and is thus a matter of judicial discretion." (citations omitted)).  A federal court's power to discipline attorneys who appear before it "ought to be exercised with great caution."  Chambers v. NASCO, Inc., 501 U.S. at 43 (quoting Ex parte Burr, 22 U.S. 529, 530 (1824)).

## RELEVANT LAW REGARDING EQUITABLE ESTOPPEL

"Estoppel precludes one party from asserting a right when another party has relied to his detriment upon the acts or conduct of the first party and when asserting that right would prejudice the other who has acted thereon in reliance."  Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 115 N.M. 690, 697, 858 P.2d 66, 73 (1993)(citation omitted).

In order to find equitable estoppel the following facts must be established as to the party estopped:

(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts.

The following elements must be shown as to the party claiming estoppel:

(1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 129 N.M. 677, 681-82, 12 P.3d 431, 435-36 (2000).

## RELEVANT LAW REGARDING THE NEW MEXICO RULES OF PROFESSIONAL CONDUCT

The local rules for the United States District Court for the District of New Mexico state: "The Rules of Professional Conduct adopted by the Supreme Court of the State of New Mexico apply except as otherwise provided by local rule or by Court order."  D.N.M.LR-Civ 83.9.  The Court will therefore apply the New Mexico Rule of Professional Conduct.

Rule 16-403 of the New Mexico Rules of Professional Conduct states:

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.  When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.  The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client.

Rule 16-403 NMRA (emphasis added).  The Committee Commentary further elaborates of the scope of the rule.  It states:

An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client.  In order

-18-

to avoid a misunderstanding, <u>a lawyer will typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person</u>. . . .

> <u>The rule distinguishes between situations involving unrepresented persons whose interests may be adverse to those of the lawyer's client and those in which the person's interests are not in conflict with those of the client. In the former situation, the possibility that the lawyer will compromise the unrepresented person's interests is so great that the rule prohibits the giving of any advice, apart from the advice to obtain counsel. Whether a lawyer is giving impermissible advice may depend on the experience and sophistication of the unrepresented person, as well as the setting in which the behavior and comments occur.</u> This rule does not prohibit a lawyer from negotiating the terms of a transaction or settling a dispute with an unrepresented person. So long as the lawyer has explained that the lawyer represents an adverse party and is not representing the person, the lawyer may inform the person of the terms on which the lawyer's client will enter into an agreement or settle a matter, prepare documents that require the person's signature and explain the lawyer's own view of the meaning of the document or the lawyer's view of the underlying legal obligations.

Rule 16-403 NMRA (emphasis added).  "The New Mexico Rules were patterned after the ABA Model Rules of Professional Conduct."  <u>Cole v. Ruidoso Mun. Schs.</u>, 43 F.3d 1373, 1383 (10th Cir. 1994).  In 1991, the American Bar Association published a formal opinion regarding "whether a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without the consent of the corporation's lawyer, communicate about the subject of the representation with the unrepresented former employee of the corporate party."  ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 91-359 (1991).  The Committee concluded

> that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.
>
> With respect to any unrepresented former employee, of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as a former employee with his or her former employer's counsel are protected by the privilege (a privilege not belonging to or for the benefit of the former employee, by the former employer).

-19-

Such an attempt could violate Rule 4.4 (requiring respect for the rights of third persons).

<u>The lawyer should also punctiliously comply with the requirements of Rule 4.3, which addresses a lawyer's dealings with unrepresented persons. That rule, insofar as pertinent here, requires that the lawyer contacting a former employee of an opposing corporate party make clear the nature of the lawyer's role in the matter giving occasion for the contact, including the identity of the lawyer's client and the fact that the witness's former employer is an adverse party.</u>

Formal Op. 91-359 (emphasis added)(citation omitted).

Rule 16-402 of the New Mexico Rules of Professional Conduct states:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.  Except for persons having a managerial responsibility on behalf of the organization, an attorney is not prohibited from communicating directly with employees of a corporation, partnership or other entity about the subject matter of the representation even though the corporation, partnership or entity itself is represented by counsel.

Rule 16-402 NMRA.

## <u>ANALYSIS</u>

Neither Mr. Villa nor Ainsworth violated the New Mexico Rules of Professional Conduct, because Mr. Villa and Ainsworth told T. Montoya that they either worked for or represented Todd, that Todd meant to file a lawsuit against the County, that T. Montoya was involved in and would be named in the lawsuit, and because the only legal advice Mr. Villa and Ainsworth gave T. Montoya was the advice to seek counsel.  Because the Court finds that Mr. Villa and Ainsworth did not violate the New Mexico Rules of Professional Conduct, the Court will not exercise its inherent power to impose sanctions on Todd.  Because the Court finds that neither Mr. Villa nor Ainsworth made false representations to T. Montoya or concealed material facts from T. Montoya, the Court will not preclude Todd from pursuing his claims under the doctrine of equitable estoppel.

## I.   NEITHER MR. VILLA NOR AINSWORTH VIOLATED THE NEW MEXICO RULES OF PROFESSIONAL CONDUCT.

The Defendants argue that Mr. Villa and Ainsworth violated rule 16-403 of the New Mexico Rules of Professional Conduct.  See Joint Motion at 6.  The Defendants contend that both rule 4.3 of the Model Rules of Professional Conduct and rule 16-403 of the New Mexico Rules of Professional Conduct require that

> an attorney who is acting on behalf of a client, advise the unrepresented person that they represent a particular client, and more importantly, that . . . s/he may wish to secure counsel, and that counsel may be present during the interview, where the lawyer knows or reasonably should know that the interests of a person are necessarily in conflict with those of the client's.

Joint Motion at 7.  The Defendants allege that Mr. Villa and Ainsworth engaged in ethical misconduct, by failing to provide T. Montoya with sufficient information to comprehend the purpose of the interview, by pressuring him into believing he was required to provide a statement, by using deceptive means to extract information from T. Montoya before informing him that his interests were adverse to Todd's interests, by failing to explain that T. Montoya would later be named as a defendant, and by telling T. Montoya that he could obtain legal counsel only after the interview. See Joint Motion at 20.

Todd responds that Mr. Villa and Ainsworth did not violate the rules of professional conduct. See Response at 8.  Todd argues that Mr. Villa and Ainsworth advised T. Montoya that they represented Todd regarding an incident at the MDC, that Todd was going to sue as a result of this incident, that Montoya would be named as a defendant, and that T. Montoya could seek advice from counsel.  See Response at 8.

Although Ainsworth is not a lawyer, if Ainsworth violated New Mexico's Rules of Professional Conduct on account of direction from Todd's counsel, Todd's counsel would be

responsible for his conduct.  Rule 16-503 of the New Mexico Rules of Professional Conduct states that a lawyer shall be responsible for the conduct of a non-lawyer assistant "that would be a violation of the New Mexico Rules of Professional Conduct if engaged in by a lawyer" if the "lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved."  Rule 16-503 NMRA.  Ainsworth was acting under the direction of Todd's counsel at all times during his interactions with T. Montoya.  See Tr. at 112:4-8 (Quinones, Villa); id. at 118:19-21 (Quinones, Ainsworth).  Todd's counsel is therefore responsible for Ainsworth's conduct if Ainsworth violated New Mexico's Rules of Professional Conduct in conducting his interactions with T. Montoya.

Under the New Mexico Rules of Professional Conduct, an attorney who is dealing on behalf of a client with an unrepresented person shall not state or imply that the lawyer is disinterested, and shall not give "legal advice . . . other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client."  Rule 16-403 NMRA.  The committee commentary elaborates on the text of the rule, stating that "[w]hether a lawyer is giving impermissible advice may depend on the experience and sophistication of the unrepresented person, as well as the setting in which the behavior and comments occur."  Rule 16-403 NMRA committee commentary.  The commentary also states that, typically, a lawyer will need to "identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person," to ensure that the unrepresented person understands that the lawyer is not disinterested.  Rule 16-403 NMRA committee commentary.  "The New Mexico Rules were patterned after the ABA Model Rules of Professional Conduct."  Cole v. Ruidoso Mun. Schs., 43 F.3d at 1383.  In 1991, the American Bar Association published a formal opinion regarding "whether a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without the

consent of the corporation's lawyer, communicate about the subject of the representation with the unrepresented former employee of the corporate party."   ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 91-359 (1991).  The Committee concluded

> that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer.
>
> With respect to any unrepresented former employee, of course, the potentially-communicating adversary attorney must be careful not to seek to induce the former employee to violate the privilege attaching to attorney-client communications to the extent his or her communications as a former employee with his or her former employer's counsel are protected by the privilege (a privilege not belonging to or for the benefit of the former employee, by the former employer). Such an attempt could violate Rule 4.4 (requiring respect for the rights of third persons).
>
> <u>The lawyer should also punctiliously comply with the requirements of Rule 4.3, which addresses a lawyer's dealings with unrepresented persons.  That rule, insofar as pertinent here, requires that the lawyer contacting a former employee of an opposing corporate party make clear the nature of the lawyer's role in the matter giving occasion for the contact, including the identity of the lawyer's client and the fact that the witness's former employer is an adverse party.</u>

Formal Op. 91-359 (emphasis added)(internal citation omitted).

In short, the New Mexico Rules of Professional Conduct require that a lawyer make clear that he is not disinterested when dealing with an unrepresented person with interests that conflict with his or her client's interests; to ensure that the unrepresented person understands that the attorney is not disinterested, the lawyer must to identify his or her client, make clear the lawyer's role, and explain that the client has interests opposed to those of the unrepresented person.  The rule also requires that a lawyer not give legal advice to an unrepresented person, other than the advice to secure counsel.

The Defendants argue that rule 16-403 also requires a lawyer to state the reason for the

interview and inform the unrepresented person that counsel may be present in the interview, and that

he or she may refuse to give the interview.  See Joint Motion at 7; Reply at 6-7.  The Court does not

find the cases upon which the Defendants rely persuasive in its interpretation of rule 16-403's

requirements.  In McCallum v. CSX Transp., Inc., 149 F.R.D. 104, 112 (M.D.N.C. 1993), the United

States District Court for the Middle District of North Carolina recognized that ABA Model Rule 4.3

"imposes an obligation on an attorney to convey to the unrepresented witness the truth about the

lawyer's role, representative capacity, and that he is not disinterested."  McCallum v. CSX Transp.,

Inc., 149 F.R.D. at 112.  The North Carolina federal court then cited a North Carolina Ethics

Opinion as stating that the former employee must be willing to be interviewed.  See McCallum v.

CSX Transp., Inc., 149 F.R.D. at 112.  The district court then set forth several requirements,

specifically, that the investigator or attorney disclose his or her representative capacity, state the

reason for the interview, inform the individual of his or her right to refuse the interview, and inform

the person of his or her right to have counsel present.  See McCallum v. CSX Transp., Inc., 149

F.R.D. at 112.  The district court took these requirements from a case from the United States District

from the Eastern District of Pennsylvania, in which the District for the Eastern District of

Pennsylvania addressed the requirements imposed by rule 4.2 of the Pennsylvania Rules of

Professional Conduct, which deals with lawyers communicating with people represented by counsel.

See McCallum v. CSX Transp., Inc., 149 F.R.D. at 112 (citing Univ. Patents, Inc. v. Kligman, 737

F. Supp. 325, 328 (E.D. Pa. 1990)(discussing rule 4.2)).  Because these requirements were taken

from a case addressing rule 4.2, not rule 4.3, the Court is not persuaded that it should interpret rule

16-403 as imposing these requirements.  Several of the cases on which the Defendants rely address

situations in which the courts found that investigators violated rule 4.3 and required further

precautions in the instance of future interviews.  See Monsanto Co v. Aetna Cas. & Sur. Co., 593

A.2d 1013, 1021 (Del. Super. 1990), <u>enforcement granted in part, order set aside in part by</u> <u>Monsanto Co. v. Aetna Cas. & Sur. Co.</u>, C.A. No. 88C-JA-118, 1990 WL 200471 (Del. Super. Dec. 4, 1990)(finding that rule 4.3 of the Delaware Rules of Professional conduct was violated, and therefore required the investigator to state that he was an investigator, who he was working for, that there was a pending suit, and the purpose of the suit, and to ask permission to interview the former employee about the issues in the litigation before conducting future interviews); <u>Upjohn Co. v.</u> <u>Aetna Cas. & Sur. Co.</u>, NO. 4:88 CV 124, 1990 WL 446503 (W.D. Mich. July 13, 1990)(finding that a lawyer when communicating with an adverse corporation's former employee should identify himself as an attorney for the adverse party in pending litigation involving the witness' former employer and state the purpose of the communication, and further finding that the investigators violated these guidelines and therefore requiring that the investigators identify themselves and state that former employees have no obligation to agree to an interview before further interviews). The Court thus does not find these cases persuasive. The Defendants also rely upon cases interpreting rules governing a lawyer's communication on the subject of the representation with a party he or she knows to be represented, which impose different requirements. <u>See</u> <u>Morrison v. Brandeis Univ.</u>, 125 F.R.D. 14, 19-20 (D. Mass. 1989); <u>Bey v. Vill. of Arlington Heights</u>, No. 88 C 5479, 1989 WL 103387, at *1 (N.D. Ill. Aug. 29, 1989). The Court therefore does not find these cases persuasive. Because the Court does not find these cases persuasive, it will not interpret rule 16-403 to require that a lawyer inform an unrepresented person that counsel may be present in the interview and that he may refuse to give the interview. The Court believes that the New Mexico Rules of Professional Conduct require only that a lawyer make clear that he is not disinterested and the nature of his or her role when dealing with an unrepresented person whose interests conflict with his or her client's interests' and that a lawyer not give legal advice to the unrepresented person, other than the advice

to secure counsel.

It is important for the Court not to add requirements that the Rules of Professional Conduct do not contain, even if, in a particular circumstance, the Court might wish there had been a little more clarity.  The ABA and the New Mexico courts have carefully struck a balance between the right to seek the truth and the right to counsel.  A freewheeling court, adding requirements, could upset that balance.  The Court should not disturb the balance the ABA and the New Mexico courts have struck by adding requirements, then confusing what conscientious and professional lawyers and investigators may do, and perhaps chilling informal discovery, which often informs pre-filing whether there is a case or not, quickly and relatively inexpensively, two things formal discovery often does not do.

In dealing with T. Montoya, both Mr. Villa and Ainsworth made clear that they were not disinterested.  Moreover, neither Mr. Villa nor Ainsworth stated or implied that they were disinterested.  As the committee commentary to rule 16-403 recognizes, unrepresented people, especially those not adept in dealing in legal matters, may assume that a lawyer is disinterested; therefore, "a lawyer will typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person."  Rule 16-403 NMRA committee commentary.  ABA Formal Opinion 91-359 further states that a lawyer must make clear the nature of the lawyer's role in the matter giving occasion for the contact, the identity of the lawyer's client and the fact that the unrepresented person's former employer is an adverse party.

In his communications with T. Montoya, Ainsworth made clear that he was not disinterested and the nature of his role.  Furthermore, Ainsworth did not imply that he was disinterested. Ainsworth identified for whom he was working and his purpose in contacting T. Montoya by telling T. Montoya that he was a private investigator, that Todd's attorneys hired him to investigate an

incident that happened while T. Montoya was working at MDC, and that he wanted to get a statement from T. Montoya.  See Tr. at 34:25-35:10 (T. Montoya); id. at 57:17-22, 57:25-58:14 (Johnson, T. Montoya); id. at 124:9-125:5 (Johnson, Ainsworth); T. Montoya Aff. ¶ 4, at 2; Ainsworth Aff. ¶ 12, at 2.  Ainsworth also explained that Todd's interests might be opposed to T. Montoya's interests by stating that the lawyers for whom he worked were going to sue Bernalillo County, see Tr. at 37:4-11 (Quinones, T. Montoya); id. at 115:18-20 (Baker, Ainsworth); id. at 126:1-2 (Johnson, Ainsworth), and by informing T. Montoya that a lawsuit had not yet been filed, but that he was involved and that lawsuit involved and centered around T. Montoya's actions regarding Todd, see Tr. at 120:19-25 (Ainsworth); id. at 124:15-125:3, 125:21-126:5 (Johnson, Ainsworth); Ainsworth Aff. ¶ 12, at 2.  Even if these statements were not sufficient to comply with the requirements of ABA Formal Opinion 91-359, which required Ainsworth to make clear that T. Montoya's interests were opposed to Todd's interests, because Ainsworth did not inform T. Montoya that Todd would sue him, before T. Montoya gave a statement, Mr. Villa informed T. Montoya that he would be named in the lawsuit that Todd was going to file.  The Court therefore finds that Todd's legal team complied with the requirements of rule 16-403 before T. Montoya gave his statement.

Similarly, Mr. Villa made clear he was not disinterested and the nature of his role.  He also did not imply disinterest in his communications with T. Montoya.  When Mr. Villa spoke to T. Montoya, he identified Todd as his client and explained his role by stating that he represented Todd. See Tr. at 41:4-8 (T. Montoya); id. at 102:12-21 (Villa, Johnson); id. at 127:17-24 (Johnson, Ainsworth); T. Montoya Aff. ¶ 10, at 3; Ainsworth Aff. ¶ 22, at 4; Villa Aff. ¶ 10, at 2.  Mr. Villa also told T. Montoya that he contacted T. Montoya, because he wanted to obtain T. Montoya's statement of what happened.  See Transcript of Interview at 2:15-23.  Mr. Villa also informed T.

Montoya that Todd's interests were opposed to T. Montoya's interests by telling T. Montoya, before

taking his statement, that T. Montoya would be named in the lawsuit that Todd was going to file.

See Tr. at 104:11-25, 105:17-20 (Johnson, Villa); Ainsworth Aff. ¶¶ 23, 24, at 4; Villa Aff. ¶ 12, at

8. The Court finds that Mr. Villa and Ainsworth made all three necessary disclosures either alone

or together before T. Montoya made his statement. The Court therefore also finds that neither Mr.

Villa nor Ainsworth implied disinterest in their communications with T. Montoya. See Rule 16-403

NMRA ("In dealing on behalf of a client with a person who is not represented by counsel, a lawyer

shall not state or imply that the lawyer is disinterested."); Formal Op. 91-359 ("Rule 4.3 . . . requires

that the lawyer contacting a former employee of an opposing . . . party make clear the nature of the

lawyer's role in the matter giving occasion for the contact, including the identity of the lawyer's

client and the fact that the witness's former employer is an adverse party.").

    Mr. Villa and Ainsworth also did not give T. Montoya legal advice, other than the advice that

he could seek counsel. Both Mr. Villa and Ainsworth informed T. Montoya that he could seek

advice from his own attorney. See Transcript of Telephone Call at 5:23-25; Tr. at 104:13-15

(Johnson, Villa); id. at 105:22-25 (Villa); Ainsworth Aff. ¶¶ 14, 24, at 3, 4; Villa Aff. ¶ 12, at 8.

Although both Mr. Villa and Ainsworth read Section 41-4-20 to T. Montoya, the Court finds that,

in this context, they did not offer legal advice to T. Montoya. As the committee commentary to rule

16-403 recognizes, "[w]hether a lawyer is giving impermissible advice may depend on the

experience and sophistication of the unrepresented person, as well as the setting in which the

behavior and comments occur." Rule 16-403 NMRA committee commentary. Based on the

evidence presented in the evidentiary hearing, it is evident that Mr. Villa and Ainsworth were trying

to avoid giving T. Montoya legal advice by reading him Section 41-4-20. They read him the words

of the statute, yet did not explain what the statute meant, simply re-reading the statute if he asked

questions.  At most, they were trying -- perhaps inartfully -- to tell T. Montoya that he needed an attorney and he might contact Bernalillo County's risk management division, who would probably provide him with that attorney.  Although in another context, a lawyer's act of reading a statute to an unrepresented person might constitute legal advice, the Court does not believe that Mr. Villa and Ainsworth gave T. Montoya legal advice when they read him Section 41-4-20, except perhaps tell him that he needed an attorney and where he might look for that attorney.

Because Mr. Villa and Ainsworth made clear, before T. Montoya made a statement, their roles and that they were not disinterested, because neither Mr. Villa nor Ainsworth implied that they were disinterested, and because neither Mr. Villa nor Ainsworth gave T. Montoya legal advice, other than the advice to seek counsel, and where perhaps to find that counsel, the Court finds that Mr. Villa and Ainsworth complied with the New Mexico Rules of Professional Conduct.

## II.   BECAUSE THE COURT FINDS THAT NEITHER MR. VILLA NOR AINSWORTH VIOLATED THE NEW MEXICO RULES OF PROFESSIONAL CONDUCT, THE COURT WILL NOT EXERCISE ITS INHERENT POWERS TO SANCTION TODD.

In the Joint Motion, the Defendants ask the Court to exercise its inherent powers to dismiss Todd's case because of Mr. Villa's and Ainsworth's alleged misconduct.  See Joint Motion at 13-14.  The Defendants also seek disqualification of Todd's attorneys based on Mr. Villa's and Ainsworth's alleged misconduct.  See Reply at 5 (stating that the Court has wide discretion in framing sanctions to remedy abuses, including attorney disqualification).  Todd contends that the Court should not issue any sanctions, because neither Mr. Villa nor Ainsworth violated the New Mexico Rules of Professional Conduct.  See Response at 16.

The Supreme Court has recognized that "'[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" Chambers v. NASCO, Inc., 501

U.S. at 43 (quotation omitted).  A court's inherent powers must be exercised with restraint and discretion because "of their very potency."  <u>Chambers v. NASCO, Inc.</u>, 501 U.S. at 44 (citing <u>Roadway Exp., Inc. v. Piper</u>, 447 U.S. 752, 764 (1980).  "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."  <u>Chambers v. NASCO, Inc.</u>, 501 U.S. at 44-45.  The Court has found that neither  Mr. Villa nor Ainsworth violated the New Mexico Rules of Professional Conduct.  Because the Court has not found that Mr. Villa or Ainsworth committed abuses, the Court will not exercise its inherent powers to sanction Todd.  <u>Cf.</u> <u>Rogler v. Standard Ins. Co.</u>, 30 F. App'x 909, 914 (10th Cir. 2002)(finding that the district court did not abuse its discretion in denying a request that it exercise its inherent power to sanction the other party when the district court did not find that the other party acted improperly during the litigation).

Moreover, even if the Court were to find that Mr. Villa and/or Ainsworth violated the requirements of rule 16-403, the Court would not dismiss Todd's case or disqualify his choice of counsel.  Neither draconian remedy is warranted at this stage.  T. Montoya has not pointed out any statement he made to Mr. Villa or Ainsworth that he no longer believes is an accurate statement.  At the hearing, Mr. Baker stated that he was not sure whether T. Montoya would testify differently in his deposition.  T. Montoya also has not pointed out any prejudice.  If some inconsistency, discrepancy, or prejudice becomes apparent down the road, the Court at that time can exercise its powers to remedy any unfairness by excluding that particular statement rather than the draconian remedy of dismissing the case -- which might now have statute-of-limitations problems even if it were dismissed without prejudice -- or disqualifying counsel, who have made a considerable investment of time, resources and who now have considerable knowledge of the case.

## III.     THE COURT WILL NOT PREVENT TODD FROM PURSUING HIS THEORIES OF LIABILITY UNDER THE DOCTRINE OF EQUITABLE ESTOPPEL.

The Defendants contend that Mr. Villa and Ainsworth concealed important facts and misrepresented their rationale for the interview and T. Montoya's need for legal counsel, and that T. Montoya relied on the representations to the Defendants' detriment.  See Joint Motion at 23-24. The Defendants contend that the Court should therefore prevent Todd from pursuing his claims, which are premised on Mr. Villa's and Ainsworth's alleged misconduct.  See Joint Motion at 25.

Todd contends that the doctrine of equitable estoppel does not bar him from pursuing his theories of liability, because neither Mr. Villa nor Ainsworth committed ethical violations, and because T. Montoya's statement was voluntary and was not given under duress or through coercive or improper tactics.  See Response at 16.

"Estoppel precludes one party from asserting a right when another party has relied to his detriment upon the acts or conduct of the first party and when asserting that right would prejudice the other who has acted thereon in reliance."  Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 115 N.M. at 697, 858 P.2d at 73 (citation omitted).

> In order to find equitable estoppel the following facts must be established as to the party estopped:
>
> > (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts.
>
> The following elements must be shown as to the party claiming estoppel:
>
> > (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

Memorial Med. Ctr., Inc. v. Tatsch Const., Inc., 129 N.M. at 681-82, 12 P.3d at 435-36.

The Court finds no false representations or concealment of material facts that would form the basis of equitable estoppel.  Ainsworth told T. Montoya he worked for the lawyers who represented Todd, see Tr. at 34:25-35:10 (T. Montoya); id. at 57:17-22, 57:25-58:14 (Johnson, T. Montoya); id. at 124:9-125:5 (Johnson, Ainsworth), and Mr. Villa told T. Montoya he represented Todd, see Tr. at 41:4-8 (T. Montoya); id. at 102:12-21 (Villa, Johnson); T. Montoya Aff. ¶ 10, at 3; Villa Aff. ¶ 10, at 2.  Mr. Villa and Ainsworth both told T. Montoya that Todd was going to file a lawsuit.  See  Transcript of Interview of T. Montoya at 2:15-23; Tr. at 37:4-11 (Quinones, T. Montoya); id. at 115:18-20 (Baker, Ainsworth); id. at 126:1-2 (Johnson, Ainsworth).  Ainsworth told T. Montoya that the lawsuit involved and centered around T. Montoya's actions regarding Todd, see Tr. at 120:19-25 (Ainsworth); id. at 124:15-125:3, 125:21-126:5 (Johnson, Ainsworth), and Mr. Villa told T. Montoya that he would be named in the lawsuit, see Tr. at 104:11-25, 105:17-20 (Johnson, Villa); Villa Aff. ¶ 12, at 8.  Both Mr. Villa and Ainsworth told T. Montoya that he could seek the advice of an attorney.  See Transcript of Telephone Call at 5:23-25; Tr. at 104:13-15 (Johnson, Villa); id. at 105:22-25 (Villa).  At no time did either Mr. Villa or Ainsworth tell T. Montoya that he needed to give a statement or that, if he did not give a statement, he would be in trouble.  See  Transcript of Phone Call at 5-7; Tr. at 65:17-24, 73:16-24 (Johnson, T. Montoya); id. at 107:8-15 (Johnson, Villa); Ainsworth Aff. ¶ 15, at 3.  These representations were not false.  Indeed, Todd later filed suit against Bernalillo County and named T. Montoya as a defendant.  The lawsuit is based upon an incident at the MDC.  Mr. Villa and Ainsworth also did not conceal material facts from T. Montoya.  They told T. Montoya what they were investigating, who they represented, and for whom worked.  They also told T. Montoya that Todd would sue Bernalillo County, and Mr. Villa  told T. Montoya that he would be named in the lawsuit -- before he took

T. Montoya's statement.  The Court therefore finds that there is no basis for estoppel, because Todd's legal team did not make false representations or conceal material facts.  See Espinosa v. United of Omaha Life Ins. Co., 139 N.M. 691, 137 P.3d 631 (Ct. App. 2006)("Here, the elements of equitable estoppel are not met.  It is undisputed that there was nothing hidden with regard to the anti-assignment provision stamped on the annuity; thus, Settlement Funding could not have relied to its detriment on the lack of such a provision.").

      **IT IS ORDERED** that the requests for relief in the Defendants' Joint Motion for Summary Judgment or in the Alternative Motion to Disqualify Legal Counsel, filed March 26, 2010 (Doc. 16), are denied.  The Court will not dismiss Plaintiff Bryon Todd's case, disqualify his counsel, or otherwise sanction Todd, and will not prevent Todd from pursuing his theories of liability.  If there is any unfairness in any statement Defendant Tomas Montoya gave before trial to Todd's legal team, the Court may be willing to entertain a request to exclude some particularly troubling statement.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ryan J. Villa
The Law Office of Robert R. Cooper
Albuquerque, New Mexico

-- and --

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

     *Attorneys for Plaintiff*

Carlos M. Quinones
Quinones Law Firm
Santa Fe, New Mexico

      *Attorneys for Defendant Tomas Montoya*

Jeffrey L. Baker
Renni Zifferblatt
The Baker Law Firm
Albuquerque, New Mexico

      *Attorneys for Defendants Ron Torres and Board of County Commissioners of Bernalillo*
        *County*