**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

BYRON TODD,

      Plaintiff,

vs.                                                                              No. CIV 10-0106 JB/KBM

TOMAS MONTOYA, RON TORRES,
Director of the Metropolitan Detention
Center, and THE BOARD OF COUNTY
COMMISSIONERS OF BERNALILLO
COUNTY,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Tomas Montoya's Renewed Motion

for Summary Judgment Based upon Qualified Immunity and Other Grounds, filed January 30, 2012

(Doc. 94)("Jan. 30, 2012 MSJ").  The Court held a hearing on April 5, 2012.  The primary issues

are: (i) whether Defendant Tomas Montoya is entitled to summary judgment on the basis of

qualified immunity under the facts presented; (ii) whether the Court should permit Plaintiff Byron

Todd to have additional discovery under rule 56(d) of the Federal Rules of Civil Procedure to

challenge Montoya's assertion of qualified immunity; (iii) whether the Court should enter summary

judgment on Todd's tort claims under the New Mexico Tort Claims Act, N.M.S.A.1978, §§ 41-4-1

to -30 ("NMTCA"); and (iv) whether the Court should permit Todd to have additional discovery

under rule 56(d) to show the existence of a genuine issue of material fact regarding Montoya's

liability under the NMTCA.  The Court will grant the Jan. 30, 2012 MSJ.  The Court concludes that,

on the facts presented, Todd has not met his burden to overcome Montoya's qualified-immunity

defense.  Likewise, Todd has not satisfied the standards under rule 56(d) to obtain additional

discovery to overcome Montoya's qualified-immunity defense. Todd has also not met his burden to show the existence of a genuine issue of material fact regarding Montoya's liability under the NMTCA. Lastly, Todd has not met the requirements under rule 56(d) to merit additional discovery regarding his NMTCA claim against Montoya.

## **FACTUAL BACKGROUND**

Todd attempts to dispute many of Montoya's asserted facts. In contravention of D.N.M.LR-Civ. 56.1(b), however, Todd does not distinguish between Montoya's asserted facts which he intends to dispute and additional asserted facts he intends to present. D.N.M.LR-Civ. 56.1(b) provides in relevant part:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b). While the Court does not believe that any sanction is appropriate for Todd's failure to comply with this local rule, the Court notes that it may have some difficulty in determining whether Todd intends to present additional asserted facts or intends to dispute Montoya's asserted facts.

There have been two summary judgment motions filed in this case, with the most recent motion being the Jan. 30, 2012 MSJ and the earlier motion being the motion for summary judgment filed on April 13, 2011. See Defendant Tomas Montoya's Motion for Summary Judgment Based upon Qualified Immunity and Other Grounds, and Supporting Memorandum (Doc. 61)("Apr. 13,

2011 MSJ"). Because the parties incorporate their factual sections from their previous filings regarding the Apr. 13, 2011 MSJ, the Court will present both sets of facts in chronological order.

Todd also provides two separate affidavits under rule 56(d) asserting that he needs additional discovery to have the ability to properly dispute Montoya's asserted facts. In his most recent response to Montoya's motion for summary judgment, Todd asserts that he has sufficient evidence to show the existence of a genuine issue of material fact to avoid the entry of summary judgment and requests, as an alternative ground, that the Court permit him to have additional discovery. See Plaintiff's Response to Defendant Montoya's Renewed Motion for Summary Judgment at 3 [Doc. No. 94], filed February 27, 2012 (Doc. 96)("Response to Jan. 30, 2012 MSJ"). Specifically, he states: "Although Plaintiff does not believe it is necessary, should the Court believe that additional discovery is necessary to rule on Defendant's Motion, the Court should defer ruling until said discovery can be completed." Response to Jan. 30, 2012 MSJ at 3. Consequently, the Court will evaluate Todd's requests for additional discovery under rule 56(d) in the analysis section of this Memorandum Opinion and Order once it has determined, on the facts presented, whether entry of summary judgment is appropriate. This course of action is also the more practical one given that Todd, in response to the significant majority of Montoya's asserted facts, has asserted that he "is without sufficient knowledge to admit or deny these allegations, and is in need of further discovery." E.g., Response to Defendant Tomas Montoya's Motion for Summary Judgment Based upon Qualified Immunity and Other Grounds, and Supporting Memorandum ¶ 2, at 2, filed May 23, 2011 (Doc. 67)("Response to Apr. 13, 2011 MSJ"). It will be more efficient for the Court to address this argument one time rather than each time Todd makes it -- particularly given that Todd makes this argument over fifty times. If Todd makes this argument in response to an asserted fact, the Court will consider the fact undisputed for purposes of deciding the Jan. 30, 2012 MSJ, but will separately

consider whether additional discovery under rule 56(d) is appropriate such that the Court should deny the motion for summary judgment. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

This dispute revolves around a fight between several inmates in which an inmate named Patrick Wilks and an inmate named Joseph Armijo attacked Todd. The Bernalillo County Metropolitan Detention Center ("MDC") hired Montoya as a detention center or corrections officer, where he began working on October 19, 2007. See Apr. 13, 2011 MSJ ¶ 1, at 2 (setting forth this fact); Affidavit of Defendant Tomas Montoya ¶ 3, at 1, filed April 13, 2011 (Doc. 61)("Montoya Aff."); Response to Apr. 13, 2011 MSJ ¶ 1, at 2 (not disputing this fact). On January 13, 2008, Montoya was assigned to oversee the inmates in the Fox-7 housing unit ("F-7") at the MDC. See Apr. 13, 2011 MSJ ¶ 2, at 2 (setting forth this fact); Montoya Aff. ¶ 4, at 1; Response to Apr. 13, 2011 MSJ ¶ 2, at 2 (not disputing this fact). Inmates in the F-7 on January 13, 2008 consisted of general population inmates. See Apr. 13, 2011 MSJ ¶ 3, at 2; Montoya Aff. ¶ 5, at 1; Response to Apr. 13, 2011 MSJ ¶ 3, at 2 (not disputing this fact). General population inmates are free to move about F-7 among other general population inmates, except that they cannot enter the cells of other inmates and must remain at all times at least arm's length apart from the staff station area that the corrections officer on duty occupies. See Apr. 13, 2011 MSJ ¶ 4, at 2-3 (setting forth this fact);Montoya Aff. ¶ 7, at 2.[1]

─────────────

[1]Todd asserts that he "denies the allegations in paragraph 4, to the extent the allegations are referring to something other than MDC rules and regulations." Response to Apr. 13, 2011 MSJ ¶ 4, at 2. To dispute the portion of the asserted fact that inmates must remain at least arm's length apart from the staff station area that the corrections officer on duty occupied, he relies on several pieces of evidence indicating that Wilks jumped on a desk where Montoya maintained his computer or that Montoya showed Wilks this information. See Interview of Officer Tomas Montoya 9:6-17 (dated October 14, 2009), filed May 23, 2011 (Doc. 67-2)("Montoya Interview"); Letter from Abraham Gallardo, Corrections Officer to Jonathon Thomas, Captain at 1 (dated January 15, 2008), filed May

23, 2011 (Doc. 67-4)("Jan. 15, 2008 Letter").  One of the corrections officers, Abraham Gallardo, relates in the Jan. 15, 2008 Letter that "Inmate Todd stated 'that Officer Montoya had gotten in the Internet in the unit pod computer on Sunday and shown all the Inmates in the pod his past charges.'" Jan. 15, 2008 Letter at 1.  Montoya objects to this statement as hearsay.  Montoya objects to Todd's use of many exhibits he has presented on hearsay grounds, including evidence where other individuals summarize what Todd related to them.  See Reply to Plaintiff's Response to Defendant Tomas Montoya's Motion for Summary Judgment Based upon Qualified Immunity and Other Grounds at 2-3, filed June 20, 2011 (Doc. 80)("Reply to Response to Apr. 13, 2011 MSJ").  While this letter may be a business record, Todd has not laid any foundation indicating that this document falls within this exception.  See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)("The proponent of the document must also lay this foundation for its admission.").  Nevertheless, the letter appears to meet the criteria for a business record, and Montoya has not objected to the letter on this basis.  A business record requires that: (i) "the record was made at or near the time by -- or from information transmitted by -- someone with knowledge"; (ii) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (iii) "making the record was a regular practice of that activity"; and (iv) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification"; and (v) "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 806(6).  The letter is dated January 15, 2008, which is only a few days after the incident, such that it "was made at or near the time by . . . someone with knowledge." Fed. R. Evid. 806(6)(i).  Drawing all reasonable inferences in Todd's favor, it appears that keeping and making records investigating fights or potential misconduct by staff members would be done in the regular course of managing a prison.  See United States v. Frazier, 53 F.3d 1105, 1110 (10th Cir. 1995)("Our review of the record convinces us the audit report qualifies in all respects as a business record."); Crimm v. Mo. Pac. R.R., 750 F.2d 703, 709 (8th Cir. 1984)("MoPac had a written policy requiring that in an investigation of sexual harassment the conversations of those interviewed 'should be documented through written memoranda.'  Shoener was directed to conduct an investigation and to prepare such memoranda.").  There is no one providing testimony showing that all these conditions to qualify as a business record are met, but Montoya has not objected to the letter on this basis.  Lastly, there do not appear to be circumstances that indicate that the letter itself is untrustworthy.

More importantly, the statement that Todd allegedly made is another layer of hearsay that does not fall within any exception.  See United States v. Blechman, 657 F.3d 1052, 1065 (10th Cir. 2011)("Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person."); 4 S. Saltzburg, M. Martin, D. Capra, Federal Rules of Evidence Manual § 805.02, at 805-2 (9th ed. 2006)("Sometimes a hearsay statement includes, or repeats, one or more other hearsay statements.  When this occurs, in order for the statement to be admitted into evidence, there must be an applicable hearsay exception or exemption for each level of hearsay.").  Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  The advisory committee notes provide an example of this principle:

Montoya had no authority or discretion to determine which inmates were classified as general population inmates and which were permitted to be in F-7.  See Apr. 13, 2011 MSJ ¶ 5, at 3 (setting forth this fact); Montoya Aff. ¶ 6, at 2; Response to Apr. 13, 2011 MSJ ¶ 5, at 3 (not

---

> Thus a hospital record might contain an entry of the patient's age based on information furnished by his wife. The hospital record would qualify as a regular entry except that the person who furnished the information was not acting in the routine of the business. However, her statement independently qualifies as a statement of pedigree (if she is unavailable) or as a statement made for purposes of diagnosis or treatment, and hence each link in the chain falls under sufficient assurances.

Fed. R. Evid. 805 advisory committee's note to proposed rules. Professor Steven Saltzburg similarly illustrates this principle:

> Consider, for example, the following illustration: an insurance investigator goes to the scene of an accident and takes the statement of one of several persons involved in the accident.  The witness admits fault, taking the entire blame for the accident.  Suppose the police charge another person with reckless driving, and the witness is unavailable at trial.  If the investigator is also unavailable, an offer of a report by the investigator concerning the witness' statement would have to overcome two hearsay hurdles: one for the out-of-court statement of the witness who admitted fault, and one for the investigator's statement (the report).  Probably the witness' statement is a declaration against interest.  However, the second hearsay hurdle is not overcome unless the investigator's report meets the requirement of the exception for regularly conducted business activities.

4 S. Saltzburg, M. Martin, D. Capra, supra § 805.02, at 805-2. Todd has not presented any basis for excepting his statement from the hearsay rule, and the Court does not otherwise find an applicable hearsay exception.  Thus, the Court will not consider this statement attributable to Todd contained in the Jan. 15, 2008 Letter given that the statement is hearsay.

Furthermore, the evidence upon which Todd relies does not specifically controvert the asserted fact that inmates must remain at least arm's length apart from the staff station area occupied by the corrections officer on duty.  D.N.M.LR-Civ. 56.1(b) provides: "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b).  That Wilks may have jumped on the table and may have seen information on the computer does not controvert the asserted fact that inmates must generally remain at least arm's length apart from the staff station area.  Without more information regarding whether Wilks was abiding by the rules when he did what he did, these two statements are not in conflict.  Thus, the Court will deem Montoya's asserted fact admitted.

disputing this fact).[2]

On January 13, 2008, and on other dates when Montoya worked in F-7, his work post consisted of the staff station.  See Apr. 13, 2011 MSJ ¶ 6, at 3 (setting forth this fact); Montoya Aff. ¶ 6, at 2.[3]  In front of the staff station is a large brick wall in a half oval, and there is access to the staff station by walking up three steps and then entering around the sides of the half oval brick wall; this wall is about six feet high from the floor level on the inmates' side of the wall.  See Apr. 13, 2011 MSJ ¶ 7, at 3 (setting forth this fact); Montoya Aff. ¶ 9, at 2; Response to Apr. 13, 2011 MSJ ¶ 7, at 3 (not disputing this fact).  The staff station consists of a top desk with a drop-down computer terminal with a telephone on the top desk and a chair located behind the desk.  See Apr. 13, 2011 MSJ ¶ 8, at 3 (setting forth this fact); Montoya Aff. ¶ 10, at 2; Response to Apr. 13, 2011 MSJ ¶ 8, at 3 (not disputing this fact).

Generally, Montoya, during his shift in F-7, would be at the staff station observing inmates from an elevated position.  See Apr. 13, 2011 MSJ ¶ 9, at 3 (setting forth this fact); Montoya Aff. ¶ 11, at 2; Response to Apr. 13, 2011 MSJ ¶ 9, at 4 (not disputing this fact).  Corrections officers use the drop-down computer terminal located at the staff station desk to look for an open cell for a new inmate who was already classified to be in F-7, to look up account balances of inmates with

---

[2]Todd asserts that this asserted fact is not relevant.  See Response to Apr. 13, 2011 MSJ ¶ 5, at 3.  "Whether this fact is relevant is a legal argument" that the Court "will consider in its legal analysis."  Wilson v. Jara, No. 10-0797, 2011 WL 5822729, at *2 n.7 (D.N.M. Oct. 17, 2011)(Browning, J.).  Thus, the Court deems this fact admitted given that Todd has not specifically controverted this fact under D.N.M.LR-Civ. 56.1(b).

[3]Todd asserts that this asserted fact is not relevant.  See Response to Apr. 13, 2011 MSJ ¶ 6, at 3.  "Whether this fact is relevant is a legal argument" that the Court "will consider in its legal analysis."  Wilson v. Jara, 2011 WL 5822729, at *2 n.7.  Thus, the Court deems this fact admitted given that Todd has not specifically controverted this fact under D.N.M.LR-Civ. 56.1(b).

Canteen Services,[4] and to review the legal and criminal history of inmates within MDC's files.  See Apr. 13, 2011 MSJ ¶ 10, at 3 (setting forth this fact); Montoya Aff. ¶ 12, at 2; Response to Apr. 13, 2011 MSJ ¶ 10, at 4 (not disputing this fact).

Montoya's review of inmates' legal or criminal history as stated in their MDC files was as a precaution for his safety as a corrections officer.  See Apr. 13, 2011 MSJ ¶ 11, at 4 (setting forth this fact); Montoya Aff. ¶ 13, at 3.[5]  The computer terminal screen was always located down

---

[4]The parties do not explain what Canteen Services is, but the Court assumes it is a place where inmates can purchase food and personal items that the detention center does not otherwise supply.

[5]Todd admits that "this may be one of the reasons Defendant Montoya reviewed criminal history of an inmate, but denies that it is the only reason."  Response to Apr. 13, 2011 MSJ ¶ 11, at 4.  He contends that Montoya "also reviewed criminal history in order to provide it to other inmates for the purposes of having those inmates attack Plaintiff based on that history."  Response to Apr. 13, 2011 MSJ ¶ 11, at 4.  For this proposition, Todd relies on: (i) a written statement allegedly attributable to Wilks stating: "I found [Todd's] charges by a CO Montoya I saw [sic] them on the computer," Voluntary Statement at 1 (dated January 15, 2008), filed May 23, 2011 (Doc. 67-3); (ii) the statement from the Jan. 15, 2008 Letter which is as follows: "Inmate Todd stated 'that Officer Montoya had gotten in the Internet in the unit pod computer on Sunday and shown all the Inmates in the pod his past charges,'" Jan. 15, 2008 Letter at 1; and (iii) a statement from private investigator Gary Ainsworth that Wilks "stated that he was instructed by the correctional officer to attack Byron Todd," Affidavit of Gary Ainsworth ¶ 8, at 1 (executed May 23, 2011), filed May 23, 2011 (Doc. 67-5)("Ainsworth Aff.").  Montoya objects to these statements on the basis that they are hearsay.  See Reply to Response to Apr. 13, 2011 MSJ at 2-3.  Todd also relies on Montoya's resignation to dispute the asserted fact.  See Bernalillo County Personnel Action Form at 1 (dated April 3, 2011), filed April 13, 2011 (Doc. 61-6).

The statement allegedly made by Wilks -- one of the inmates at MDC -- in the Voluntary Statement is hearsay.  While the document itself, the Voluntary Statement, may fall within a hearsay exception as a business record or a public record, Todd has laid no foundation to support that conclusion.  See United States v. Ary, 518 F.3d at 786 ("The proponent of the document must also lay this foundation for its admission.").  Montoya objects to this evidence on the basis that Todd has not laid the proper foundation.  See Reply to Response to Apr. 13, 2011 MSJ ("Therefore, Exhibit 3 to Plaintiff's Response is nothing more than inadmissible hearsay, as well as a document that fails for lack of a proper evidentiary foundation.").  Furthermore, the handwritten statement within the Voluntary Statement is hearsay that does not fall within an exception.  See Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); Coffey v. United States, Nos. 08-0588 and 09-0028, 2011 WL 6013611, at *4 n.22 (D.N.M. Nov. 28, 2011)(Browning, J.)("While the incident

-8-

statement itself may be a public record under rule 803(8) of the Federal Rules of Evidence, the handwritten statement from Reiser, an inmate at the prison, is double hearsay . . . ."); S. Saltzburg, M. Martin, D. Capra, supra § 805.02, at 805-2 ("Sometimes a hearsay statement includes, or repeats, one or more other hearsay statements. When this occurs, in order for the statement to be admitted into evidence, there must be an applicable hearsay exception or exemption for each level of hearsay."). As the United States Court of Appeals for the Third Circuit has recognized:

> The Advisory Committee's Notes make clear that Federal Rule of Evidence 803(8) exempts from the hearsay rule only reports by officials; and of course the pilots and other witnesses are not officials for this purpose. Moreover, the memoranda submitted to the government by its investigators often contained statements from witnesses which would make such memoranda encompass double hearsay.

John McShain, Inc. v. Cessna Aircraft Co., 563 F.2d 632, 636 (3d Cir. 1977). Thus, the Court will not consider this handwritten statement in the Voluntary Statement, because it is hearsay that does not fall within any exception.

The Voluntary Statement is dated January 15, 2008, while the fight occurred on January 13, 2008. Thus, given that several days passed before Wilks purportedly made the statement, there is no argument that it is a statement of Wilks' "then-existing" state of mind under rule 803(3) of the Federal Rules of Evidence. See United States v. Ledford, 443 F.3d 702, 709 (10th Cir. 2005). Accord Fed. R. Evid. 803(3) (excepting from the hearsay rule "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)"). Todd has argued that the residual exception to the hearsay rule applies to the Voluntary Statement. There are serious questions about the trustworthiness of this statement such that it does not have "equivalent circumstantial guarantees of trustworthiness." Fed. R. Evid. 807(a)(1). In his deposition, Wilks denies ever having made the statement, denies that this was his handwriting, and asserts that the statement is inaccurate. See Deposition of Patrick Wilks at 26:9-12, 49:20-24 (dated September 23, 2011), filed January 30, 2012 (Doc. 94-1). Thus, the evidence does not fall within the residual hearsay exception stated in rule 807. As Montoya correctly points out, Wilks' denial that he wrote the statement undermines its authenticity. See Reply to Plaintiff's Response and Amended Response to Defendant Tomas Montoya's Renewed Motion for Summary Judgment Based upon Qualified Immunity and Other Grounds, filed March 22, 2012 (Doc. 104)("Reply to Response to Jan. 30, 2012 MSJ")("Therefore, this document remains unauthenticated and, as such, constitutes inadmissible hearsay."). Rule 901 of the Federal Rules of Evidence requires the proponent of a piece of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Because Wilks was available for a deposition, the statement does not qualify as a statement against interest under rule 804 of the Federal Rules of Evidence -- which requires the declarant to be "unavailable as a witness." Fed. R. Evid. 804(b). Accord Pfingston v. Ronan Eng'g Co., 284 F.3d 999, 1004 (9th Cir. 2002)(recognizing that a party could not rely on the hearsay exceptions under rule 804 on summary judgment without showing unavailability of the witness).

The Court has already determined that the statement attributable to Todd in the Jan. 15, 2008 Letter is hearsay that does not fall within any exception. See note 1, supra. Lastly, Ainsworth's

statement relating what Wilks said is hearsay.  While Ainsworth's statements, to which he has attested in an affidavit, are competent evidence for summary-judgment purposes, his assertion regarding what Wilks said is double hearsay.  See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996)("Federal Rule of Civil Procedure 56(e) specifically requires that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge.");  United States v. Bradshaw, 787 F.2d 1385, 1392 (10th Cir. 1986)("Instead, appellant's motion for new trial was based on an affidavit of counsel which contained nothing more reliable than double hearsay obtained from appellant's own brother.").  None of the evidence upon which Todd relies is competent evidence that the Court can consider.  Thus, the Court deems admitted the asserted fact that Montoya's review of inmates' legal or criminal history as stated in their MDC files was as a precaution for his safety as a corrections officer.

Regarding Montoya's resignation, Montoya admitted at a hearing before the Court that he resigned because of this incident.  See Transcript of Hearing at 54:3-12, filed January 4, 2011 (Doc. 38)(Johnson, Montoya).  While Montoya does not dispute that he resigned because of the fight between Todd and Wilks, that evidence does not specifically controvert Montoya's asserted fact that, his review of inmates' legal or history as stated in their MDC files was as a precaution for his safety as a corrections officer.  Even when viewing the facts in the light most favorable to Todd and drawing all reasonable inferences in Todd's favor, the mere fact that Montoya resigned from his job is too tenuously connected to the asserted fact to specifically controvert the asserted fact.  The same logic applies to the statement in the Bernalillo County Personnel Action Form that Montoya's resignation was based on fraternization issues.  It is worth noting that the Bernalillo County Personnel Action Form provides no context to elaborate on what these fraternization issues are.  See Bernalillo County Personnel Action Form at 1.  Without context clarifying what these fraternization issues are, the Court cannot reasonably conclude that this evidence specifically controverts the asserted fact that Montoya's review of inmates' legal or history as stated in their MDC files was as a precaution for his safety as a corrections officer.  Furthermore, the context available to the Court indicates that the statement regarding fraternization does not involve Wilks or Armijo.  At the hearing on April 5, 2012, Montoya explained that these references to fraternization implicate Montoya's interactions with his brother, whom he represented was incarcerated at the time he was working.  See Apr. 5, 2012 Tr. at 12:17-13:9 (Quinones).  In his Reply to Plaintiff's Response and Amended Response to Defendant Tomas Montoya's Renewed Motion for Summary Judgment Based upon Qualified Immunity and Other Grounds, filed March 22, 2012 (Doc. 104)("Reply to Response to Jan. 30, 2012 MSJ"), Montoya attaches a portion of an interview Todd's counsel, Ryan Villa, conducted with him, in which Montoya relates that the statement regarding fraternization relates to this incident with his brother.  See Interview of Officer Tomas Montoya at 5:10-6:1 (dated October 14, 2009), filed May 23, 2011 (Doc. 104-2)("Second Copy of Montoya Interview").  Todd has presented a few pages from this same interview in his Response to Apr. 13, 2011 MSJ, see Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time."), and has not objected to its admissibility.  Montoya's statements in this interview undercut the inference that the reference to fraternization implicates Montoya's interactions with Wilks or Armijo.

It is important to note that the probative value, if any, of the evidence regarding Montoya's

-10-

resignation is weak.  While this evidence is not irrelevant in the sense that it has no relevance under rule 401 of the Federal Rules of Evidence, it has limited probative value.  Notably, this evidence would be excludable under rule 407 as a subsequent remedial measure, although Montoya has not objected to the evidence on this basis.  See Nolan v. Memphis City Sch., 589 F.3d 257, 274 (6th Cir. 2009)("Evidence that an employer subsequently discharged an employee accused of causing a plaintiff's injury may be properly excluded as a subsequent remedial measure under Rule 407." (citing Hull v. Chevron USA, Inc., 812 F.2d 584, 586-87 (10th Cir. 1987)).  He, in fact, has presented this evidence himself.  The MDC and Montoya both took the remedial actions, with the MDC recommending that Montoya resign instead of face termination and Montoya deciding to resign.  Whether Montoya engaged in inappropriate conduct and the appropriateness of his employment in light of his potential involvement in Todd's beating are "the subject[s] of this lawsuit, and as a result, [his termination] is a measure that 'if taken previously,' would have made the injury or harm less likely to occur'" within the meaning of rule 407.  Stahl v. Bd. of Cnty. Comm'rs of the Unified Gov't of Wynandotte Cnty/Kan., 101 F.App'x 316, 321 (10th Cir. 2004)(unpublished).  Furthermore, both the MDC and Montoya are defendants in this lawsuit, so their actions fall within rule 407's scope.  See Mehoja v. Drummond, 56 F.3d 1213, 1215 (10th Cir. 1995)("We reject the rule crafted by the dissent, as unsupported by the cases and unworkable, that Rule 407 applies not only to actual defendants, but also to obvious potential defendants." (emphasis in original)).

Rule 407's considerations are relevant to assess the relative probative value of this evidence.  As the advisory committee's note to rule 407 relates, the inference one draws from a subsequent remedial measure as proof of an admission of fault is relatively weak:

> The rule incorporates conventional doctrine which excludes evidence of subsequent remedial measures as proof of an admission of fault.  The rule rests on two grounds.  (1) The conduct is not in fact an admission, since the conduct is equally consistent with injury by mere accident or through contributory negligence.  Or, as Baron Bramwell put it, the rule rejects the notion that "because the world gets wiser as it gets older, therefore it was foolish before."  Hart v. Lancashire & Yorkshire Ry. Co., 21 L.T.R. N.S. 261, 263 (1869).  Under a liberal theory of relevancy this ground alone would not support exclusion as the inference is still a possible one.

Fed. R. Evid. 407 advisory committee's note to 1972 proposed rules.  The United States Court of Appeals for the Tenth Circuit, relying on this advisory committee's note, has similarly stated: "First, as an admission of fault, the probative value of subsequent remedial measures is limited."  Hull v. Chevron USA, Inc., 812 F.2d at 586-87 (citing Fed. R. Evid. 407 advisory committee's note to 1972 proposed rules)(noting that the district court properly excluded testimony from a former employee who had been fired as a result of the incident underlying the lawsuit).  While this evidence may create a weak inference of wrongdoing, it is minimally probative.  See In re Air Crash Disaster, 86 F.3d 498, 528-29 (6th Cir. 1996)("Northwest's rewiring of the CAWS is circumstantial evidence, if only of a weak and suspect sort, that the CAWS as it existed at the time of the accident was not foolproof.").  Even if the evidence is not technically with rule 407's scope: (i) rule 407's underlying

between the knees of the corrections officer sitting at the staff station desk; the corrections officer could raise the computer keyboard to a higher level, but not the computer screen itself.  See Apr. 13, 2011 MSJ ¶ 12, at 4 (setting forth this fact); Montoya Aff. ¶¶ 14-15, at 3; Response to Apr. 13, 2011 MSJ ¶ 12, at 5 (not disputing this fact).  A corrections officer, such as Montoya, would always be looking at a downward angle at the computer screen.  See Apr. 13, 2011 MSJ ¶ 12, at 3 (setting forth this fact); Montoya Aff. ¶¶ 14-15, at 3; Response to Apr. 13, 2011 MSJ ¶ 12, at 5 (not disputing this fact).  The computer screen was covered with a plexi-glass shield "that made it difficult even for the corrections officer to view the information on the computer screen."  Apr. 13, 2011 MSJ ¶ 13, at 4 (setting forth this fact).  Accord Montoya Aff. ¶ 16, at 3; Response to Apr. 13, 2011 MSJ ¶ 13, at 5 (not disputing this fact).  The drop-down computer was situated such that no one other than a person sitting in the chair at the staff station desk could view the information on the computer screen.  See Apr. 13, 2011 MSJ ¶ 14, at 4 (setting forth this fact); Montoya Aff. ¶ 17, at 3; Response to Apr. 13, 2011 MSJ ¶ 14, at 5 (not disputing this fact).

Both Todd and Wilks were inmates in F-7 on January 13, 2008.  See Apr. 13, 2011 MSJ ¶ 15, at 4 (setting forth this fact); Montoya Aff. ¶¶ 18-19, at 3; Response to Apr. 13, 2011 MSJ ¶ 15, at 5 (not disputing this fact).  Wilks was at the MDC during the time period his fight with Todd occurred.  See Jan. 30, 2012 MSJ ¶ 1, at 3 (setting forth this fact); Deposition of Patrick Wilks at 14:10-12, 15:2-6 (dated September 23, 2011), filed January 30, 2012 (Doc. 94-1)("Wilks Depo.");  Plaintiff's Amended Response to Defendant Montoya's Renewed Motion for Summary Judgment

concerns are persuasive when evaluating the probative value of the evidence; and (ii) the circumstances of Montoya's resignation in light of the other evidence in the record make the inference of wrongdoing one can draw from his resignation a weak one.  See Gray v. Hoffman-La Roche, Inc., 82 F.App'x 639, 646-47 (10th Cir. 2003)(unpublished)(recognizing that, while the evidence at issue was "admissible under Rule 407," its "probative value was minimal").

[Doc. No. 94] ¶ 1, at 1, filed February 28, 2012 (Doc. 97)("Amended Response to Jan. 30, 2012 MSJ").  Wilks testified in his deposition that the fight occurred in 2006 rather than 2008.  <u>See</u> Amended Response to Jan. 30, 2012 MSJ ¶ 1, at 1 (setting forth this fact); Wilks Depo. at 11:17-13:3; Reply to Plaintiff's Response and Amended Response to Defendant Tomas Montoya's Renewed Motion for Summary Judgment Based upon Qualified Immunity and Other Grounds, filed March 22, 2012 (Doc. 104)("Reply to Response to Jan. 30, 2012 MSJ")(not disputing this fact). Wilks remembers that Montoya was the guard on duty the day the fight that involved Todd and Wilks took place.  <u>See</u> Jan. 30, 2012 MSJ ¶ 2, at 4 (setting forth this fact); Wilks Depo. at 44:20-45:1; Amended Response to Jan. 30, 2012 MSJ ¶ 2, at 1 (not disputing this fact).  Before the day of the fight, Todd and Wilks had never fought one another, had not argued with one another, or otherwise had any problems.  <u>See</u> Jan. 30, 2012 MSJ ¶ 3, at 4 (setting forth this fact); Wilks Depo. at 24:2-5; Amended Response to Jan. 30, 2012 MSJ ¶ 3, at 1 (not disputing this fact).  On the day the fight occurred, Todd and Wilks did not have any conversations with one another before the fight broke out.[6]  Before and at the time of the fight, Wilks had no knowledge of Todd's criminal or legal

---

[6]Montoya asserts, relying on Wilks' deposition, that Todd told Wilks "something smart," which offended Wilks; specifically, during mealtime, Todd told Wilks that he needed "to grow up and wait [his] turn, be patient and wait [your] turn."  Jan. 30, 2012 MSJ ¶ 4, at 4 (alterations in original)(quoting Wilks Depo. at 24:6-21).  Todd asserts that "no words were exchanged between him and Wilks prior to the fight, but that Wilks and Armijo just attacked him."  Amended Response to Jan. 30, 2012 MSJ ¶ 4, at 3.  Todd relies on his affidavit for this assertion, in which he states: "Prior to this attack, neither Wilks nor Armijo said anything to me and I did not say anything to them. They just attacked without warning."  Affidavit of Plaintiff Byron Todd ¶ 12, at 2 (executed February 28, 2012), filed February 28, 2012 (Doc. 97-1)("Todd Aff.").  This evidence specifically controverts Montoya's asserted fact, so the Court will consider it disputed whether Todd and Wilks had any conversations with one another before the fight broke out.

Montoya asserts that, regardless of which event occurred, these facts are not relevant to the disposition summary judgment.  <u>See</u> Reply to Response to Jan. 30, 2012 MSJ at 2.  "Whether this fact is relevant is a legal argument" that the Court "will consider in its legal analysis."  <u>Wilson v. Jara</u>, 2011 WL 5822729, at *2 n.7.

background, except that Todd had told Wilks that he had been in the penitentiary.  See Jan. 30, 2012

MSJ ¶ 9, at 4 (setting forth this fact); Wilks Depo. at 48:20-49:7.[7]

---

[7]Todd attempts to dispute this asserted fact, citing his response to Montoya's asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 9, at 4 ("Plaintiff disputes. See Response to ¶ 4, above.").  Todd's response to paragraph 4 of the Jan. 30, 2012 MSJ is approximately two pages long and refers to at least seven different exhibits.  See Amended Response to Jan. 30, 2012 MSJ ¶ 4, at 2-3.  Todd provides no explanation why his response to paragraph 4 of the Jan. 30, 2012 MSJ controverts the asserted fact in paragraph 9 of the Jan. 30, 2012 MSJ.  D.N.M.LR-Civ. 56.1(b) requires that a party responding to a motion for summary judgment "must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  Additionally, "it is not the Court's responsibility to scour the record for evidence to defeat [a] Motion for Summary Judgment."  Gonzales v. City of Albuquerque, No. 09-0520, 2011 WL 1114830, at *24 (D.N.M. Mar. 23, 2011)(Browning, J.).  Accord Hauff v. Petterson, 755 F.Supp.2d 1138, 1150 (D.N.M. 2010)(Kelly, J.)("Nor is it the court's function to 'scour the record in search of evidence to defeat a motion for summary judgment.'" (quoting Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996))).

Nevertheless, the Court will address the evidence Todd has presented in his response to paragraph 4 of the Jan. 30, 2012 MSJ.  First, Todd cites portions of Armijo's deposition that refer to Armijo and another inmate confronting Todd, because they did not like his attitude.  See Armijo Depo. at 14:11-20, 22:23-31:11.  Nothing about that evidence specifically controverts the asserted fact that, before and at the time of the fight, Wilks had no knowledge of Todd's criminal or legal background, except that Todd had told Wilks that he had been in the penitentiary.  See D.N.M.LR-Civ. 56.1(b).  Second, Todd cites a portion of Wilks' deposition where Wilks relates that he attacked Todd, because Todd said offensive things to him.  See Wilks Depo. at 4:26-23.  Nothing about that evidence specifically controverts this asserted fact.  See D.N.M.LR-Civ. 56.1(b).  Third, Todd relies on the handwritten statement in the Voluntary Statement that is allegedly attributable to Wilks.  See Voluntary Statement at 1.  As the Court has explained before, see note 5, supra, this evidence is hearsay, not within any exception, upon which the Court cannot rely.  Fourth, Todd relies on the Jan. 15, 2008 Letter with a statement attributable to Todd where an officer relates that Todd said that Montoya showed other prisoner's his criminal history on the computer screen.  See Jan. 15, 2008 Letter at 1.  As the Court has already discussed, this statement attributable to Todd is hearsay that does not fall within any exception.  See note 1, supra.  Fifth, Todd relies on a statement from Ainsworth in Ainsworth's affidavit where he relates that Wilks told him that Montoya instructed him to beat Todd.  See Ainsworth Aff. ¶ 8, at 1.  As the Court has already discussed, this statement that is attributable to Wilks is hearsay that does not fall within any exception.  See note 5, supra.  Sixth, Todd relies on his own affidavit where he states that Wilks related, shortly after the altercation, that "Defendant Montoya showed him my criminal history on the computer."  Todd Aff. ¶ 15, at 2.  Todd makes other similar statements: (i) "Officer Gallardo told me that in Mr. Wilks['] statement he admitted that Defendant Montoya showed him my criminal history"; and (ii) "Officer Gallardo also informed me that he spoke to Officer Montoya, who admitted to either showing or telling Mr. Wilks my criminal history."  Todd Aff. ¶¶ 18-19, at 2.  Montoya objects to the use of these statements as hearsay.  See Reply to Response to Jan. 30, 2012 MSJ at 3 ("This alleged statement is inadmissible

Armijo was at the MDC at the time of the fight.  See Jan. 30, 2012 MSJ ¶ 29, at 6 (setting

forth this fact); Deposition of Joseph Armijo at 5:14-22, 14:3-10 (taken November 29, 2011), filed

January 30, 2012 (Doc. 94-5)("Armijo Depo."); Amended Response to Jan. 30, 2012 MSJ ¶ 29, at

5 (not disputing this fact).  Todd was a mentor in "God's pod," a place for religious studies for

inmates.  Jan. 30, 2012 MSJ ¶ 30, at 6 (setting forth this fact).  Accord Armijo Depo. at 16:1-11;

Amended Response to Jan. 30, 2012 MSJ ¶ 30, at 5 (not disputing this fact).  According to Armijo,

Todd was acting "like he was a bad ass" and let being a mentor "go to his head."  Jan. 30, 2012 MSJ

¶ 31, at 7 (setting forth this fact).  Accord Armijo Depo. at 23:10-21; Amended Response to Jan. 30,

---

hearsay. . . . Plaintiff also attests in his affidavit to double and triple hearsay statements allegedly coming from a detention center officer whose Name Plaintiff does not recall . . . .").  As Montoya correctly observes, these statements are all double or triple hearsay, and thus not admissible, and Todd has not argued that they fall within any exception.  See Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); Evans v. Technologies Applications & Serv. Co., 80 F.3d at 962 ("Federal Rule of Civil Procedure 56(e) specifically requires that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge."); United States v. Bradshaw, 787 F.2d at 1392 ("Instead, appellant's motion for new trial was based on an affidavit of counsel which contained nothing more reliable than double hearsay obtained from appellant's own brother.").  Sixth, Todd relies on Montoya resigning from his job to controvert this asserted fact.  D.N.M.LR-Civ. 56.1(b) provides: "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56.1(b).  While Montoya does not dispute that he resigned because of this fight, that evidence does not specifically controvert Montoya's asserted fact that, at the time of the fight, Wilks had no knowledge of Todd's criminal or legal background, except for Todd having told Wilks that he had been in the penitentiary.  Even when viewing the facts in the light most favorable to Todd and drawing all reasonable inferences in Todd's favor, the mere fact that Montoya resigned from his job is too tenuously connected to the asserted fact to specifically controvert the asserted fact.  Seventh, Todd relies on the Inter-Office Correspondence from Montoya to Christopher Sanchez wherein Montoya states that Wilks and Armijo attacked Todd without provocation.  See Inter-Office Correspondence from Corrections Officer Tomas Montoya to Sergeant Christopher Sanchez at 1 (dated January 13, 2008), filed April 13, 2011 (Doc. 61-4)("Inter-Office Correspondence").  That evidence does not specifically controvert the asserted fact.  Thus, the Court deems this fact admitted.

-15-

2012 MSJ ¶ 31, at 5 (not disputing this fact).[8]  "Inmates wanted to know why Todd 'was acting like

he was a bad ass,' i.e., what charges he was in prison for."  Jan. 30, 2012 MSJ ¶ 32, at 7 (setting

forth this fact).  Accord Armijo Depo. at 23:10-25; Amended Response to Jan. 30, 2012 MSJ ¶ 32,

at 5 (not disputing this fact).  "Armijo found out from an 'an outside source' that Plaintiff had 'rape

charges.'"  Jan. 30, 2012 MSJ ¶ 33, at 7 (setting forth this fact).  Accord Armijo Depo. at 24:9-20;

Amended Response to Jan. 30, 2012 MSJ ¶ 33, at 5-6 (not disputing this fact).[9]  The outside source

was someone's relative who was not in the MDC.  See Jan. 30, 2012 MSJ ¶ 34, at 7 (setting forth

this fact); Armijo Depo. at 24:9-20; Amended Response to Jan. 30, 2012 MSJ ¶ 34, at 6 (not

disputing this fact).[10]  The outside source was not an MDC employee.  See Jan. 30, 2012 MSJ ¶ 35,

---

[8]Todd asserts that he disputes this asserted fact "to the extent Armijo testified this is the main or sole reason for the fight."  Amended Response to Jan. 30, 2012 MSJ ¶ 31, at 5.  Montoya has not presented as an asserted fact that Todd's conduct in this manner was the main or sole reason for the fight.  Thus, given that Montoya has not presented such an asserted fact, there is no dispute over the asserted fact that, according to Armijo, Todd was acting "like he was a bad ass" and let being a mentor "go to his head."  Jan. 30, 2012 MSJ ¶ 31, at 7.

[9]Todd does not dispute the asserted fact, but states that he "disputes this paragraph to the extent it suggests Armijo did not find out or confirm the charges with Montoya, either directly or through Wilks."  Amended Response to Jan. 30, 2012 MSJ ¶ 33, at 5-6.  To dispute this fact, he cites his response to Montoya's asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 33, at 5-6 ("See Response to ¶ 4, above.").  The Court has already set out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay which does not fall within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted fact.  The Court deems the asserted fact admitted.

[10]Todd does not dispute the asserted fact, but states that he "disputes this paragraph to the extent it suggests Armijo did not find out or confirm the charges with Montoya, either directly or through Wilks."  Amended Response to Jan. 30, 2012 MSJ ¶ 34, at 5-6.  To dispute this fact, he cites his response to Montoya's asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 34, at 6 ("See Response to ¶ 4, above.").  The Court has already set out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining

-16-

at 7 (setting forth this fact); Armijo Depo. at 64:1-7; Amended Response to Jan. 30, 2012 MSJ ¶ 35, at 6 (not disputing this fact).[11]  The outside source informed Armijo that Todd was on a sex-offender website.  _See_ Jan. 30, 2012 MSJ ¶ 36, at 7 (setting forth this fact); Armijo Depo. at 55:12-21; Amended Response to Jan. 30, 2012 MSJ ¶ 36, at 6 (not disputing this fact).[12]

At some point during the shift on January 13, 2008, Wilks approached Montoya while both men were standing on the floor level of the area below and outside the confines of the staff station.  _See_ Apr. 13, 2011 MSJ ¶ 16, at 4 (setting forth this fact); Montoya Aff. ¶ 20, at 3.[13]  Wilks asked Montoya if Todd was a "chester."  Apr. 13, 2011 MSJ ¶ 17, at 4 (setting forth this fact).  _Accord_ Montoya Aff. ¶ 21, at 3;  Response to Apr. 13, 2011 MSJ ¶ 17, at 5 (not disputing this fact).  Montoya interpreted Wilks' use of the phrase chester to mean that Wilks was asking if Todd was a child molester.  _See_ Apr. 13, 2011 MSJ ¶ 17, at 4-5 (setting forth this fact); Montoya Aff. ¶ 22, at 3;  Response to Apr. 13, 2011 MSJ ¶ 17, at 5 (not disputing this fact).  Montoya told Wilks "that he did not know."  Apr. 13, 2011 MSJ ¶ 17, at 5 (setting forth this fact).  _Accord_ Montoya Aff. ¶ 22,

---

evidence does not specifically controvert the asserted fact.  The Court deems the asserted fact admitted.

[11]Todd repeats his response to the previous two asserted facts.  _See_ Amended Response to Jan. 30, 2012 MSJ ¶ 35, at 6 ("_See_ Responses to ¶¶ 33 and 34, above.").  For the same reasons, the Court concludes that Todd has not successfully disputed any portion of this fact.

[12]Todd repeats his response to the previous two asserted facts.  _See_ Amended Response to Jan. 30, 2012 MSJ ¶ 36, at 6 ("_See_ Responses to ¶¶ 33 and 34, above.").  For the same reasons, the Court concludes that Todd has not successfully disputed any portion of this fact.

[13]Todd attempts to dispute the asserted fact by relying on the handwritten statement in the Voluntary Statement.  _See_ Response to Apr. 13, 2011 MSJ ¶ 16, at 5.  This statement, which is allegedly attributable to Wilks, provides: "I found [Todd's] charges by a CO Montoya I saw [sic] them on the computer."  Voluntary Statement at 1.  The Court has already determined that this statement is hearsay that does not fall within any exception.  _See_ note 5, _supra_.  Thus, the Court will not rely on this evidence.  The Court deems Montoya's asserted fact admitted.

-17-

at 3.[14]  Wilks then walked away from and departed the staff station area.  See Apr. 13, 2011 MSJ

¶ 18, at 5 (setting forth this fact); Montoya Aff. ¶ 24, at 4;  Response to Apr. 13, 2011 MSJ ¶ 18, at

5 (not disputing this fact).  Other than Todd's statement to him, Wilks had no other knowledge of

Todd's criminal history.  See Jan. 30, 2012 MSJ ¶ 10, at 4 (setting forth this fact); Wilks Depo. at

49:5-7.[15]  Other than to tell Wilks that he did not know if Todd was a chester, Montoya did not

verbally tell Wilks about any charges or other information regarding Todd.[16]  Other than to ask

---

[14]Todd attempts to dispute this asserted fact by relying on the handwritten statement in the
Voluntary Statement.  See Response to Apr. 13, 2011 MSJ ¶ 17, at 5.  The Court has already
determined that this statement is hearsay that does not fall within any exception.  See note 5, supra.
Thus, the Court cannot properly rely on this evidence.  The Court deems Montoya's asserted fact
admitted.

[15]Once again, Todd attempts to dispute the asserted fact by citing his response to Montoya's
asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ
¶ 10, at 4 ("Plaintiff disputes.  See Response to ¶ 4, above.").  Todd's response to paragraph 4 of the
Jan. 30, 2012 MSJ is approximately two pages long and refers to at least seven different exhibits.
See Amended Response to Jan. 30, 2012 MSJ ¶ 4, at 2-3.  Todd provides no explanation why his
response to paragraph 4 of the Jan. 30, 2012 MSJ controverts the asserted fact in paragraph 9 of the
Jan. 30, 2012 MSJ.  D.N.M.LR-Civ. 56.1(b) requires that a party responding to a motion for
summary judgment "must refer with particularity to those portions of the record upon which the
non-movant relies."  D.N.M.LR-Civ. 56.1(b).
    The Court has already set out the contents of the evidence upon which Todd relies numerous
times.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.
As the Court has already held, much of that evidence is hearsay that does not fall within any
exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted
fact.  The Court deems the asserted fact admitted.

[16]Montoya presents an asserted fact that he never verbally told Wilks about any charges or
other information regarding Todd.  See Jan. 30, 2012 MSJ ¶ 25, at 6 (citing Wilks Depo. at 46:15-
19, 57:6-13).  It is worth noting that this statement is in tension with Montoya's previous asserted
facts relating that, in response to a question from Wilks asking whether Todd was a chester,
Montoya responded that he did not know.  See Apr. 13, 2011 MSJ ¶ 17, at 4-5.  Thus, the Court will
modify Montoya's asserted fact to reflect that Montoya said that he did not know if Todd was a
chester.  This version of events is more favorable to Todd than if Montoya had never had any
communications with Wilks regarding Todd.
    Todd also attempts to dispute this asserted fact by citing his responses to Montoya's asserted
facts in previous paragraphs of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012
MSJ ¶ 25, at 5.  The Court has already set out the contents of that evidence upon which Todd relies.

-18-

Montoya if Todd was a chester, Wilks did not ask Montoya about Todd's criminal charges.[17]

After Wilks left the staff station area, Montoya began to attempt to access the MDC records on Todd on the staff station computer.  See Apr. 13, 2011 MSJ ¶ 19, at 5 (setting forth this fact); Montoya Aff. ¶ 25, at 4.[18]  A few minutes later, while Montoya was sitting down attempting to access the MDC records on Todd on the staff station computer, Wilks used his arms to raise his upper torso over the six-foot wall for about ten seconds; Wilks was peering over the six-foot wall on the right side of the staff station trying to view the computer terminal screen.  See Apr. 13, 2011 MSJ ¶ 20, at 5 (setting forth this fact); Montoya Aff. ¶ 26, at 4.[19]  Montoya "quickly scooted back

_____

Todd does not explain why these exhibits controvert this asserted fact.  See note 7, supra.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  The remaining evidence does not specifically controvert the asserted fact.

[17]Montoya asserts that Wilks never asked him about Todd's criminal charges.  See Jan. 30, 2012 MSJ ¶ 26, at 6 (citing Wilks Depo. at 46:15-19).  As Todd correctly points out, this statement is in tension with Montoya's previous asserted facts that Wilks asked Montoya if Todd was a chester.  See Amended Response to Jan. 30, 2012 MSJ ¶ 26, at 5.  Thus, the Court will modify Montoya's asserted fact to reflect that Wilks asked Montoya if Todd was a chester.

Todd also attempts to dispute this asserted fact by citing his responses to Montoya's asserted facts in previous paragraphs of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 26, at 5.  Montoya states in the Montoya Interview: "Like I remember him jumping onto like the staff station and looking, but there was nothing on the computer that he could have looked at."  Montoya Interview at 2.  That evidence does not specifically controvert the asserted fact.  The Court has already set out the contents of the other evidence upon which Todd relies.  See note 1, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  The remaining evidence does not specifically controvert the asserted fact.

[18]Todd attempts to dispute this asserted fact by relying on the handwritten statement in the Voluntary Statement.  See Response to Apr. 13, 2011 MSJ ¶ 19, at 5.  The Court has already determined that this statement is hearsay that does not fall within any exception.  Thus, the Court cannot rely on this evidence.  The Court deems Montoya's asserted fact admitted.

[19]Todd attempts to dispute this asserted fact by relying on several pieces of evidence.  See Response to Apr. 13, 2011 MSJ ¶ 20, at 5.  Notably, other than citing to four different exhibits and stating that he "denies these allegations," Todd provides no explanation why the cited evidence, or which portions of the evidence, controvert Montoya's asserted fact.  Response to Apr. 13, 2011 MSJ

-19-

¶ 20, at 5.  D.N.M.LR-Civ. 56.1(b) requires that a party responding to a motion for summary judgment "must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).

First, Todd relies on the handwritten statement in the Voluntary Statement.  See Response to Apr. 13, 2011 MSJ ¶ 20, at 5 (citing Voluntary Statement at 1).  The Court has already determined that this statement is hearsay that does not fall within any exception.  See note 5, supra.  Thus, the Court cannot properly rely on this evidence.  Second, Todd relies on the statement attributable to Todd in the Jan. 15, 2008 Letter to the effect that Montoya showed other inmates Todd's criminal history.  See Response to Apr. 13, 2011 MSJ ¶ 20, at 5 (citing Jan. 15, 2008 Letter at 1).  The Court has already determined that the statement attributable to Todd in the Jan. 15, 2008 Letter is hearsay which does not fall within any exception.  See note 1, supra.  Thus, the Court cannot rely on this evidence.  Third, Todd relies on Ainsworth's affidavit wherein Ainsworth states that Wilks related to him that a correctional officer instructed him to attack Todd.  See Response to Apr. 13, 2011 MSJ ¶ 20, at 5 (citing Ainsworth Aff. at 1).  The Court has already determined that this statement relating what Wilks said to Ainsworth is hearsay, and that statement does not fall within any exception.  See note 5, supra.  Thus, the Court will not consider this evidence.  Fourth, Todd relies on a letter from Sanchez to Captain Jonathan Thomas wherein Sanchez relates some of what occurred in the incident where Todd was beaten.  See Letter from Sergeant Christopher Sanchez to Captain Jonathan Thomas at 1-2 (dated January 13, 2008), filed May 23, 2011 (Doc. 67-6)("Jan. 13, 2008 Letter").  In the Jan. 13, 2008 Letter, Sanchez states: "Inmate Todd made a statement in which he accused CO Montoya of abusing the pod radio and showing his charges to inmate Wilks."  Jan. 13, 2008 Letter at 2.  Montoya objects to this statement as hearsay.  See Reply to Response to Apr. 13, 2011 MSJ at 2 ("The same is true of that portion of Exhibit 6 to Plaintiff's Response used to support his contention that Defendant Montoya showed Plaintiff's charges to inmate Wilks.").  Todd has not laid any foundation to support a finding that this evidence falls within a hearsay exception -- such as the business-records exception.  See United States v. Ary, 518 F.3d at 786 ("The proponent of the document must also lay this foundation for its admission.").  Nevertheless, the letter appears to meet the criteria for a business record, and Montoya has not objected to the letter on this basis.  A business record requires that: (i) "the record was made at or near the time by -- or from information transmitted by -- someone with knowledge"; (ii) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (iii) "making the record was a regular practice of that activity"; and (iv) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification"; and (v) "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 806(6).  The letter is dated January 13, 2008, which is the day of the incident, which indicates that the record "was made at or near the time by . . . someone with knowledge."  Fed. R. Evid. 806(6)(i).  Drawing all reasonable inferences in Todd's favor, it appears that keeping and making records investigating fights or potential misconduct by staff members would be done in the regular course of managing a prison.  See United States v. Frazier, 53 F.3d at 1110 ("Our review of the record convinces us the audit report qualifies in all respects as a business record."); Crimm v. Mo. Pac. R.R., 750 F.2d at 709 ("MoPac had a written policy requiring that in an investigation of sexual harassment the conversations of those interviewed 'should be documented

his chair a little and told Wilks, 'You need to get off the staff station.'"  Apr. 13, 2011 MSJ ¶ 21,

at 5 (setting forth this fact).  Accord Montoya Aff. ¶ 27, at 4.[20]  After a few seconds, Wilks complied

---

through written memoranda.'  Shoener was directed to conduct an investigation and to prepare such memoranda.").  There is no one providing testimony showing that all these conditions to qualify as a business record are met, but Montoya has not objected to the letter on this basis.  Lastly, there do not appear to be circumstances that indicate that the letter itself is untrustworthy.

Nevertheless, much like the statement in the Jan. 15, 2008 Letter, the Jan. 13, 2008 Letter contains another layer of hearsay -- the statement that Todd allegedly made -- that does not fall within any exception.  See United States v. Blechman, 657 F.3d at 1065 ("Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person."); 4 S. Saltzburg, M. Martin, D. Capra, supra § 805.02, at 805-2 ("Sometimes a hearsay statement includes, or repeats, one or more other hearsay statements. When this occurs, in order for the statement to be admitted into evidence, there must be an applicable hearsay exception or exemption for each level of hearsay.").  Professor Saltzburg similarly illustrates this principle:

> Consider, for example, the following illustration: an insurance investigator goes to the scene of an accident and takes the statement of one of several persons involved in the accident.  The witness admits fault, taking the entire blame for the accident.  Suppose the police charge another person with reckless driving, and the witness is unavailable at trial.  If the investigator is also unavailable, an offer of a report by the investigator concerning the witness' statement would have to overcome two hearsay hurdles: one for the out-of-court statement of the witness who admitted fault, and one for the investigator's statement (the report).  Probably the witness' statement is a declaration against interest.  However, the second hearsay hurdle is not overcome unless the investigator's report meets the requirement of the exception for regularly conducted business activities.

4 S. Saltzburg, M. Martin, D. Capra, supra § 805.02, at 805-2.  Thus, the Court cannot properly consider this evidence.  Consequently, Todd has presented no competent evidence to rebut Montoya's asserted fact.  The Court deems Montoya's asserted fact admitted.

[20]Todd attempts to dispute this asserted fact by repeating his response to Montoya's asserted fact in paragraph 20 of the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011 MSJ ¶ 21, at 5 ("Same response as paragraph 20.").  Todd provides no further explanation regarding which portion of his exhibits upon which he intends to rely.  D.N.M.LR-Civ. 56.1(b) requires that a party responding to a motion for summary judgment "must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  The Court has already determined that the evidence upon which Todd intends to rely within the Voluntary Statement, the Jan. 15, 2008 Letter, the Ainsworth Aff., and the Jan. 13, 2008 Letter are hearsay.  See note 5, supra.  Thus, the Court cannot rely upon those portions of that evidence.  The Court has looked through the remainder of these exhibits and, without any guidance from Todd regarding what portions of these

and left the staff station area.  See Apr. 13, 2011 MSJ ¶ 21, at 5 (setting forth this fact); Montoya

Aff. ¶ 28, at 4.[21]

From his vantage point or angle on top of the wall, Wilks had a limited view of the

information contained on the computer screen.  See Apr. 13, 2011 MSJ ¶ 22, at 5 (setting forth this

fact); Montoya Aff. ¶ 29, at 4.[22]  Wilks looked at the computer located on the desk of the corrections

─────────────────

exhibits to consider, concludes that no other portions of these exhibits specifically controvert
Montoya's asserted fact.  D.N.M.LR-Civ. 56.1(b) provides: "All material facts set forth in the
Memorandum will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ.
56.1(b).  Thus, the Court deems this asserted fact admitted.

[21]Todd attempts to dispute this asserted fact by repeating his response to Montoya's asserted
fact in paragraph 20 of the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011 MSJ ¶ 21, at 5
("Same response as paragraph 20.").  Todd provides no further explanation regarding which portion
of his exhibits upon which he intends to rely.  D.N.M.LR-Civ. 56.1(b) requires that a party
responding to a motion for summary judgment "must refer with particularity to those portions of the
record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  The Court has already
determined that the evidence upon which Todd intends to rely within the Voluntary Statement, the
Jan. 15, 2008 Letter, the Ainsworth Aff., and the Jan. 13, 2008 Letter are hearsay.  See note 5, supra.
Thus, the Court cannot properly rely upon those portions of that evidence.  The Court has looked
through the remainder of these exhibits and, without any guidance from Todd regarding what
portions of these exhibits to consider, concludes that no other portions of these exhibits specifically
controvert Montoya's asserted fact.  D.N.M.LR-Civ. 56.1(b) provides: "All material facts set forth
in the Memorandum will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ.
56.1(b).  Thus, the Court deems this asserted fact admitted.

[22]Once again, Todd attempts to dispute this asserted fact by repeating his response to
Montoya's asserted fact in paragraph 20 of the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011
MSJ ¶ 22, at 5 ("Same response as paragraph 20.").  As the Court has already stated, see note 19,
supra, reliance on the hearsay statements in theses exhibits is not appropriate.  The Court has looked
through the remainder of these exhibits and, without any guidance from Todd regarding what
portions of these exhibits to consider, concludes that no other portions of these exhibits specifically
controvert Montoya's asserted fact.  Thus, the Court deems admitted the asserted fact that, from his
vantage point or angle on top of the wall, Wilks had a limited view of the information contained on
the computer screen.

    In a separate location in his Response to Apr. 13, 2011 MSJ, Todd relates that Wilks looked
at the computer screen when he jumped up on this staff station.  For this assertion, he relies upon
an excerpt from an interview of Montoya, in which Montoya states: "Like I remember him jumping
onto like the staff station and looking, but there was nothing on the computer that he could have
looked at." Montoya Interview at 2.  The Court does not see any of these pieces of evidence as in

officer.[23]  Wilks came close to the desk of the corrections officer.[24]

When Wilks was on the staff station wall, Montoya had not yet viewed any MDC records for Todd related to Todd's legal or criminal history.  See Apr. 13, 2011 MSJ ¶ 23, at 5 (setting forth this fact); Montoya Aff. ¶ 30, at 4.[25]  Wilks did not see or view information on Todd from the computer screen.  See Jan. 30, 2012 MSJ ¶ 24, at 6 (setting forth this fact); Wilks Depo. at 45:20-

_____

conflict regarding whether Wilks could see any information on the computer screen -- although it is a reasonable inference to draw in Todd's favor that Wilks attempted to look at the computer screen.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).  Montoya, in his asserted fact, essentially presents this scenario -- that Wilks tried to look at the computer screen but could not have seen anything.

[23]Montoya asserts that Wilks never looked at the computer located on the desk of the corrections officer.  See Jan. 30, 2012 MSJ ¶ 21, at 6 (citing Wilks Depo. at 27:17-25, 45:20-23).  Todd attempts to dispute this fact, relying on evidence from the Montoya Interview.  See Amended Response to Jan. 30, 2012 MSJ ¶ 21, at 4-5.  Montoya states in the Montoya Interview: "Like I remember him jumping onto like the staff station and looking, but there was nothing on the computer that he could have looked at."  Montoya Interview at 2.  While, given many of the parties' other asserted facts, it may be that Wilks looked at the computer screen and never saw anything, this evidence from the Montoya Interview specifically controverts the asserted fact.

[24]Montoya asserts that Wilks never came close to the corrections officer's desk.  See Jan. 30, 2012 MSJ ¶ 22, at 6 (citing Wilks Depo. at 27:17-25).  Todd attempts to dispute this fact, relying on evidence from the Montoya Interview.  See Amended Response to Jan. 30, 2012 MSJ ¶ 22, at 5.  Montoya states in the Montoya Interview: "Like I remember him jumping onto like the staff station and looking, but there was nothing on the computer that he could have looked at."  Montoya Interview at 2.  Viewing the facts in the light most favorable to Todd and drawing all reasonable inferences in his favor, this evidence is sufficient to specifically controvert this asserted fact.  Accordingly, the Court will adopt Todd's statement as true.

[25]Once again, Todd attempts to dispute this asserted fact by repeating his response to Montoya's asserted fact in paragraph 20 of the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011 MSJ ¶ 23, at 5 ("Same response as paragraph 20.").  As the Court has already stated, reliance on the hearsay statements in these exhibits is not appropriate.  See note 19, supra.  The Court has looked through the remainder of these exhibits and, without any guidance from Todd regarding what portions of these exhibits to consider, concludes that no other portions of these exhibits specifically controvert Montoya's asserted fact.  Thus, the Court deems this asserted fact admitted.

46:11.[26]  Montoya did not show Wilks any charges or other information regarding Todd.  See Jan.

30, 2012 MSJ ¶ 24, at 6 (setting forth this fact); Wilks Depo. at 46:12-14.[27]  Montoya did not

communicate to Wilks any information about Todd's criminal or legal history.  See Apr. 13, 2011

_____

[26]For this asserted fact, Montoya relies on Wilks' deposition, in which Wilks states, in response to a question whether he ever saw any information regarding Todd from the computer screen on the correction officer's desk: "No, sir.  Like I said before, Montoya does not allow that.  He's -- excuse my French, but he was an asshole about that, coming up to his desk like that."  Wilks Depo. at 45:24-46:3.  Todd attempts to dispute this asserted fact.  See Amended Response to Jan. 30, 2012 MSJ ¶ 23, at 5.  To do so, he relies on Montoya's affidavit and the Montoya Interview.  Montoya states in the Montoya Interview: "Like I remember him jumping onto like the staff station and looking, but there was nothing on the computer that he could have looked at."  Montoya Interview at 2.  That evidence does not controvert the asserted fact given that Montoya states that, while Wilks may have looked at the screen, "there was nothing on the computer that he could have looked at."  Montoya Interview at 2.  In his affidavit, Montoya states: "[Wilks] was peering over the six foot wall on the right side of the staff station trying to view the computer terminal screen."  Montoya Aff. ¶ 26, at 4.  That evidence does not support the proposition that Wilks saw anything on the computer screen, given that Montoya states that Wilks was trying to look at the computer screen, and Wilks specifically denies that he saw anything on the computer screen.  D.N.M.LR-Civ. 56.1(b) provides: "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56.1(b).  While Wilks may have tried to view something on the computer screen, he specifically denies that he saw anything.  The evidence on which Todd relies does not specifically controvert the asserted fact.  The Court also finds it notable that Wilks states in his deposition, in response to a question whether he ever got to look at the computer: "Heck, no.  Because if we did, it was -- it was -- we couldn't even come close to the -- you couldn't even come within a foot of that desk."  Wilks Depo. at 27:17-21.
Todd also attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 23, at 5.  The Court has already set out the contents of that evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted fact.

[27]Once again, Todd attempts to dispute this asserted fact by citing his responses to Montoya's asserted facts in previous paragraphs of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 24, at 5.  The Court has already set out the contents of that evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted fact.

MSJ ¶ 24, at 5 (setting forth this fact); Montoya Aff. ¶ 31, at 4.[28]  Wilks' actions on January 13,

2008, in trying to view the computer terminal screen from atop the six-foot wall was the only time

during Montoya's employment at MDC that an inmate had tried to view the computer terminal

screen located in the staff station.  See Apr. 13, 2011 MSJ ¶ 25, at 6 (setting forth this fact);

Montoya Aff. ¶ 32, at 4.[29]  Before Wilks' actions in trying to view the computer terminal screen

from atop the six-foot wall, Montoya had no concerns about any inmate attempting to view the

computer screen while he was attempting to access Todd's MDC records.  See Apr. 13, 2011 MSJ

¶ 26, at 6 (setting forth this fact); Montoya Aff. ¶ 33, at 4-5.[30]

---

[28]Once again, Todd attempts to dispute this asserted fact by repeating his response to
Montoya's asserted fact in paragraph 20 of the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011
MSJ ¶ 24, at 5 ("Same response as paragraph 20.").  As the Court has already stated, reliance on the
hearsay statements in these exhibits is not appropriate.  See note 19, supra.  The Court has looked
through the remainder of these exhibits and, without any guidance from Todd regarding what
portions of these exhibits to consider, concludes that no other portions of these exhibits specifically
controvert Montoya's asserted fact.  Thus, the Court deems this asserted fact admitted.

[29]Once again, Todd attempts to dispute this asserted fact by repeating his response to
Montoya's asserted fact in paragraph 20 of the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011
MSJ ¶ 25, at 5 ("Same response as paragraph 20.").  As the Court has already stated, reliance on the
hearsay statements in these exhibits is not appropriate.  See note 19, supra.  The Court has looked
through the remainder of these exhibits and, without any guidance from Todd regarding what
portions of these exhibits to consider, concludes that no other portions of these exhibits specifically
controvert Montoya's asserted fact.  Todd also asserts that this fact is not relevant.  See Response
to Apr. 13, 2011 MSJ ¶ 25, at 6.  "Whether this fact is relevant is a legal argument" that the Court
"will consider in its legal analysis."  Wilson v. Jara, 2011 WL 5822729, at *2 n.7.  Thus, the Court
deems this asserted fact admitted.

[30]Once again, Todd attempts to dispute this asserted fact by repeating his response to
Montoya's previous asserted facts in the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011 MSJ
¶ 26, at 5.  As the Court has already stated, reliance on the hearsay statements in these exhibits is
not appropriate.  See note 19, supra.  The Court has looked through the remainder of these exhibits
and, without any guidance from Todd regarding what portions of these exhibits to consider,
concludes that no other portions of these exhibits specifically controvert Montoya's asserted fact.
Furthermore, "[w]hether this fact is relevant is a legal argument" that the Court "will consider in its
legal analysis."  Wilson v. Jara, 2011 WL 5822729, at *2 n.7.  Thus, the Court deems this asserted
fact admitted.

Before the altercation involving Todd, Armijo did not see Wilks speaking to Montoya.  See Jan. 30, 2012 MSJ ¶ 44, at 8 (setting forth this fact); Armijo Depo. at 46:6-9; Amended Response to Jan. 30, 2012 MSJ ¶ 44, at 6 (not disputing this fact).  Armijo did not see anyone looking at the computer on the corrections officer's desk on the day of the fight.  See Jan. 30, 2012 MSJ ¶ 45, at 8 (setting forth this fact); Armijo Depo. at 46:16-18; Amended Response to Jan. 30, 2012 MSJ ¶ 45, at 6 (not disputing this fact).[31]  Armijo did not see or view any information regarding Todd on the computer at the guard station at any time.  See Jan. 30, 2012 MSJ ¶ 46, at 8 (setting forth this fact); Armijo Depo. at 64:24-65:4.[32]  The corrections officer on duty on the date of the fight did not show any charges or other information regarding Todd to Armijo.  See Jan. 30, 2012 MSJ ¶ 47, at 8 (setting forth this fact); Armijo Depo. at 65:10-13.[33]  The corrections officer on duty on the date of the fight did not verbally tell Armijo about any charges or other information regarding Todd.  See Jan. 30, 2012 MSJ ¶ 48, at 8 (setting forth this fact); Armijo Depo. at 65:14-17.[34]  The corrections

---

[31]Todd does not dispute the asserted fact, "but disputes that Wilks did not look or attempt to look at the computer."  Amended Response to Jan. 30, 2012 MSJ ¶ 44, at 6.  The asserted fact does not relate any information about Wilks, and there are various other asserted facts regarding whether Wilks looked at the computer screen.  Accordingly, there is essentially no dispute about this asserted fact.

[32]Todd attempts to dispute this asserted fact, relying on his response to several previously asserted facts.  See Amended Response to Jan. 30, 2012 MSJ ¶ 46, at 7.  For the same reasons the Court has stated throughout its presentation of these facts, the Court concludes that Todd has not successfully disputed any portion of this fact based on these exhibits.

[33]Todd attempts to dispute this asserted fact, relying on his response to several previously asserted facts.  See Amended Response to Jan. 30, 2012 MSJ ¶ 47, at 7.  For the same reasons the Court has stated throughout its presentation of these facts, the Court concludes that Todd has not successfully disputed any portion of this fact based on these exhibits.

[34]Todd attempts to dispute this asserted fact, relying on his response to several previously asserted facts.  See Amended Response to Jan. 30, 2012 MSJ ¶ 48, at 7.  For the same reasons the Court has stated throughout its presentation of these facts, the Court concludes that Todd has not successfully disputed any portion of this fact based on these exhibits.

officer on duty on the date of the fight did not instruct or direct Armijo to attack Todd. See Jan. 30, 2012 MSJ ¶ 48, at 8 (setting forth this fact); Armijo Depo. at 65:14-17.[35]

A couple of minutes after Wilks left the staff station area, a physical altercation took place involving Todd and Wilks; Montoya observed Todd and Wilks exchanging punches with their fists, and then saw them on the floor wrestling with one another. See Apr. 13, 2011 MSJ ¶ 27, at 6 (setting forth this fact); Montoya Aff. ¶¶ 34-35, at 5; Response to Apr. 13, 2011 MSJ ¶ 27, at 6 (not disputing this fact). During the fight, Wilks hit Todd in the face, wrestled with him, and put him in a headlock on the floor. See Jan. 30, 2012 MSJ ¶ 6, at 4 (setting forth this fact); Wilks Depo. at 24:22-25:2, 47:3-6; Amended Response to Jan. 30, 2012 MSJ ¶ 6, at 3 (not disputing this fact). Before the fight, neither Wilks nor Armijo said anything to Todd, and Todd did not say anything to them; Wilks and Armijo attacked Todd without provocation.[36]

During the altercation between Todd and Wilks, Montoya saw another inmate, Armijo, enter the altercation by kicking Todd in the facial area. See Apr. 13, 2011 MSJ ¶ 28, at 6 (setting forth this fact); Montoya Aff. ¶ 36, at 5; Response to Apr. 13, 2011 MSJ ¶ 28, at 6 (not disputing this

[35]Todd attempts to dispute this asserted fact, relying on his response to several previously asserted facts. See Amended Response to Jan. 30, 2012 MSJ ¶ 49, at 7. For the same reasons the Court has stated throughout its presentation of these facts, the Court concludes that Todd has not successfully disputed any portion of this fact based on these exhibits.

[36]Relying on Wilks' deposition, Montoya puts forward an asserted fact that Todd's comments offended Wilks and that Wilks hit Todd as a result of these comments. See Jan. 30, 2012 MSJ ¶¶ 5-6, at 4 (citing Wilks Depo. at 24:22-25:2, 47:3-6). Todd admits that a fight occurred, but disputes that the fight was the result of comments he made to Wilks. See Amended Response to Jan. 30, 2012 MSJ ¶ 6, at 3. Todd relies on his affidavit for this assertion, in which he states: "Prior to this attack, neither Wilks nor Armijo said anything to me and I did not say anything to them. They just attacked without warning." Todd Aff. ¶ 12, at 2. This evidence specifically controverts Montoya's asserted fact, so the Court will consider it disputed whether Todd may any comments that offended Wilks. Accordingly, construing the facts in the light most favorable to Todd, the Court adopts Todd's version of events for purposes of summary judgment.

fact).   Armijo and another inmate did not confront Todd before Wilks attacked Todd.[37]   Todd and

Armijo threw punches at one another.[38]   "Within seconds after the physical altercation began,

Defendant Montoya called a 'Code 32' on his radio communicator, indicating that an altercation or

'inmate fight' was taking place."   Apr. 13, 2011 MSJ ¶ 31, at 6 (setting forth this fact).   Accord

Montoya Aff. ¶ 39, at 5; Response to Apr. 13, 2011 MSJ ¶ 31, at 7 (not disputing this fact).   Guards

did not come immediately to break up the fight between Todd and Wilks, and the fight lasted for two

to three minutes before guards arrived.[39]   When the guards arrived, "MDC Sgt. Chris Sanchez and

five (5) MDC corrections officers entered F-7 and the altercation was broken up."   Apr. 13, 2011

MSJ ¶ 31, at 6-7 (setting forth this fact).   Accord Montoya Aff. ¶ 40, at 5; Response to Apr. 13, 2011

---

[37]Montoya asserts that the fight involving Todd began when Armijo and another inmate confronted Todd regarding his past criminal history and his presence on a sex-offender website.   See Jan. 30, 2012 MSJ ¶ 37, at 7 (citing Armijo Depo. at 28:1-12, 55:12-21).   Todd disputes this asserted fact, see Amended Response to Jan. 30, 2012 MSJ ¶ 37, at 6, relying upon Todd's Affidavit where Todd states: "Prior to this attack, neither Wilks nor Armijo said anything to me and I did not say anything to them.   They just attacked without warning," Todd Aff. ¶ 12, at 2.   This evidence is sufficient to specifically controvert the asserted fact.   Accordingly, construing the facts in the light most favorable to Todd, the Court adopts Todd's version of events for purposes of summary judgment.

[38]Montoya asserts that Todd and Armijo began arguing and then started throwing punches at one another.   See Jan. 30, 2012 MSJ ¶ 38, at 7 (citing Armijo Depo. at 29:2-9).   Once again relying on Todd's affidavit, Todd disputes the portion of this asserted fact that Todd and Armijo first argued before throwing punches.   That evidence is sufficient to specifically controvert that portion of the asserted fact.   Accordingly, construing the facts in the light most favorable to Todd, the Court adopts Todd's version of events for purposes of summary judgment.

[39]Montoya asserts that "MDC guards came into the pod 'instantly' to break up the fight." Jan. 30, 2012 MSJ ¶ 7, at 4 (citing Wilks Depo. at 31:7-8).   Todd disputes this asserted fact by relying on Armijo's deposition testimony where Armijo testified that the fight lasted two to three minutes before corrections officers stopped the fight.   See Amended Response to Jan. 30, 2012 ¶ 7, at 3 (citing Deposition of Joseph Armijo at 29:20-25 (taken November 29, 2011), filed January 30, 2012 (Doc. 94-5)("Armijo Depo.")).   This evidence specifically controverts Montoya's asserted fact, so the Court will consider it disputed whether Todd may any comments that offended Wilks. Accordingly, construing the facts in the light most favorable to Todd, the Court adopts Todd's version of events for purposes of summary judgment.

MSJ ¶ 31, at 7 (not disputing this fact).  These guards placed Todd and Wilks in restraints, and escorted them out of F-7 for medical treatment.  See Apr. 13, 2011 MSJ ¶ 32, at 7 (setting forth this fact); Montoya Aff. ¶ 41, at 5; Response to Apr. 13, 2011 MSJ ¶ 32, at 7 (not disputing this fact). After the guards took Wilks for medical treatment, they placed him in a segregation unit.  See Jan. 30, 2012 MSJ ¶ 8, at 4 (setting forth this fact); Wilks Depo. at 47:20-22; Amended Response to Jan. 30, 2012 MSJ ¶ 8, at 4 (not disputing this fact).

During the time he was in segregation, Wilks did not speak with anyone regarding Todd's criminal or legal background.  See Jan. 30, 2012 MSJ ¶ 11, at 4 (setting forth this fact); Wilks Depo. at 48:20-23.[40]  Montoya did not instruct or direct Wilks to attack Todd.  See Jan. 30, 2012 MSJ ¶ 27, at 6 (setting forth this fact); Wilks Depo. at 46:19-21.[41]  The fight between Wilks and Todd had nothing to do with Montoya.  See Jan. 30, 2012 MSJ ¶ 28, at 6 (setting forth this fact); Wilks Depo. at 46:22-47:6, 57:6-13.[42]

---

[40]Once again, Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 11, at 4 ("Plaintiff disputes.  See Response to ¶ 4, above.").  The Court has already set out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted fact.  The Court deems the asserted fact admitted.

[41]Once again, Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 27, at 5 ("Plaintiff disputes.  See Response to ¶ 4, above.").  The Court has already set out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted fact.  The Court deems the asserted fact admitted.

[42]Once again, Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 27, at 5 ("Plaintiff disputes.  See Response to ¶ 4, above . . . .").  The Court has already set out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why

Armijo was not near the staff station at any time on January 13, 2008, including when Montoya was trying to access Todd's MDC files. See Apr. 13, 2011 MSJ ¶ 29, at 6 (setting forth this fact); Montoya Aff. ¶ 37, at 5; Response to Apr. 13, 2011 MSJ ¶ 29, at 6 (not disputing this fact). Montoya never communicated to Armijo any information about Todd's criminal or legal history. See Apr. 13, 2011 MSJ ¶ 30, at 6 (setting forth this fact); Montoya Aff. ¶ 38, at 5.[43] After

these exhibits controvert this asserted fact. As the Court has already held, much of that evidence is hearsay that does not fall within any exception. See note 7, supra. The remaining evidence does not specifically controvert the asserted fact. The Court deems the asserted fact admitted.

Todd also attempts to dispute this fact by relying on the fact of Montoya's resignation. D.N.M.LR-Civ. 56.1(b) provides: "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b). While Montoya does not dispute that he resigned because of this fight, that evidence does not specifically controvert Montoya's asserted fact that the fight between Wilks and Todd had nothing to do with Montoya. To support the asserted fact, Montoya relies on evidence from Wilks' deposition. See Jan. 30, 2012 MSJ ¶ 28, at 6. In his deposition, Wilks testified, in response to a question whether "the fight between [himself] and Mr. Todd" had "anything to do with Mr. Montoya's conduct," "No. It had something to do with my personal conduct." Wilks Depo. at 46:22-47:2. Even when viewing the evidence of Montoya's resignation in the light most favorable to Todd and drawing all reasonable inferences in Todd's favor, the mere fact that Montoya resigned from his job is not sufficient to specifically controvert Wilks' direct assertion that the fight between Wilks and Todd had nothing to do with Montoya. The Court takes into account that Montoya has successfully objected to all evidence Todd has presented to the effect that Montoya showed or communicated to Wilks Todd's criminal history. Thus, the Court deems the asserted fact admitted.

[43]Todd attempts to dispute this asserted fact stating that "[b]ased on the available information . . . the MDC investigation reveals that inmate Armijo helped inmate Wilks attack Plaintiff," and that "[i]t can be inferred from this . . . that Montoya either directly told Armijo or told Wilks with the intent that he would relay the information to Armijo." Response to Apr. 13, 2011 MSJ ¶ 30, at 5-6. To dispute this asserted fact, Todd relies on four of the same exhibits on which he has relied previously: the Voluntary Statement, the Jan. 15, 2008 Letter, the Ainsworth Aff., and the Jan. 13, 2008 Letter. As the Court has already stated, reliance on the hearsay statements in these exhibits is not appropriate. See note 5, supra. The Court has looked through the remainder of these exhibits and, without any guidance from Todd regarding what portions of these exhibits to consider, concludes that no other portions of these exhibits specifically controvert Montoya's asserted fact.

Additionally, Todd relies upon what he refers to as "Exhibit 7." Response to Apr. 13, 2011 MSJ ¶ 30, at 5-6. There is no Exhibit 7 attached to his Response to Apr. 13, 2011 MSJ. There are no other portions of the Response to Apr. 13, 2011 MSJ that clarify what Exhibit 7 is. There is an Exhibit 7 attached to Todd's response to the Jan. 30, 2012 MSJ, see Plaintiff's Response to Defendant Montoya's Renewed Motion for Summary Judgment [Doc. No. 94], filed February 27,

the fight, Armijo was taken to segregation.  See Jan. 30, 2012 MSJ ¶ 40, at 7 (setting forth this fact);

Armijo Depo. at 61:4-6; Amended Response to Jan. 30, 2012 MSJ ¶ 40, at 6 (not disputing this fact).

Armijo did not talk to Montoya on the date of the fight involving Todd.  See Jan. 30, 2012 MSJ ¶ 42,

at 7 (setting forth this fact); Armijo Depo. at 32:5-6.[44]

Before the physical altercation on January 13, 2008 took place, Montoya had never

witnessed, nor was he aware of, any contacts or communications between Todd and Wilks.  See Apr.

13, 2011 MSJ ¶ 38, at 7 (setting forth this fact); Montoya Aff. ¶ 45, at 6.[45]  Before the physical

---

2012 (Doc. 96)(citing Plaintiff's Supplemental Rule 56(d) Affidavit (executed February 27, 2012),
filed February 27, 2012 (Doc. 96-1)), but that document is a rule 56(d) affidavit and was not in
existence until several months after Todd filed his Response to Apr. 13, 2011 MSJ.  D.N.M.LR-Civ.
56.1(b) requires that a party responding to a motion for summary judgment "must refer with
particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ.
56.1(b).  Referring to an exhibit that, as far as the Court can tell from the record, does not exist does
not qualify as referring "with particularity to those portions of the record upon which the
non-movant relies."  D.N.M.LR-Civ. 56.1(b).  Thus, the Court deems this asserted fact admitted.

[44]Todd repeats his response to several previously asserted facts.  See Amended Response to
Jan. 30, 2012 MSJ ¶ 42, at 6 ("Plaintiff disputes.  See Responses to ¶¶ 4, 33 and 34, above.").  For
the same reasons it has stated before, the Court concludes that Todd has not successfully disputed
any portion of this fact.  See note 7, supra.

[45]Todd attempts to dispute this asserted fact by relying upon the Voluntary Statement, the
Jan. 15, 2008 Letter, and the Ainsworth Aff.  See Response to Apr. 13, 2011 MSJ ¶ 38, at 7.  As the
Court has already stated, reliance on the hearsay statements in these exhibits is not appropriate.  See
note 5, supra.  The Court has looked through the remainder of these exhibits and, without any
guidance from Todd regarding what portions of these exhibits to consider, concludes that no other
portions of these exhibits specifically controvert Montoya's asserted fact.  Additionally, Todd
contends that Montoya's resignation is sufficient to raise a fact issue whether Montoya had
previously witnessed, or was aware of, any contacts or communications between Todd and Wilks.
See Response to Apr. 13, 2011 MSJ ¶ 38, at 7.  D.N.M.LR-Civ. 56.1(b) provides: "All material facts
set forth in the Memorandum will be deemed undisputed unless specifically controverted."
D.N.M.LR-Civ. 56.1(b).  While Montoya does not dispute that he resigned because of this fight, that
evidence does not specifically controvert Montoya's asserted fact that he never witnessed, nor was
he aware of, any contacts or communications between Todd and Wilks.  Even when viewing the
facts in the light most favorable to Todd and drawing all reasonable inferences in Todd's favor, the
mere fact that Montoya resigned from his job is too tenuously connected to the asserted fact to
specifically controvert that Montoya never witnessed, nor was he aware of, any contacts or

altercation on January 13, 2008 taking place, Montoya had never witnessed, nor was he aware of, any contacts or communications between Todd and Armijo.  See Apr. 13, 2011 MSJ ¶ 39, at 8 (setting forth this fact); Montoya Aff. ¶ 46, at 6.[46]  Throughout his employment with MDC, Montoya had never allowed any inmate to have access to the staff station area -- including never allowing any inmate access to the computer terminal or computer screen.  See Apr. 13, 2011 MSJ ¶ 40, at 8 (setting forth this fact); Montoya Aff. ¶ 47, at 6.[47]  Before the altercation on January 13, 2008, took place, Montoya was not aware of any excessive risk to the health or safety of Todd, and was not aware of any risk of physical harm to Todd.  See Apr. 13, 2011 MSJ ¶ 41, at 8 (setting forth this

---

communications between Todd and Wilks.  Thus, the Court deems the asserted fact admitted.

[46]In an attempt to dispute this asserted fact, Todd makes the same argument that he did in response to Montoya's asserted fact in paragraph 38 of the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011 MSJ ¶ 39, at 7.  To support his argument, Todd relies on four of the same exhibits on which he has relied previously: the Voluntary Statement, the Jan. 15, 2008 Letter, the Ainsworth Aff., and the Jan. 13, 2008 Letter.  As the Court has already stated, reliance on the hearsay statements in these exhibits is not appropriate.  See note 5, supra.  The Court has looked through the remainder of these exhibits and, without any guidance from Todd regarding what portions of these exhibits to consider, concludes that no other portions of these exhibits specifically controvert Montoya's asserted fact.  Todd also relies on Montoya's resignation.  D.N.M.LR-Civ. 56.1(b) provides: "All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."  D.N.M.LR-Civ. 56.1(b).  While Montoya does not dispute that he resigned because of this fight, that evidence does not specifically controvert Montoya's asserted fact that he never witnessed, nor was he aware of, any contacts or communications between Todd and Armijo.  Even when viewing the facts in the light most favorable to Todd and drawing all reasonable inferences in Todd's favor, the mere fact that Montoya resigned from his job is too tenuously connected to the asserted fact to specifically controvert that Montoya never witnessed, nor was he aware of, any contacts or communications between Todd and Armijo.  Thus, the Court deems the asserted fact admitted.

[47]Todd attempts to dispute this asserted fact by relying on the handwritten statement in the Voluntary Statement.  See Response to Apr. 13, 2011 MSJ ¶ 40, at 7.  This statement, which is allegedly attributable to Wilks, provides: "I found [Todd's] charges by a CO Montoya I saw [sic] them on the computer."  Voluntary Statement at 1.  The Court has already determined that this statement is hearsay that does not fall within any exception.  See note 5, supra.  Thus, the Court cannot rely on this evidence.  The Court deems Montoya's asserted fact admitted.

fact); Montoya Aff. ¶¶ 48-49, at 6.[48]

Wilks initially refused to give a statement regarding the incident.  See Apr. 13, 2011 MSJ

¶ 33, at 7 (setting forth this fact); Voluntary Statement at 1 (dated January 15, 2008), filed April 13,

2011 (Doc. 61-2)("Wilks' Refusal to Give Statement").[49]  Wilks did not write the handwritten

statement in the Voluntary statement that states: "I found out his charges by a CO Montoya I saw

them on the computer."  Jan. 30, 2012 MSJ ¶ 12, at 5 (setting forth this fact).  Accord Wilks Depo.

at 26:9-12; Voluntary Statement at 1 (dated January 15, 2008), filed January 30, 2012 (Doc. 94-

2)("Second Copy of Voluntary Statement").[50]  The handwritten statement in the Second Copy of

Voluntary Statement is not in Wilks' handwriting.  See Jan. 30, 2012 MSJ ¶ 13, at 5 (setting forth

this fact); Wilks Depo. at 26:9-12.[51]  The handwritten statement of "I found out his charges by a CO

---

[48]Todd attempts to dispute this asserted fact by relying on the handwritten statement in the Voluntary Statement.  See Response to Apr. 13, 2011 MSJ ¶ 41, at 8.  The Court has already determined that this statement is hearsay that does not fall within any exception.  See note 5, supra. Thus, the Court cannot rely on this evidence.  The Court deems Montoya's asserted fact admitted.

[49]In what appears to be the presentation of an additional asserted fact, Todd relates that, "[a]lthough Wilks initially refused to give a statement, he eventually gave a statement that Defendant Montoya showed him Plaintiff's charges on the computer."  Response to Apr. 13, 2011 MSJ ¶ 33, at 6.  In support of this asserted fact, he relies on the handwritten statement allegedly attributable to Wilks in the Voluntary Statement.  See Voluntary Statement at 1.  Montoya has objected to this evidence as hearsay, see Reply to Response to Apr. 13, 2011 MSJ at 2-3, and the Court has determined that this evidence is hearsay, see note 5, supra.  Thus, the Court cannot properly rely upon this evidence.  The Court will not consider this asserted fact.

[50]Once again, Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 12, at 4 ("Plaintiff disputes.  See Response to ¶ 4, above.").  The Court has already set out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted fact.  The Court deems the asserted fact admitted.

[51]Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraph 12 of the Jan. 30, 2012 MSJ, which refers to his response to paragraph 4 of the Jan. 30,

Montoya I saw them on the computer" is untrue.  Jan. 30, 2012 MSJ ¶ 14, at 5 (setting forth this

fact); Wilks Depo. at 49:20-24.[52]  Wilks signed the back page of another document also entitled

"Voluntary Statement."  Jan. 30, 2012 MSJ ¶ 15, at 5 (setting forth this fact).  Accord Wilks Depo.

at 50:12-15; Voluntary Statement at 2 (dated January 15, 2008), filed January 30, 2012 (Doc. 94-

3)("Signed Copy of Wilks' Refusal to Give Statement"); Amended Response to Jan. 30, 2012 MSJ

¶ 15, at 4 (not disputing this fact).  An MDC employee presented the Signed Copy of Wilks' Refusal

to Give Statement when he "was in segregation following the fight with Todd."  Jan. 30, 2012 MSJ

¶ 16, at 5 (setting forth this fact).  Accord Wilks Depo. at 50:24-51:11; Amended Response to Jan.

30, 2012 MSJ ¶ 16, at 4 (not disputing this fact).  Wilks refused to give a written statement, but

signed the document upon the request of the MDC employee.  See Jan. 30, 2012 MSJ ¶ 16, at 5

(setting forth this fact); Wilks Depo. at 50:24-51:11.[53]

---

2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 13, at 4 ("Plaintiff disputes.  See
Response to ¶ 12, above.").  The Court has already set out the contents of the evidence upon which
Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted
fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any
exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted
fact.  The Court deems the asserted fact admitted.

[52]Once again, Todd attempts to dispute this asserted fact by citing his response to Montoya's
asserted fact in paragraph 12 of the Jan. 30, 2012 MSJ, which refers to his response to paragraph 4
of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 14, at 4 ("Plaintiff
disputes.  See Response to ¶ 12, above.").  The Court has already set out the contents of the evidence
upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert
this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall
within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert
the asserted fact.  The Court deems the asserted fact admitted.

[53]Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact
in paragraph 4 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 16, at 4
("Plaintiff disputes the second sentence.  See Response to ¶ 4, above.").  The Court has already set
out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain
why these exhibits controvert this asserted fact.  As the Court has already held, much of that
evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining

At some point, Wilks made his only handwritten statement about the fight to Lieutenant Jason Ellis at MDC.  Jan. 30, 2012 MSJ ¶ 17, at 5 (setting forth this fact); Wilks Depo. at 52:16-53:20.[54]  The Statement to Jason Ellis from Patrick Wilks (dated January 21, 2008), filed January 30, 2012 (Doc. 94-4), is the only written statement Wilks made that he provided to MDC personnel regarding his fight with Todd.  See Jan. 30, 2012 MSJ ¶ 19, at 5 (setting forth this fact); Wilks Depo. at 54:7-10.[55]  In his only handwritten statement about the fight, Wilks wrote: "Me and Todd were fighting because he got in my face."  Jan. 30, 2012 MSJ ¶ 18, at 5 (setting forth this fact).  Accord Wilks Depo. at 52:16-53:20; Statement to Jason Ellis from Patrick Wilks at 1; Amended Response to Jan. 30, 2012 MSJ ¶ 18, at 5 (not disputing this fact).  The written statement contained in the Statement to Jason Ellis from Patrick Wilks is an accurate and true statement to the extent that it

---

evidence does not specifically controvert the asserted fact.  The Court deems the asserted fact admitted.

[54]Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraphs 4 and 12 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 17, at 4 ("Plaintiff disputes.  See Responses to ¶¶ 4 and 12, above.").  The Court has already set out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted fact.  The Court deems the asserted fact admitted.

[55]Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraphs 4 and 12 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 19, at 4 ("Plaintiff disputes.  See Responses to ¶¶ 4 and 12, above.").  The Court has already set out the contents of the evidence upon which Todd relies.  See note 7, supra.  Todd does not explain why these exhibits controvert this asserted fact.  As the Court has already held, much of that evidence is hearsay that does not fall within any exception.  See note 7, supra.  The remaining evidence does not specifically controvert the asserted fact.  The Court deems the asserted fact admitted.

states that Todd and Wilks did not have any interactions before the fight.[56]

Armijo also refused to give a statement regarding the incident.  See Apr. 13, 2011 MSJ ¶ 34, at 7; Voluntary Statement at 1 (dated January 15, 2008), filed April 13, 2011 (Doc. 61-3)("Armijo's Refusal to Give Statement"); Response to Apr. 13, 2011 MSJ ¶ 34, at 7 (not disputing this fact). "Armijo signed the back page (Page 2 of 2) of a document entitled 'Voluntary Statement,' in which Armijo refused to give a written statement." Jan. 30, 2012 MSJ ¶ 43, at 8 (setting forth this fact). Accord Voluntary Statement at 1-2 (dated January 15, 2008), filed January 30, 2012 (Doc. 94-6); Amended Response to Jan. 30, 2012 MSJ ¶ 43, at 6 (not disputing this fact).

Sanchez later directed Montoya to provide a written report on the incident.  See Apr. 13, 2011 MSJ ¶ 35, at 7 (setting forth this fact); Montoya Aff. ¶ 42, at 5; Response to Apr. 13, 2011 MSJ ¶ 35, at 7 (not disputing this fact).  Montoya provided Sanchez with a written report on the incident. See Apr. 13, 2011 MSJ ¶ 36, at 7 (setting forth this fact); Inter-Office Correspondence from Corrections Officer Tomas Montoya to Sergeant Chris Sanchez at 1 (dated January 13, 2008), filed April 13, 2011 (Doc. 61-4)("Inter-Office Correspondence"); Response to Apr. 13, 2011 MSJ ¶ 36, at 7 (not disputing this fact).

---

[56]Montoya presents an asserted fact that the written statement contained in the Statement to Jason Ellis from Patrick Wilks is an accurate and true statement.  See Jan. 30, 2012 MSJ ¶ 20, at 6. Todd attempts to dispute this asserted fact by citing his response to Montoya's asserted fact in paragraphs 4 and 12 of the Jan. 30, 2012 MSJ.  See Amended Response to Jan. 30, 2012 MSJ ¶ 20, at 4 ("Plaintiff disputes.  See Responses to ¶¶ 4 and 12, above.").  In his affidavit, Todd states: "Prior to this attack, neither Wilks nor Armijo said anything to me and I did not say anything to them.  They just attacked without warning."  Todd Aff. ¶ 12, at 2.  This evidence specifically controverts Montoya's asserted fact that the written statement contained in the Statement to Jason Ellis from Patrick Wilks is an accurate and true statement, so the Court will consider it disputed whether this written statement is accurate and true to the extent that there is a dispute over whether Todd and Wilks had any interactions before the fight.  Accordingly, construing the facts in the light most favorable to Todd, the Court adopts Todd's version of events for purposes of summary judgment.

-36-

"Subsequently, Defendant Montoya was called into the Deputy Chief's office and told to resign or he would probably be terminated during his probationary period."  Apr. 13, 2011 MSJ ¶ 37, at 7 (setting forth this fact).  Accord Montoya Aff. ¶ 44, at 6; Response to Apr. 13, 2011 MSJ ¶ 37, at 7 (not disputing this fact).  Montoya resigned because of this incident.  See Response to Apr. 13, 2011 MSJ ¶ 37, at 7 (setting forth this fact); Transcript of Hearing at 54:3-12, filed January 4, 2011 (Doc. 38)(Johnson, Montoya); Reply to Response to Apr. 13, 2011 MSJ at 1-10 (not disputing this fact).  Todd is suing Montoya solely in his individual capacity.  See Apr. 13, 2011 MSJ ¶ 42, at 8 (setting forth this fact); Complaint for Civil Rights Violations, Tort Claims and Damages ¶ 6, at 2 (dated January 11, 2010), filed February 8, 2010 (Doc. 2-1)("Complaint")(admitting this fact); Response to Apr. 13, 2011 MSJ ¶ 42, at 8 (not disputing this fact).  Todd makes no tort claims against Montoya on the basis of vicarious liability under the tort principle of respondeat superior. See Apr. 13, 2011 MSJ ¶ 43, at 8 (setting forth this fact); Complaint ¶¶ 59-65, at 9-10 (admitting this fact); Response to Apr. 13, 2011 MSJ ¶ 43, at 8 (not disputing this fact).

## PROCEDURAL BACKGROUND

On January 11, 2010, Todd filed his Complaint against Montoya, Defendant Ron Torres, the Director of the MDC, and Defendant Board of County Commissioners of Bernalillo County in the Second Judicial District Court.  See Doc. 2-1.  Todd asserts the following counts against Montoya: (i) Count I -- a cause of action under 42 U.S.C. § 1983 for cruel and unusual punishment in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and (ii) Count III -- a cause of action under the NMTCA for negligence, gross negligence, and recklessness.  Complaint at 6-10.  On February 8, 2010, the Defendants filed their Notice of Removal to remove this case to federal court.  See Notice of Removal at 1-2 (Doc. 2).

On April 13, 2011, Montoya filed his Apr. 13, 2011 MSJ.  See Doc. 61.  He "moves for

summary judgment on all claims . . . on the basis of qualified immunity and other grounds."  Apr. 13, 2011 MSJ at 1.  Montoya contends that Todd cannot establish that he acted with deliberate indifference in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution -- which, given Todd's pre-trial detention, he argues is coterminous with the requirements imposed by the Eighth Amendment to the United States Constitution.  See Apr. 13, 2011 MSJ at 12.  Montoya concedes that prison officials have a duty to protect prisoners from violence at the hands of other prisoners, but argues that they have no obligation to "prevent all inmate-on-inmate violence."  Apr. 13, 2011 MSJ at 13.  Montoya asserts that Todd cannot show the existence of a genuine issue of material fact whether he acted with deliberate indifference while Todd was incarcerated in a way that resulted in Todd's injuries.  See Apr. 13, 2011 MSJ at 13-14. Montoya contends that Todd can satisfy neither the objective prong nor the subjective prong of the Eighth Amendment analysis given that: (i) Todd cannot show that he, or the inmates who beat him, were wrongly classified within the prison population as general-population prisoners; (ii) Montoya had no involvement in the beating; and (iii) there is no competent evidence that Montoya acted with deliberate indifference to Todd's safety.  See Apr. 13, 2011 MSJ at 14-18.  Montoya also argues that no competent evidence supports a conclusion that he committed any tort against Todd, specifically, that he acted in a negligent, grossly negligent, or reckless manner.  See Apr. 13, 2011 MSJ at 18-19.

On April 13, 2011, Montoya filed his Defendant Tomas Montoya's Motion to Stay Discovery Pending Determination of His Motion for Summary Judgment on Basis of Qualified Immunity.  See Doc. 62 ("Motion to Stay").  Montoya seeks a stay of discovery in this proceedings pending a determination of his Apr. 13, 2011 MSJ.  See Motion to Stay at 2.

On May 23, 2011, Todd filed his Response to Apr. 13, 2011 MSJ.  See Doc. 67.  Todd asserts that genuine issues of material fact exist whether Montoya showed the inmates who beat him

information regarding Todd's "convictions for offenses that are sexual in nature."  Response to Apr. 13, 2011 MSJ at 1-2.  Todd requested additional discovery under rule 56(d) of the Federal Rules of Civil Procedure so that he could properly rebut the Apr. 13, 2011 MSJ.  See Response to Apr. 13, 2011 MSJ at 10-11.  Todd notes that the United States Court of Appeals for the Sixth Circuit rejected a qualified-immunity defense in a similar case where a guard told other inmates about the plaintiff's charges for a sex offense that resulted in the plaintiff's beating.  See Response to Apr. 13, 2011 MSJ at 12-13 (citing Leary v. Livingston Cnty., 528 F.3d 438, 442 (6th Cir. 2008)).  He asserted that there is a clearly established duty for prison officials to protect prisoners from violence.  See Response to Apr. 13, 2011 MSJ at 13-14.

On June 20, 2011, Montoya filed his Reply to Response to Apr. 13, 2011 MSJ.  See Doc. 80.  Montoya asserts that Todd has alleged for the first time in his response brief that Montoya instructed Wilks to attack Todd.  See Reply to Response to Apr. 13, 2011 MSJ at 5.  Montoya objects to various evidence Todd has presented as hearsay evidence or as otherwise inadmissible.  See Reply to Response to Apr. 13, 2011 MSJ at 2.

At the hearing on August 19, 2011, Montoya noted that Wilks' testimony "does appear to be a focal point for plaintiff's claims."  Transcript of  Hearing at 5:21-22 (taken August 19, 2011)(Quinones)("Aug. 19, 2011 Tr.").[57]  Montoya then stated that, if Wilks testifies that he never received any information on Todd's charges or criminal history from Montoya, then this case should be dismissed either voluntarily or by the Court.  See Aug. 19, 2011 Tr. at 5:22-25 (Quinones).  Montoya asserted that if, on the other hand, Wilks testifies that Montoya informed him or showed him anything about Todd's past criminal charges, then the case can go forward.  See Aug. 19, 2011

---

[57]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

Tr. at 6:1-4 (Quinones).  Todd agreed with the Court that he needed to refute Montoya's sworn assertions that he had never shown this information to Wilks to create an issue of fact so that the case could proceed.  See Aug. 19, 2011 Tr. at 10:15-11:2 (Court, Villa).  Todd acknowledged that he needed to have some evidence that Montoya communicated in some way to Wilks -- either via the computer screen or orally -- that Todd should be beaten.  See Aug. 19, 2011 Tr. at 10:15-11:5 (Court, Villa).

On October 4, 2011, the Court filed its Memorandum Opinion and Order granting in part and denying in part the Motion to Stay.  See Doc. 88 ("MOO").  The Court recounted that, "[a]t the August 19, 2011 hearing, the parties agreed that the viability of Todd's case turned on inmate Wilks' sworn testimony."  MOO at 7.  The Court held that "Todd has shown, as best he can without using the Court's subpoena power, that there may be evidence to keep his case alive if he is allowed to take Wilks' deposition."  MOO at 8.  The Court further stated:

> The Court will allow Wilks' deposition to go forward.  This testimony is possib[ly] determinative of Todd's case, and this limited amount of discovery is narrowly crafted to get to the heart of the motion for summary judgment without allowing a lot of potentially unnecessary discovery.  Montoya has said he did not show Wilks or Armijo his computer screen, or tell them Todd's crimes; if Wilks says otherwise, there will likely be a genuine issue of fact requiring the Court to deny the motions and allow the parties to proceed to trial.  It seems fundamentally unfair to dismiss Todd's case when a deposition of Wilks may make his case.  Further, this deposition will not burden any government employees or entities.  Accordingly, the Court finds that this limited discovery falls within the exceptions to disallowing discovery once the defense of qualified immunity has been raised. See Garrett v. C.A. Stratmen, M.D., 254 F.3d  at 953 (recognizing that a discovery order in the context of qualified immunity is not immediately appealable "when the defendant's immunity claim turns at least partially on a factual question; when the district court is unable to rule on the immunity defense without further clarification of the facts; and which are narrowly tailored to uncover only those facts needed to rule on the immunity claim are neither avoidable or overly broad.").  The Court does not believe this one deposition defeats the important purposes of qualified immunity that recognize the need for barring most, if not all, discovery when the defendant raise the defense.  The Court may also allow Armijo's deposition to be taken, depending upon Wilks' testimony.  See Tr. at 14:17-25 (Court).  The Court will not authorize

-40-

> Armijo's deposition at this time.  If Wilks does not give Todd what he needs and
> wants to defeat summary judgment, however, the parties are advised that the Court
> will be strongly inclined to allow Todd to take Armijo's deposition; perhaps this
> inclination will help the parties as they discuss whether to allow Armijo's deposition
> after assessing Wilks' deposition.

MOO at 9-10.  After the Court issued its MOO, the parties conducted a deposition for both Wilks

and Armijo.  See Certificate of Service at 1, filed November 1, 2011 (Doc. 92); Certificate of

Service at 1, filed November 23, 2011 (Doc. 93).  Wilks' Deposition took place at the Penitentiary

of New Mexico.  See Wilks Depo at 1.  Armijo's deposition took place at the MDC.  See Armijo

Depo. at 4:10-14.

On January 30, 2012, Montoya filed his Jan. 30, 2012 MSJ.  See Doc. 94.  Montoya seeks

summary judgment on qualified-immunity grounds on all claims that Todd has asserted against him.

See Jan. 30, 2012 MSJ at 1.  Montoya incorporates by reference his Apr. 13, 2011 MSJ and his reply

brief as it relates to that motion.  See Jan. 30, 2012 MSJ at 1 n.1.  Montoya argues that Todd has not

shown the existence of a genuine issue of material fact whether he acted with deliberate indifference.

See Jan. 30, 2012 MSJ at 9.  Montoya contends that he "cannot be expected to prevent a spur-of-the-

moment fight between inmates."  Jan. 30, 2012 MSJ at 10.

On February 27, 2012, Todd filed his Response to Jan. 30, 2012 MSJ.  See Doc. 96.  Todd

asserts that, "[a]lthough Plaintiff does not believe it is necessary, should the Court believe that

additional discovery is necessary to rule on Defendant's Motion, the Court should defer ruling until

said discovery can be completed."  Response to Jan. 30, 2012 MSJ at 3.  He asks the Court, if

additional discovery is necessary, for depositions from "the two MDC employees who spoke to Mr.

Wilkes after the incident, Sgt. Sanchez and CO Gallardo."  Response to Jan. 30, 2012 MSJ at 3.  He

contends that these individuals will have information regarding a statement Wilks made "that

Montoya did show him Plaintiff's charges."  Response to Jan. 30, 2012 MSJ at 3.  Todd asserts that

-41-

"[i]t is undisputed that eight days after Wilks purportedly made a statement that he found out Plaintiff's charges from Defendant Montoya, Defendant Montoya resigned in lieu of termination." Response to Jan. 30, 2012 MSJ at 10.  Todd argues that this resignation supports a determination that there is a genuine issue of material fact regarding Montoya's liability.  See Response to Jan. 30, 2012 MSJ at 10-11.  Todd contends that Montoya arranged for Wilks and Armijo to attack Todd by showing them his criminal history.  See Response to Jan. 30, 2012 MSJ at 11.  Todd asserts that Armijo testified that the altercation arose when he and Wilks discovered that Todd is a sex offender. See Response to Jan. 30, 2012 MSJ at 11-12.  Todd argues that "a jury could infer that the reason Armijo attacked Plaintiff along with Wilks is because either Wilks, Montoya or another inmate relayed the information about Plaintiff's status to Armijo."  Response to Jan. 30, 2012 MSJ at 12. On February 28, 2012, Todd filed his Amended Response to Jan. 30, 2012 MSJ to correct his statement of facts.  See Doc. 97.  Todd asserts that "[a]ll of the Argument section of the original Response remains unchanged."  Amended Response to Jan. 30, 2012 MSJ at 1.

On March 9, 2012, Montoya filed a notice of withdrawal to withdraw his Apr. 13, 2011 MSJ. See Defendant Tomas Montoya's Notice of Withdrawal of Defendant Montoya's Motion for Summary Judgment Based upon Qualified Immunity and Other Grounds Filed April 13, 2011 (Doc. # 61) and Agreement on Consideration of Content of Original Motion for Purposes of Defendant Montoya's Renewed Motion for Summary Judgment (Doc. # 94), filed March 9, 2012 (Doc. 102). On March 22, 2012, Montoya filed his Reply to Response to Jan. 30, 2012 MSJ.  See Doc. 104.

At the hearing on April 5, 2012, Montoya emphasized that, while depositions for Wilks and Armijo may have been appropriate, Todd did not request, in response to the Apr. 13, 2011 MSJ, further discovery beyond depositions of those two individuals.  See Transcript of Hearing at 6:10-25 (taken April 5, 2012)(Quinones)("Apr. 5, 2012 Tr.").  Montoya contended that, in light of the burden

he faces in participating in further discovery and the piecemeal nature of Todd's discovery requests, further discovery is not appropriate at this time.  See Apr. 5, 2012 Tr. at 7:1-8:16 (Quinones); id. at 23:16-23 (Quinones).  Montoya emphasized that no competent evidence supports Todd's assertions that Montoya provided Wilks or Armijo with information about Todd's criminal history.  See Apr. 5, 2012 Tr. at 8:8-9:21 (Quinones).  Montoya argued that, on the issue of his liability in this lawsuit, it is not relevant that he has been discharged from his position given that he was an at-will employee.  See Apr. 5, 2012 Tr. at 10:13-11:19 (Quinones).  Montoya asserted that the references to fraternization in some of the documents related to his discharge implicate Montoya's interactions with his brother, whom he represents was incarcerated while he was working at the MDC.  See Apr. 5, 2012 Tr. at 12:17-13:9 (Quinones).  Montoya argued that the written statement allegedly attributable to Wilks that Montoya showed him Todd's criminal history is hearsay and that Wilks denies ever having written that statement.  See Apr. 5, 2012 Tr. at 13:25-14:11 (Quinones).  Montoya asserted that the Court should not consider statements that appear in Todd's affidavit which are speculative or which are not based on personal knowledge.  See Apr. 5, 2012 Tr. at 23:2-15 (Quinones).

Todd responded that there are cases establishing that a constitutional violation occurs when a prison official shows a prisoner another inmate's criminal history in such a way that other prisoners beat the inmate.  See Apr. 5, 2012 Tr. at 30:21-31:5 (Villa).  The Court noted that, in its MOO granting Todd some ability to conduct discovery, it was pushing the limit of what it felt comfortable giving in light of the qualified-immunity defense.  See Apr. 5, 2012 Tr. at 31:13-32:2 (Court).  Todd conceded that both Wilks and Armijo denied in their depositions that Montoya communicated to them any information about Todd's criminal history.  See Apr. 5, 2012 Tr. at 34:10-12 (Villa).  The Court stated that it was more concerned about entering summary judgment

-43-

previously when there was a possibility that Montoya showed Wilks or Armijo this information, but noted that there now does not appear to be any disagreement on that issue in light of their deposition testimony.  See Apr. 5, 2012 Tr. at 24:13-20 (Court).  Todd stated that it is often necessary to prove intent circumstantially.  See Apr. 5, 2012 Tr. at 36:5-14 (Villa).  Todd represented that he is asserting alternative theories regarding Montoya's conduct, specifically that Montoya either, in an unintentional but constitutionally improper manner, allowed Wilks to see Todd's criminal history, or that Montoya intentionally provided Wilks and/or Armijo with this information.  See Apr. 5, 2012 Tr. at 40:12-20 (Villa).  Todd asserted that he has pled both of these theories in his pleadings.  See Apr. 5, 2012 Tr. at 43:5-44:18 (Villa).  Todd contended that a deposition for Abraham Gallardo and/or Chris Sanchez, individuals whom he asserted interviewed Wilks about the fight, would be appropriate to clear up the origin of the statement that Montoya communicated Todd's criminal history to Wilks that is allegedly attributable to Wilks.  See Apr. 5, 2012 Tr. at 44:19-45:12 (Villa).  Todd asserted that he never conceded that only depositions for Wilks and Armijo would be necessary.  See Apr. 5, 2012 Tr. at 46:9-47:5 (Villa).

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary

judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty

-46-

Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING RULE 56(d)

Rule 56(d) of the Federal Rules of Civil Procedure states:

(d)     **When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

     (1)     defer considering the motion or deny it;

     (2)     allow time to obtain affidavits or declarations or to take discovery; or

     (3)     issue any other appropriate order.

Fed. R. Civ. P. 56(d).[58] The United States Court of Appeals for the Tenth Circuit reviews a district court's denial of a rule 56(d) motion for abuse of discretion.  See Comm. for First Amendment v. Campbell, 962 F.2d 1517, 1522 (10th Cir. 1992).  "A prerequisite to granting relief . . . is an affidavit furnished by the nonmovant." Comm. for First Amendment v. Campbell, 962 F.2d at 1522 (citing Pasternak v. Lear Petroleum Exploration, Inc., 790 F.2d 828, 832 (10th Cir. 1986)).  "Unless dilatory or lacking in merit," a party's rule 56(d) application "should be liberally treated." Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993)(internal quotation marks omitted).  "The general principle of Rule 56(f) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000)(internal quotation marks omitted).  "Rule 56(f) does not require, however, that summary judgment not be entered until discovery is complete." Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., Nos. 02-1146, 03-1185, 2007 WL 2461629, at *3 (D.N.M. June 5, 2007)(Browning, J.)(citing Price v.

---

[58]"Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments.

W. Res., Inc., 232 F.3d 779, 784 (10th Cir. 2000)).

To invoke the shelter that rule 56(d) provides, a party must (i) file an affidavit, see Pasternak v. Lear Petroleum Exploration Inc., 790 F.2d at 832-33; (ii) identify the probable facts not available, their relevance, and what steps have been taken to obtain those facts, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522; (iii) explain why facts precluding summary judgment cannot be presented, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522; and (iv) state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522.  "Rule 56([d]) may not be invoked based solely upon the assertion that discovery is incomplete or that the specific facts necessary to oppose summary judgment are unavailable." Schaefer v. Antill, No. 06-0460, 2007 WL 709046, at *9 (D.N.M. Jan. 31, 2007)(Browning, J.). "Rule 56([d]) is not a license for a fishing expedition." Lewis v. Ft. Collins, 903 F.2d 752, 759 (10th Cir. 1990).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity

is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful activity. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.    Procedural Approach to Qualified Immunity.

The Supreme Court of the United States recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz will often be beneficial. See Pearson v. Callahan 555 U.S. at 241. In rejecting a mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of

appeals with "what may seem to be an essentially academic exercise." Pearson v. Callahan, 555 U.S. at 237.   The Supreme Court also recognized that a mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." Pearson v. Callahan, 555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).   Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified-immunity defense generally fails. See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognized seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis:

> [W]hen (1) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (2) "it appears that the question will soon be decided by a higher court"; (3) deciding the constitutional question requires "an uncertain interpretation of state law"; (4) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (5) tackling the first element "may create a risk of bad decisionmaking" due to inadequate briefing; (6) discussing both elements risks "bad decisionmaking" because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (7) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."

Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).   Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is necessary and the conduct is only likely to face challenges in the qualified-immunity context.

Camreta v. Greene, 131 S.Ct. 2020, 2031-32 & n.5 (2011).  See Kerns v. Bader, 663 F.3d at 1181. "In general, courts should think hard, and then think hard again, before turning small cases into large ones."  Camreta v. Greene, 131 S.Ct. at 2032.  Accord Kerns v. Bader, 663 F.3d at 1181.  The Supreme Court has also recently emphasized in the qualified immunity context: "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011).  The Tenth Circuit will normally remand a case to the district court for further consideration when the district court has given cursory treatment to the qualified immunity issue.  See Kerns v. Bader, 663 F.3d at 1182.

## 2.  Clearly Established Rights in the Qualified-Immunity Analysis.

In evaluating whether a right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' a court assesses the objective

legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."   Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court further clarified what a plaintiff must show to satisfy the clearly established requirement in Ashcroft v. al-Kidd.   The Supreme Court held that, while a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate."   Ashcroft v. al-Kidd, 131 S.Ct. at 2083.   Conflicting or unclear case law can be the basis for concluding that a right is not clearly established.   See Reichle v. Howards, 132 S.Ct. 2088, 2096-97 (2012)(noting that a circuit court decision from the circuit where the conduct occurred had "injected uncertainty into the law governing retaliatory arrests, particularly in light of" that decision's "rationale and the close relationship between retaliatory arrest and prosecution claims," and that the "uncertainty was only confirmed by subsequent appellate decisions that disagreed over whether the" decision's "reasoning . . . applied similarly to retaliatory arrests").   "The operation of this [clearly established] standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."   Anderson v. Creighton, 483 U.S. at 639.   "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."   Ashcroft v. al-Kidd, 131 S.Ct. at 2084.   The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable,

but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit, in Kerns v. Bader, focused on the Supreme Court's language in Ashcroft v. al-Kidd in its analysis of qualified immunity.  In that case, which dealt with a search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  Kerns v. Bader, 663 F.3d at 1183.  The Tenth Circuit reiterated that "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing law," but held that, where distinctions "might make a constitutional difference," the law is not clearly established.  Kerns v. Bader, 663 F.3d at 1187 (emphasis in original).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  In Casey v. City of Federal Heights, 509 F.3d 1278 (10th Cir. 2007), the Tenth Circuit re-emphasized its sliding scale approach: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  509 F.3d at 1284 (citing Pierce v. Gilchrist, 359 F.3d at 1298).  Thus, "when an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

### 3.    Factual Disputes in the Qualified-Immunity Analysis.

In determining whether the plaintiff has met his or her burden of establishing a constitutional violation that was clearly established, a court construes the facts in the light most favorable to the

plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v.

Goodman, 572 F.3d at 1107 (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges

them").  In Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), the Tenth Circuit

explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, explained

that the blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"  Lymon v. Aramark Corp., 728 F.Supp.2d 1222, 1249 (D.N.M. 2010)(Browning,

J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury."  Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility. . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistence or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F.App'x 289, 291-92 (10th Cir. 2009)(unpublished).  See Lymon v. Aramark

Corp., 728 F.Supp.2d at 1249-50 (quoting Rhoads v. Miller, 352 F.App'x at 291-92).  In a

concurring opinion in <u>Thomson v. Salt Lake County</u>, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J. concurring)(citing <u>Goddard v. Urrea</u>, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts")).

### 4. <u>Effect of Qualified Immunity on Discovery.</u>

"Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" <u>Royal v. City of Albuquerque</u>, 2009 WL 1329834, at *10. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985). Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." <u>Pearson v. Callahan</u>, 555 U.S. at 232. The Supreme Court has suggested that, to avoid unnecessary exposure to burdensome discovery, the preferred practice is for the government officials to move to dismiss the action based on qualified immunity before discovery is ordered:

> When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense. It must exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings.

<u>Crawford-El v. Britton</u> 523 U.S. 574, 598 (1998). When a court permits discovery, the Supreme

Court has emphasized that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Crawford-El v. Britton 523 U.S. at 598. "There are, however, exceptions to the rule that no discovery be allowed when government officials claim qualified immunity." Todd v. Montoya, No. 10-0106, 2011 WL 5238900, at *4 (D.N.M. Oct. 4, 2011)(Browning, J.). The officials are not protected from all discovery, "'but only from discovery which is either avoidable or overly broad.'" Garrett v. C.A. Stratman, 254 F.3d 946, 953 (10th Cir. 2001)(quoting Maxey v. Fulton, 890 F.2d 279, 282 (10th Cir. 1989)).

## RELEVANT LAW REGARDING THE DUE PROCESS
## CLAUSE OF THE FOURTEENTH AMENDMENT

When government officials hold an individual in confinement before the formal adjudication of that individual's guilt, the Eighth Amendment does not regulate the conduct of the government officials confining that individual. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). As the Supreme Court has explained:

> "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions . . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."

City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244 (quoting Ingraham v. Wright, 430 U.S. 651, 671-672, n.40 (1977)). Nevertheless, those government officials must still comply with the protections of the Due Process Clause during that individual's confinement. See City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244 ("The Due Process Clause, however, does require the responsible government or governmental agency to provide medical care to persons, such as Kivlin, who have been injured while being apprehended by the police."). "In fact, the due process rights of a person in [this] situation are at least as great as the Eighth Amendment protections available to a convicted

prisoner." City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244.  The Tenth Circuit has held that "pretrial detainees have essentially the same rights under the due process clause of the Fourteenth Amendment as convicted prisoners have under the Eighth Amendment."  Bauer v. Dantis, 77 F.3d 492, 1996 WL 77037, at *1 n.1 (10th Cir. 1996)(unpublished table decision)(citing City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244).  The Tenth Circuit has stated that it is "clearly established that state officials had a duty to protect individuals whom they had taken involuntarily into their physical custody and control." Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 277 (10th Cir. 1996).

**LAW REGARDING THE EIGHTH AMENDMENT
TO THE UNITED STATES CONSTITUTION**

The Supreme Court has held that "a prison official's 'deliberate indifference' to a substantial risk of serious harm" implicates the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 828 (1994).  "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates." Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).  An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).  The second condition represents the functional application of the deliberate indifference standard.  See Smith v. Cummings, 445 F.3d 1254, 1258-59 (10th Cir. 2006)("To establish a cognizable Eight Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." (quoting Verdecia v. Adams, 327

-57-

F.3d 1171, 1175 (10th Cir. 2003)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. 25, 36 (1993). Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36 (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36. The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.").

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Courts apply this subjective inquiry whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be

-58-

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837.  For the purpose of Eighth Amendment analysis, the Tenth Circuit has equated deliberate indifference with recklessness.  See Belcher v. United States, 216 F.App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

## LAW REGARDING THE NEW MEXICO TORT CLAIMS ACT

The New Mexico Legislature enacted the NMTCA because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity."  N.M.S.A. 1978, § 41-4-2(A).  The New Mexico Legislature, however, also recognized

that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M.S.A. 1978, § 41-4-2(A).  As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act."  N.M.S.A. 1978, § 41-4-2(A).  The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty."  N.M.S.A. 1978, § 41-4-2(C).  The NMTCA is the

exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M.S.A. 1978, § 41-4-17(A).

A plaintiff may not sue a governmental entity of New Mexico or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions granted for governmental

entities and public employees in the NMTCA.  See Begay v. State, 104 N.M. 483, 486, 723 P.2d

252, 255 (Ct. App. 1985)("Consent to be sued may not be implied, but must come within one of the

exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay,

104 N.M. 375, 721 P.2d 1306 (1986).  "A plaintiff also may not sue a governmental entity or its

employees for a damage claim arising out of violations of rights under the New Mexico Constitution

unless the NMTCA contains a waiver of immunity."  Lymon v. Aramark Corp., 728 F.Supp.2d at

1251.  Accord Barreras v. State of N.M. Corr. Dep't, 133 N.M. 313, 319, 62 P.3d 770, 776 (Ct. App.

2003)("In the absence of affirmative legislation, the courts of this state have consistently declined

to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico

Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act.");

Chavez v. City of Albuquerque, 124 N.M. 479, 482, 952 P.2d 474, 477 (Ct. App. 1998)(noting that

a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against

a city or its employees or agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun.

Sch. Dist., 106 N.M. 446, 449, 744 P.2d 919, 922 (Ct. App. 1987)(holding that no waiver of

immunity exists for damages arising out of alleged educational malpractice claim against a school

board); Begay v. State, 104 N.M. at 488, 723 P.2d at 257 (finding that no waiver existed in NMTCA

for suit for damages under Article II, § 11 of the New Mexico Constitution -- a provision that

protects the "free exercise of religion").  The NMTCA does not limit the availability of many forms

of equitable relief.  See N.M.S.A. 1978, § 41-4-17(A) ("Nothing in this section shall be construed

to prohibit any proceedings for mandamus, prohibition, habeas corpus, certiorari, injunction or quo

warranto."); El Dorado Utils, Inc. v. Eldorado Area Water and Sanitation Dist., 137 N.M. 217, 224,

109 P.3d 305, 312 (Ct. App. 2005)("To the extent Plaintiffs seek compensatory damages based on

the District's alleged tortious conduct, the Tort Claims Act bars such a claim, as discussed above.

The Tort Claims Act would not bar a claim for injunctive relief.").  Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees must be dismissed.  See Begay v. State, 104 N.M. at 486, 723 P.2d at 255.

## ANALYSIS

The Court will grant the Jan. 30, 2012 MSJ.  The Court concludes that, on the facts presented, Todd has not met his burden to overcome Montoya's qualified-immunity defense. Likewise, Todd has not satisfied the standards under rule 56(d) to obtain additional discovery to overcome Montoya's qualified-immunity defense.  Todd has also not met his burden to show the existence of a genuine issue of material fact regarding Montoya's liability under the NMTCA. Lastly, Todd has not met the requirements under rule 56(d) to merit additional discovery regarding his NMTCA claim against Montoya.

## I.   MONTOYA IS ENTITLED TO QUALIFIED IMMUNITY ON THE CONSTITUTIONAL CLAIM ASSERTED AGAINST HIM.

When government officials hold an individual in confinement before the formal adjudication of that individual's guilt, the Eighth Amendment does not regulate the conduct of the government officials confining that individual.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244. Nevertheless, those government officials must still comply with the protections of the Due Process Clause during that individual's confinement.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244.  The Tenth Circuit has held that "pretrial detainees have essentially the same rights under the due process clause of the Fourteenth Amendment as convicted prisoners have under the Eighth Amendment."  Bauer v. Dantis, 1996 WL 77037, at *1 n.1.

"[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of

inmates." Lopez v. LeMaster, 172 F.3d at 759.  The Supreme Court has held that "a prison official's 'deliberate indifference' to a substantial risk of serious harm" implicates the Eighth Amendment. Farmer v. Brennan, 511 U.S. at 828.  An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. at 36.  Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36 (emphasis in original).  "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36.  The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. at 9-10 (internal quotation marks omitted).

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. at 298.  Courts making this subjective inquiry ask whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred.  Wilson v. Seiter, 501 U.S. at 299.  The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate

indifference with recklessness." <u>Farmer v. Brennan</u>, 511 U.S. at 836.  The Supreme Court provided

the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be
> aware of facts from which the inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the inference.

<u>Farmer v. Brennan</u>, 511 U.S. at 837.  For the purpose of Eighth Amendment analysis, the Tenth

Circuit has equated deliberate indifference with recklessness.  <u>See</u> <u>Belcher v. United States</u>, 216

F.App'x at 823-24.

While Montoya disputes that Todd can meet the first element to establish an Eighth

Amendment violation, the objective prong, a prisoner's risk of exposure to a beating by other

prisoners is a sufficiently serious harm to fall within the Eighth Amendment's scope.  Here, there

is evidence showing that Todd received a beating from two other prisoners, including having them

hit him in the face and attacking him for two to three minutes.  Various courts have recognized that

a beating can rise to the level of an Eighth Amendment violation.  <u>See</u>, <u>e.g.</u>, <u>Hudson v. McMillian</u>,

503 U.S. at 9-10 ("Yet the blows directed at Hudson, which caused bruises, swelling, loosened teeth,

and a cracked dental plate, are not <u>de minimis</u> for Eighth Amendment purposes.  The extent of

Hudson's injuries thus provides no basis for dismissal of his § 1983 claim."); <u>Romano v. Howarth</u>,

998 F.2d 101, 105 (2d Cir. 1993)("Here, no one contests the objective element of Romano's Eighth

Amendment claim, and indeed, there can be no question that the beating Romano described was

more than <u>de minimis</u>.").  Drawing all reasonable inferences in Todd's favor and viewing the facts

in the light most favorable to him, his beating was not a de minimis one.  Thus, the objective

element of the Eighth Amendment analysis is satisfied.

Nevertheless, Todd cannot show the existence of a genuine issue of material fact regarding

the subjective element of this test.  Because Montoya has invoked qualified immunity, the burden

shifts to Todd to show the existence of a genuine issue of material fact that a constitutional violation

occurred.  When a defendant asserts qualified immunity at summary judgment, the responsibility

shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d at 1128.  The

plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her

constitutional or statutory rights; and (ii) that the right was clearly established at the time of the

alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d at 1107.

Much of the evidence upon which Todd relies is hearsay evidence, such as the handwritten

statement allegedly attributable to Wilks in the Voluntary Statement, which Wilks denies ever

making.  See Voluntary Statement at 1.  Montoya objects to Todd's use of the hearsay evidence he

has presented.  Todd tries to present, in various forms, hearsay statements relating that Montoya

showed Wilks information regarding Todd's criminal history.  For instance, in the Jan. 13, 2008

Letter, Sanchez states: "Inmate Todd made a statement in which he accused CO Montoya of abusing

the pod radio and showing his charges to inmate Wilks."  Jan. 13, 2008 Letter at 2.  Gallardo relates

in the Jan. 15, 2008 Letter that "Inmate Todd stated 'that Officer Montoya had gotten in the Internet

in the unit pod computer on Sunday and shown all the Inmates in the pod his past charges.'"  Jan.

15, 2008 Letter at 1.  Likewise, Todd relies on his own affidavit wherein he states that Wilks related

to prison guards "that Defendant Montoya showed him my criminal history on the computer."  Todd

Aff. ¶ 15, at 2.  Todd makes other similar statements in his affidavit: (i) "Officer Gallardo told me

that in Mr. Wilks['] statement he admitted that Defendant Montoya showed him my criminal

history"; and (ii) "Officer Gallardo also informed me that he spoke to Officer Montoya, who

admitted to either showing or telling Mr. Wilks my criminal history."  Todd Aff. ¶ 18-19, at 2.

Some of those hearsay statements, while not admissible, caused the Court enough concern

that it permitted Todd to take Wilks' and Armijo's depositions.  The hearsay statements were a sound basis to perhaps launch an investigation and file this case, but they are not enough to get Todd to trial.  Todd admitted at the last hearing that, if he could not dispute what is in Montoya's affidavit, "we don't have a case."  Aug. 19, 2011 Tr. at 11:3-5 (Villa).  The Court then permitted limited discovery before resolving the merits of Montoya's qualified immunity defense.  After it permitted depositions of Wilks and Armijo, however, both men denied: (i) that Montoya showed either of them information about Todd's criminal history; (ii) that Montoya in some way permitted them, accidentally or intentionally, to view this information on a computer screen or otherwise; (iii) that he played a role in instigating the fight; or (iv) that Montoya otherwise had any substantial communication with Wilks on the day of the incident or any communications with Armijo.  Armijo further related that the inmates received information that Todd was on a sex-offender website from someone outside the prison.  Todd has not been able to present competent evidence to specifically controvert Wilks' and Armijo's assertions.  One of Montoya's uncontroverted facts also established that he called other prison guards to come stop the fight almost immediately after the physical altercation involving Todd began.  See Apr. 13, 2011 MSJ ¶ 31, at 6 (setting forth this fact); Montoya Aff. ¶ 39, at 5.

In light of these facts, it would be difficult to establish that Montoya acted in a negligent manner, let alone in a deliberately indifferent manner.  The Supreme Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837.  While Montoya may have been aware of a significant risk to

Todd's safety given Todd's criminal history, and while Wilks had alerted Montoya that Todd might be a child molester, there are no indications that he disregarded that risk. When Wilks attempted to climb up and see the computer screen, the uncontroverted facts indicate that there was nothing on the computer screen for Wilks to see, that Wilks tried to look at the screen and could not successfully do so, and that it was highly difficult for even the person at the computer terminal to view what was on the screen. Both Wilks and Montoya stated that Wilks could not see anything on the computer screen. There is no causation linking any of Montoya's conduct to Todd's injuries given that Wilks and Armijo both deny that Montoya played any role in their altercation with Todd.

Likewise, there are no indications that Montoya created a risk that Wilks and Montoya would discover information about Todd's criminal history. While Wilks and Armijo may have discovered, through means unrelated to Montoya, that Todd had some criminal history related to sex offenses, "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners." Lopez v. LeMaster, 172 F.3d at 759. The computer screen where Montoya could have accessed the records was approximately six feet off the ground, and Wilks was unable, even after trying, to read anything regarding Todd on the computer screen. Furthermore, when Wilks asked Montoya if Todd was a chester -- a child molester -- Montoya responded that he did not know. On the facts presented, it is difficult to characterize Montoya's conduct as rising to the level of deliberate indifference when it does not appear that Montoya acted with even negligence. Todd has not raised a genuine issue of material fact as to Montoya's deliberate indifference -- a significantly higher standard than negligence.

Todd relies heavily on Montoya's acknowledgment that he resigned because of this incident, given that he was about to face termination. While this evidence is not irrelevant in the sense that it has no relevance under rule 401 of the Federal Rules of Evidence, this piece of evidence is not

-66-

enough, by itself, to satisfy Todd's burden of production.  Notably, this evidence would be excludable under rule 407 as a subsequent remedial measure, although Montoya has not objected to the evidence on this basis.  See Nolan v. Memphis City Sch., 589 F.3d 257, 274 (6th Cir. 2009)("Evidence that an employer subsequently discharged an employee accused of causing a plaintiff's injury may be properly excluded as a subsequent remedial measure under Rule 407." (citing Hull v. Chevron USA, Inc., 812 F.2d 584, 586-87 (10th Cir. 1987)).  He, in fact, presented this evidence himself.  The MDC and Montoya both took the remedial actions, with the MDC recommending that Montoya resign instead of face termination and Montoya deciding to resign. Whether Montoya engaged in inappropriate conduct and the appropriateness of his employment in light of his potential involvement in Todd's beating are "the subject[s] of this lawsuit, and as a result, [his termination] is a measure that 'if taken previously, would have made the injury or harm less likely to occur'" within the meaning of rule 407.  Stahl v. Bd. of Cnty. Comm'rs of the Unified Gov't of Wyandotte Cnty./Kan., 101 F.App'x 316, 321 (10th Cir. 2004)(unpublished). Furthermore, both the MDC and Montoya are defendants in this lawsuit, so their actions fall within rule 407's scope.  See Mehoja v. Drummond, 56 F.3d 1213, 1215 (10th Cir. 1995)("We reject the rule crafted by the dissent, as unsupported by the cases and unworkable, that Rule 407 applies not only to actual defendants, but also to obvious potential defendants." (emphasis in original)).  Todd is offering the evidence to establish Montoya's wrongful conduct, so none of the exceptions to rule 407 applies.

Rule 407's considerations, however, are still relevant to assess the relative probative value of this evidence.  As the advisory committee's note to rule 407 relates, the inference one draws from a subsequent remedial measure as proof of an admission of fault is relatively weak:

The rule incorporates conventional doctrine which excludes evidence of

> subsequent remedial measures as proof of an admission of fault.  The rule rests on two grounds.  (1) The conduct is not in fact an admission, since the conduct is equally consistent with injury by mere accident or through contributory negligence.  Or, as Baron Bramwell put it, the rule rejects the notion that "because the world gets wiser as it gets older, therefore it was foolish before."  Hart v. Lancashire & Yorkshire Ry. Co., 21 L.T.R. N.S. 261, 263 (1869). Under a liberal theory of relevancy this ground alone would not support exclusion as the inference is still a possible one.

Fed. R. Evid. 407 advisory committee's note to 1972 proposed rules.  The Tenth Circuit, relying on this advisory committee's note, has similarly stated: "First, as an admission of fault, the probative value of subsequent remedial measures is limited."  Hull v. Chevron USA, Inc., 812 F.2d at 586-87 (citing Fed. R. Evid. 407 advisory committee's note to 1972 proposed rules)(noting that the district court properly excluded testimony from a former employee who had been fired as a result of the incident underlying the lawsuit).  While this evidence may create a weak inference of wrongdoing, it is not probative enough to meet Todd's burden of production that Montoya acted with deliberate indifference.  See In re Air Crash Disaster, 86 F.3d 498, 528-29 (6th Cir. 1996)("Northwest's rewiring of the CAWS is circumstantial evidence, if only of a weak and suspect sort, that the CAWS as it existed at the time of the accident was not foolproof.").  Even if the evidence is not technically with rule 407's scope: (i) rule 407's underlying concerns are persuasive when evaluating the probative value of the evidence; and (ii) the circumstances of Montoya's resignation in light of the other evidence in the record make the inference of wrongdoing one can draw from his resignation a weak one.  See Gray v. Hoffman-La Roche, Inc., 82 F.App'x 639, 646-47 (10th Cir. 2003)(unpublished)(recognizing that, while the evidence at issue was "admissible under Rule 407," its "probative value was minimal").  It is the proverbial scintilla of evidence that cannot properly prevent entry of summary judgment.

While the Bernalillo County Personnel Action Form refers to Montoya resigning based on

fraternization issues, that statement is relatively ambiguous, as the document provides no elaboration on what those fraternization issues are.  See Bernalillo County Personnel Action Form at 1.  Any additional inference that a factfinder could draw from that evidence is weak.  Montoya explained at the April 5, 2012 hearing that the fraternization refers to his interactions with his brother -- who was incarcerated at MDC at the time of Montoya's employment.  See Apr. 5, 2012 Tr. at 12:5-13:9 (Quinones).  In his Reply to Response to Jan. 30, 2012 MSJ, Montoya attaches a portion of an interview Todd's counsel, Ryan Villa, conducted with him, in which Montoya relates that the statement regarding fraternization relates to this incident with his brother.  See Interview of Officer Tomas Montoya at 5:10-6:1 (dated October 14, 2009), filed May 23, 2011 (Doc. 104-2)("Second Copy of Montoya Interview").  Todd has presented a few pages from this same interview as well in his Response to Apr. 13, 2011 MSJ, see Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time."), and has not objected to its admissibility.  Montoya's statements in this interview undercut an inference that the reference to fraternization implicates Montoya's interactions with Wilks or Armijo.  Todd has the burden to present evidence to meet his burden of production to show the existence of a genuine issue of material fact whether Montoya: (i) knew of and disregarded an excessive risk to inmate health or safety; (ii) the guards were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; (iii) and drew that inference. See Farmer v. Brennan, 511 U.S. at 837.  Montoya's resignation alone, particularly when taking into account the evidence that Montoya has presented which undercuts inferences of wrongdoing, is not sufficiently probative to meet this burden of production.

Any other disputed facts are not material such that they change the appropriate disposition

of the qualified-immunity issue.  For instance, Todd created a dispute regarding Wilks' and Armijo's motivation to attack Todd -- whether he had made statements that provoked them or whether they had attacked him without provocation.  He presented facts, however, that Todd stated the attack was unprovoked.  Under either scenario, however, Montoya still has no involvement in Todd's beating absent additional evidence making such a connection.  Todd successfully controverts evidence that the guards came immediately to break to break up the fight between Todd and Wilks, presenting evidence that there may have been two to three minutes that passed before guards arrived.  It is not disputed, however, that Montoya almost immediately called for the assistance of other guards when the altercation between Todd and Wilks began -- conduct which does not support a finding that Montoya acted with deliberate indifference.   More importantly, Todd has never pled in his Complaint or raised as an argument that Montoya should have acted differently once the beating began, but rather has argued and pled that Montoya was the one who caused the beating -- either recklessly or intentionally.  See Complaint ¶¶ 42-49, at 6-7.  He has not raised any theory that Montoya failed to intervene in the beating.  Because Todd has not shown the existence of a genuine issue of material fact whether Montoya acted with deliberate indifference, Montoya is entitled to qualified immunity on Todd's Fourteenth Amendment claim asserted under 42 U.S.C. § 1983.

## II.    THE COURT WILL NOT PERMIT ADDITIONAL DISCOVERY REGARDING THE CONSTITUTIONAL CLAIM ASSERTED AGAINST MONTOYA.

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. at 807.  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"   Roybal v. City of Albuquerque, 2009

WL 1329834, at *10.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. at 526.  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 555 U.S. at 232.

The Supreme Court has suggested that, to avoid unnecessary exposure to burdensome discovery, the preferred practice is for the government officials to move to dismiss the action based on qualified immunity before discovery is ordered:

> When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense.  It must exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings.

Crawford-El v. Britton 523 U.S. at 598.  When a court permits discovery, the Supreme Court has emphasized that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery."  Crawford-El v. Britton 523 U.S. at 598.  "There are, however, exceptions to the rule that no discovery be allowed when government officials claim qualified immunity."  Todd v. Montoya, 2011 WL 5238900, at *4.  The officials are not protected from all discovery, "'but only from discovery which is either avoidable or overly broad.'"  Garrett v. C.A. Stratman, 254 F.3d at 953 (quoting Maxey v. Fulton, 890 F.2d at 282).

Notably, the Court has already permitted Todd to have some discovery in that Todd has now taken Wilks' and Armijo's depositions.  Todd admitted at the last hearing that, if he could not dispute what is in Montoya's affidavit, "we don't have a case."  Aug. 19, 2011 Tr. at 11:3-5 (Villa). Todd requests additional discovery under rule 56(d).  See Plaintiff's Supplemental Rule 56(d) Affidavit ¶¶ 2-3, at 1 (executed February 27, 2012), filed February 7, 2012 (Doc. 96-1). Specifically, he requests the following evidence:

2.      In order to fully respond to paragraph 12 through 14 of Defendant's Motion

for Summary Judgment Renewed [Doc. No. 94] I need to depose corrections officer Abraham Gallardo, who is believed took the statement from Mr. Wilks. Mr. Gallardo's testimony in this regard could rebut Mr. Wilks['] testimony that he did not make that statement, that the statement, which is Exhibit 3 [Doc. No. 67-3], does not contain his handwriting, and that the statement is not true.

3.      I also need to depose Sgt. Chris Sanchez, who was involved in the investigation which ultimately culminated in the resignation of Defendant Montoya. His testimony would provide insight into the reasons why Defendant Montoya resigned.

Plaintiff's Supplemental Rule 56(d) Affidavit ¶¶ 2-3, at 1. Todd also relates, in his first rule 56 affidavit, that he needs some discovery regarding "the policies and procedures and any training that Montoya has received" regarding certain procedures in F-7, such as where inmates may go, how much discretion Montoya had to classify inmates. Plaintiff's Rule 56(f) Affidavit ¶¶ 8-9, at 2-3 (executed May 23, 2011), filed May 23, 2011 (Doc. 67-1). Todd asserts that he still needs additional discovery to controvert some of Montoya's asserted facts regarding the layout of the F-7 area and the staff station. See Plaintiff's Rule 56(f) Affidavit ¶ 11, at 3. Todd represents that he needs additional discovery to confirm whether a similar incident had ever occurred where an inmate looked at a computer screen. See Plaintiff's Rule 56(f) Affidavit ¶ 13, at 4. Todd contends that he needs additional discovery regarding how long it took Montoya to call for additional guards to come to the area where the fight occurred. See Plaintiff's Rule 56(f) Affidavit ¶ 15, at 4. Todd also asserts that he "intends to hire an expert, who will opine that it is common knowledge in the corrections business that some inmates will attack other inmates who they know have been convicted of sexual offenses and that officers should be trained to this effect." Plaintiff's Rule 56(f) Affidavit ¶ 16, at 4.

Rule 56(d) of the Federal Rules of Civil Procedure states:

(d)      **When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts

essential to justify its opposition, the court may:

    (1)    defer considering the motion or deny it;

    (2)    allow time to obtain affidavits or declarations or to take discovery; or

    (3)    issue any other appropriate order.

Fed. R. Civ. P. 56(d).  The Tenth Circuit reviews a district court's denial of a rule 56(d) motion for abuse of discretion.  See Comm. for First Amendment v. Campbell, 962 F.2d at 1522.  "The general principle of Rule 56(f) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."  Price v. W. Res., Inc., 232 F.3d at 783 (internal quotation marks omitted).  "Rule 56(f) does not require, however, that summary judgment not be entered until discovery is complete."  Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 2007 WL 2461629, at *3.  Nevertheless:

> Rule 56(f) discretion must be limited when a summary judgment motion is based on qualified immunity because insubstantial lawsuits 'against government officials [should] be resolved prior to discovery and on summary judgment if possible.' Anderson v. Creighton, 483 U.S. 635 . . . (1987)(emphasis added) . . . . Liberal application of rule 56(f) should not be allowed to subvert the goals of Harlow and its progeny."

Lewis v. City of Ft. Collins, 903 F.2d at 758 (alterations in original).  To invoke the shelter that rule 56(d) provides, a party must (i) file an affidavit, see Pasternak v. Lear Petroleum Exploration Inc., 790 F.2d at 832-33; (ii) identify the probable facts not available, their relevance, and what steps have been taken to obtain those facts, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522; (iii) explain why facts precluding summary judgment cannot be presented, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522; and (iv) state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522.

The Court does not believe that additional discovery regarding the constitutional claim against Montoya is appropriate. After asking the Court for permission to conduct a deposition for Wilks and Armijo, Todd now asks for additional discovery. There is little difference between the discovery he seeks and what he would seek if Montoya had not raised a qualified-immunity defense. He is essentially now on a fishing expedition. Rather than finding a silver bullet -- which Wilks' deposition could have been -- Todd has not found what he sought and is now trying to salvage a case that has gone south. This lawsuit has now been before the Court for over two years. The Court has also gone to great lengths under Anderson v. Creighton to permit Todd to have some significant discovery. Todd has now taken depositions of both Wilks and Armijo -- whose testimony is central to this case. The Court permitted such discovery, because, as the Court stated in its MOO resolving the discovery issue previously before the Court: "Todd has shown, as best he can without using the Court's subpoena power, that there may be evidence to keep his case alive if he is allowed to take Wilks' deposition." MOO at 8. Now that Wilks' and Armijo's depositions are before the Court, however, both unequivocally deny that Montoya played a role in their attack on Todd. While there is always the possibility that they are speaking untruthfully to avoid retribution while incarcerated, the fact remains that Montoya no longer works at the MDC such that they have little to fear from him in terms of repercussions. Furthermore, although Armijo is still at the MDC, Wilks is now at the Penitentiary of New Mexico. Each of their depositions reveals the locations where they are incarcerated. See Wilks Depo at 1; Armijo Depo. at 4:10-14. Thus, the Court has less concerns about their credibility than it would if Montoya still worked at the MDC. While there is a remote possibility Todd will discover additional information from Gallardo regarding his interview with Wilks, the fact remains that both Wilks and Armijo have denied that Montoya had any involvement in Todd's beating. At most, Gallardo's testimony will be impeachment evidence. Todd also does

-74-

not explain how he will be able to present evidence from Gallardo in a competent form to fend off summary judgment given that: (i) any statements Gallardo relates that Wilks made would be hearsay; and (ii) the most Todd could do with those statements is impeach Wilks given that those prior statements were not made under oath. See Fed. R. Evid. 801(d)(1)(A) (defining as non-hearsay a statement that "is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition"). Todd does not explain how this evidence will help him defend against summary judgment given that the Court cannot decide issues of credibility on summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

Regarding Sanchez' testimony, Todd relates that Sanchez' deposition will provide "insight into the reasons why Defendant Montoya resigned." Plaintiff's Supplemental Rule 56(d) Affidavit ¶ 3, at 1. That is largely a conclusory assertion, and Todd does not explain what facts he would obtain from Sanchez that would show the existence of a genuine issue of material fact or what he would do with those facts. See Garcia v. U.S. Air Force, 533 F.3d 1170, 1179-80 (10th Cir. 2008)("Regardless, the affidavit submitted by the Garcias' counsel failed to identify any specific facts which would create a genuine issue of material fact, let alone identify what steps had been taken to obtain such facts and a plan for the future."). Montoya has also already conceded that he resigned as a result of the altercation. Both Wilks and Armijo's depositions are now available, and each inmate unambiguously testified that Montoya had no involvement in the altercation.

Given that Todd is not alleging that Montoya behaved improperly after the altercation occurred in terms of acting with delay in calling guards to arrive, evidence to that effect is not relevant. Additionally, while information about some of Montoya's work responsibilities, training, and prior knowledge may be helpful as background, that information is only loosely related to the

issue of qualified immunity and the problems with Todd's theory the Court has identified.[59]  Even if a prisoner has tried to view the computer screen at the staff station on a past occasion, Todd has not provided an explanation for how he will obtain evidence raising a fact issue whether Wilks looked at the screen on this occasion.  The same rationale applies to Todd's proposed expert; that evidence may be helpful, but it does not explain how Montoya engaged in any actionable conduct on this occasion.  While the Court has stayed discovery, there is nothing preventing Todd from hiring an expert.  Furthermore, while evidence of the layout of the F-7 area and the desk arrangement of the staff station might be helpful to Todd, he does not explain what evidence he would discover regarding those matters that would help him oppose a qualified-immunity defense. Todd also does not explain why he himself could not provide much of that information to his attorney given that Todd was housed in this area of the prison.  Todd does not relate what prevents him from providing some of this information, what steps he has taken to obtain this information, or why Wilks and Armijo could not have provided this information.

Permitting Todd to take Montoya's deposition would also begin to place too much of a burden on Montoya in light of the amount of litigation and participation in discovery the Court has already required.  Todd further makes various arguments about Montoya's credibility given that Wilks and Montoya made slightly different statements regarding whether Wilks was able to look

---

[59]In the Apr. 13, 2011 MSJ, Montoya refers to a potential theory that Todd might argue that Montoya misclassified him as appropriate to be in the general-prison population.  See Apr. 13, 2011 MSJ at 14.  Montoya correctly notes that "Plaintiff makes no allegations in his Complaint of ever being wrongly classified into the general population, nor does he allege that inmates Wilkes [sic] or Armijo were erroneously classified."  Apr. 13, 2011 MSJ at 14.  Todd has not argued any such theory in his responses to the motions for summary judgment, and has not made any allegations to this effect in his Complaint.  The Court should not allow discovery at this stage, when Montoya has asserted a qualified-immunity defense, to permit Todd to support a theory he has not pled; doing so would be unfair to defendants asserting a qualified-immunity defense.

at the computer screen on the staff station desk -- although both men agree that Wilks was not able to see anything on the screen.  See Response to Jan. 30, 2012 MSJ at 14-15.  None of these arguments appear in Todd's rule 56(d) affidavits.  Beyond the inability of the Court to consider evidence regarding credibility on summary judgment, see Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 -- such that it is doubtful whether Todd could obtain any evidence to overcome qualified immunity in light of his arguments that he intends to attack credibility -- Todd does not explain why additional discovery would uncover, in the face of Montoya and Wilks both denying that Wilks could see anything on the computer, anything different.  Also, given that Montoya has filed an affidavit, the Court and the parties have before them his likely deposition testimony.  He also gave an interview with Todd's counsel.  Todd asserts in his filings, but not in any of his rule 56(d) affidavits, that he may be able to find out more information about the fraternization issue that the Bernalillo County Personnel Action Form mentions as grounds for Montoya's resignation.  While none of this information appears in Montoya's affidavit, Montoya explained at the April 5, 2012 hearing that the fraternization refers to his interactions with his brother -- who was incarcerated at MDC at the time of Montoya's employment.  See Apr. 5, 2012 Tr. at 12:5-13:9 (Quinones).  In his Reply to Response to Jan. 30, 2012 MSJ, Montoya attaches a portion of an interview Mr. Villa conducted with him, in which Montoya relates that the statement regarding fraternization relates to this incident with his brother.  See Second Copy of Montoya Interview at 5:10-6:1.  Todd has presented a few pages from this same interview in his Response to Apr. 13, 2011 MSJ, see Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time."), and has not objected to its admissibility.  Montoya's statements in this interview undercut an inference that the reference to

fraternization implicate Montoya's interactions with Wilks or Armijo. The Court found that statement regarding fraternization more troubling before it had Wilks and Armijo's depositions before it. The Court also has Montoya's explanation for that statement regarding fraternization before it. Montoya, Wilks, and Armijo have, under oath, all denied that Montoya communicated to Wilks and Armijo any information about Todd's charges, or otherwise had anything to do with the fight that occurred. Todd has not explained what a deposition of Montoya would reveal that is not already available. The Court has considered his affidavits and concludes that they raise speculative assertions that he will find something helpful.

While the situation was different before Todd had depositions for both Wilks and Armijo, the Court is much less concerned about denying additional discovery now that it has seen their deposition testimony. The Court understands the hardship that Todd faces if the Court does not permit him to have additional discovery regarding the constitutional claims, but the Court does not believe that Montoya should face the additional burdens of litigation that more discovery would entail. This case is not one where additional discovery would yield as much regarding the facts of the case as discovery in a document-intensive case, in a case involving a highly complex set of facts, or in a case that required a great deal of expert testimony. The Court is not yet entering judgment on the entire case. If Todd uncovers something more about Montoya's conduct -- either in formal discovery or informal discovery -- he can approach the Court to reconsider the issue of Montoya's liability. At this stage, however, Todd has not presented persuasive arguments for additional discovery or presented evidence sufficient to overcome Montoya's qualified-immunity defense. Thus, the Court enters summary judgment on Count I in favor of Montoya.

### III.   TODD HAS NOT RAISED A GENUINE ISSUE OF MATERIAL FACT REGARDING THE NMTCA CLAIM ASSERTED AGAINST MONTOYA.

The Court notes that, as a threshold matter, while Montoya has asserted in his answer as an affirmative defense that there is no waiver of sovereign immunity under the NMTCA, see Defendant Tomas Montoya's Answer and Affirmative Defenses to Complaint for Civil Rights Violations, Tort Claims and Damages at 11, filed February 15, 2010 (Doc. 6), he has not raised lack of waiver of sovereign immunity under the NMTCA as a grounds for summary judgment in either of his summary judgment motions, see Apr. 13, 2011 MSJ at 18-19; Jan. 30, 2012 MSJ at 13.  The Court has not located any New Mexico authority indicating that a waiver under the NMTCA is a jurisdictional prerequisite to suit.[60]  Thus, because raising this issue sua sponte does not appear appropriate, the Court will proceed to address the parties' arguments regarding Todd's NMTCA claims.  Todd has asserted claims against Montoya for: (i) negligence; (ii) gross negligence; and (iii) recklessness.  See Complaint at 9-10.  Montoya has not argued that the NMTCA imposes any limitations on the scope of these tort causes of action.

---

[60]Proper notice under the NMTCA appears to be jurisdictional, but notice is not required for suits against public employees:

No suit or action for which immunity has been waived under the Tort Claims Act shall be maintained and no court shall have jurisdiction to consider any suit or action against the state or any local public body unless notice has been given as required by this section, or unless the governmental entity had actual notice of the occurrence.

N.M.S.A. 1978, § 41-4-16(B).  Accord Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 707 F.Supp.2d 1190, 1245 (D.N.M. 2010)(Browning, J.)("The plain language of NMSA 1978, § 41-4-16A and 16B does not require a notice when the suit is against a public employee, and the New Mexico Court of Appeals has so held." (citing Dutton v. McKinley County Bd. of Comm'rs, 113 N.M. 51, 54, 822 P.2d 1134, 1137 (Ct. App. 1991)), rev'd on other grounds sub nom. Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011); Howie v. Stevens, 102 N.M. 300, 304 694 P.2d 1365, 1369 (Ct. App. 1984)(noting that "notice was jurisdictional and would have defeated the infant's claim" under "the Tort Claims Act");

### A.   TODD HAS NOT RAISED A GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER MONTOYA ACTED NEGLIGENTLY.

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty -- which is typically based on a standard of reasonable care -- and the breach being a cause in fact and proximate cause of the plaintiff's damages.  See Herrera v. Quality Pontiac, 134 N.M. 43, 47-48, 73 P.3d 181, 185-86 (2003).  Generally, negligence is a question of fact for the jury.  See Schear v. Bd. of County Comm'rs, 101 N.M. 671, 672, 687 P.2d 728, 729 (1984).  Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons."  Baxter v. Noce, 107 N.M. 48, 51, 752 P.2d 240, 243 (1988).

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 134 N.M. at 56, 73 P.3d at 194.  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the same time, which in

combination with it, causes the injury." Herrera v. Quality Pontiac, 134 N.M. at 57, 73 P.3d at 195.

Notably, qualified immunity does not apply to Todd's claims under the NMTCA. While the

Supreme Court of New Mexico has not specifically reached this holding, it has stated the following:

> Whether the doctrine of qualified immunity protects an official from an action brought under the Tort Claims Act is an open question. The Act was passed prior to the genesis of the modern qualified immunity law established in Harlow. Further, qualified immunity has developed as a defense to § 1983 actions and to corresponding actions against federal officials under Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 . . . (1971). See, e.g., Anderson, 483 U.S. at 637 . . . (Bivens action against FBI agent); Mitchell, 472 U.S. at 513 . . . (Bivens action against United States for warrantless wiretap); Carrillo, 114 N.M. at 609, 845 P.2d at 132 (Section 1983 action). In this case both parties assumed that qualified immunity does protect officials from actions brought under the Tort Claims Act and, as a result, did not argue in the trial court whether the doctrine of qualified immunity from suit under § 1983 applies to liability for which immunity is specifically waived under the Tort Claims Act. Although we question the parties' assumption, we will not address the question here because it is not properly before us.

Romero v. Sanchez, 119 N.M. 690, 696, 895 P.2d 212, 218 (1995). The Honorable Monroe G.

McKay, Senior Judge for the Tenth Circuit, cited this language from Romero v. Sanchez in an

opinion concurring in part and dissenting in part; he also criticized the majority and the district court

for not addressing this issue:

> As for Mr. Painter's state law claims against the officers, however, I would hold that the district court erred in dismissing these claims. The district court concluded that the officers were entitled to summary judgment on these claims because they had probable cause for the arrest, see State v. Johnson, 122 N.M. 696, 930 P.2d 1148, 1153-54 (1996), and I disagree with this conclusion. The district court did not consider whether Mr. Painter's state law claims might also be subject to the doctrine of qualified immunity, and this question has not been definitely resolved by New Mexico's courts. See Romero v. Sanchez, 119 N.M. 690, 895 P.2d 212, 218 (1995)("question[ing] the parties' assumption" that qualified immunity applied to actions brought under New Mexico's Tort Claims Act, but declining to address this issue because it had not been raised by the parties). Under these circumstances, I would reverse the district court's entry of summary judgment to the officers on Mr. Painter's state law claims and remand these claims to the district court for either further consideration or remand to the state court. See Smith v. City of Enid, 149 F.3d 1151, 1156 (10th Cir. 1998)("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over

-81-

any remaining state claims.").

Painter v. City of Albuquerque, 383 F.App'x 795, 804 (10th Cir. 2010)(unpublished)(McKay, J.,

concurring in part and dissenting in part).  In a different context, the Tenth Circuit noted that it had

"interlocutory jurisdiction over denials of qualified immunity at the summary judgment" under some

circumstances, but held that it lacked interlocutory jurisdiction over the denial of summary judgment

on state law claims and that it had only pendent appellate jurisdiction over those state law claims.

Fogarty v. Gallegos, 523 F.3d 1147, 1153-54 (10th Cir. 2008).  It noted that the issue of the

disposition of the state law claims "is not 'inextricably intertwined with [the district court's]

decision to deny . . . qualified immunity,' nor is consideration of the issue 'necessary to ensure

meaningful review of the' qualified immunity rulings."  Fogarty v. Gallegos, 523 F.3d at 1155.

Case law from other circuits supports the conclusion that state law controls the determination

of immunity and liability under a state tort claims act.  The United States Court of Appeals for the

Fourth Circuit held that Maryland law controlled in analyzing qualified immunity under a Maryland

law.  See Henry v. Purnell, 652 F.3d 524, 536 (4th Cir. 2011).  As the Fourth Circuit explained:

> Maryland Declaration of Rights Articles 24 and 26 prohibit employment of excessive force during a seizure.  Randall v. Peaco, 175 Md. App. 320, 927 A.2d 83, 89 (2007).  The standards for analyzing claims under these articles are the same as for analyzing Fourth Amendment claims.  Id.  Thus, from our conclusion that the facts, viewed in the light most favorable to Henry, showed Purnell violated Henry's Fourth Amendment rights, it follows that Purnell also violated his rights under Articles 24 and 26.

> However, Maryland officials are granted immunity under the Maryland Tort Claims Act ("MTCA") for state constitutional violations committed within the scope of their duties when the violations are made "without malice or gross negligence."  Lee v. Cline, 384 Md. 245, 863 A.2d 297, 307 (2004); Md. Code State Gov't §§ 12-101(a)(6), 12-105.  And, "[u]nlike qualified immunity from claims of violations of federal rights under § 1983, the question of immunity for State personnel from State law torts is a subjective one."  Newell v. Runnels, 407 Md. 578, 967 A.2d 729, 763 (2009).

Henry v. Purnell, 652 F.3d at 536.  In a case involving New Jersey law, the United States Court of

Appeals for the Third Circuit similarly held, in an unpublished opinion:

> The issue of whether the Tort Claims Act protects defendants is entirely independent from the issue of whether they are entitled to qualified immunity, and we find that we can provide "meaningful review" of the qualified immunity determination without considering the scope of the Tort Claims Act.  We therefore lack jurisdiction over the appeal to the extent that it involves defendants' argument with respect to the Tort Claims Act.

Ciardiello v. Sexton, 390 F.App'x 193, 199 (3d Cir. 2010)(unpublished).  The United States Court

of Appeals for the First Circuit also held, when applying Massachusetts law:

> We agree with appellant that the district court erred in reasoning that because the police officers' actions were "discretionary" for the purposes of qualified immunity under federal law, they were also performing "discretionary functions" for the purposes of the § 10(b) exception.  As we have already explained, supra, it would be the rare case indeed where an officer is denied qualified immunity because the officer is found to have engaged in "ministerial" rather than "discretionary" conduct.  The discretionary function exception in both the Massachusetts and the Federal Torts Claims acts is altogether different from whatever narrow exception may still exist under immunity law for nondiscretionary ("ministerial") conduct.  "Because of the limitation of the [§ 10(b)] exemption to conduct that is policymaking or planning, the words 'discretionary function' are somewhat misleading as a name of the concept."  Harry Stoller & Co. v. City of Lowell, 412 Mass. 139, 587 N.E.2d 780, 783 (1992)(hereinafter Stoller).  The proper approach is to apply Massachusetts law on the discretionary function exception to appellant's Massachusetts Tort Claims Act claims against Lakeville and Freetown.

Horta v. Sullivan, 4 F.3d 2, 15-16 (1st Cir. 1993)(alterations in original).

The Court concludes that, given the Supreme Court of New Mexico's statements in Romero

v. Sanchez, qualified immunity does not apply to claims brought under the NMTCA.  Thus, for

Todd's claims under the NMTCA, Montoya has the initial burden of production to show "that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  It is worth noting that Montoya does not contest that he owed a duty

to Todd.  Todd has never pled in his Complaint or raised as an argument that Montoya should have

acted differently once the beating began, but rather that Montoya was the one who caused the beating -- either recklessly or intentionally. Instead, he has alleged: (i) "Defendant Montoya knew or should have known that by disclosing Mr. Todd's criminal history to other inmates, Mr. Todd would be subjected to physical attack by other inmates"; and (ii) "Defendant Montoya failed to use ordinary and reasonable care in allowing and/or failing to prevent Patrick Wilks and Joseph Armijo from viewing Mr. Todd's criminal record, which Defendant knew . . . would lead to Wilks and Armijo committing the torts of battery, assault and false imprisonment on Mr. Todd." Complaint ¶¶ 59-64, at 9.

Montoya has met his initial summary-judgment burden of production regarding the elements of breach and causation, because he has come forward with sufficient evidence to make an initial demonstration that there is no genuine issue whether he acted negligently or whether he caused Todd's injuries. The allegations against Montoya are that he negligently permitted Wilks and/or Armijo to discover Todd's criminal history in such a way that caused Todd's beating. Todd has also argued that Montoya showed them Todd's criminal history intentionally. Both Wilks and Armijo have denied, however: (i) that Montoya showed either of them information about Todd's criminal history; (ii) that Montoya in some way permitted them, accidentally or intentionally, to view this information on a computer screen or otherwise; (iii) that he played a role in instigating the fight; or (iv) that Montoya otherwise had any substantial communication with Wilks on the day of the incident or any communications with Armijo. Armijo further related that the inmates received information that Todd was on a sex-offender website from someone outside the prison. Todd has not been able to present competent evidence to specifically controvert Wilks' and Armijo's assertions. One of Montoya's uncontroverted facts also established that he called other prison guards to come stop the fight almost immediately after the physical altercation involving Todd

began.  See Apr. 13, 2011 MSJ ¶ 31, at 6 (setting forth this fact); Montoya Aff. ¶ 39, at 5.

Likewise, other evidence Montoya has presented undercuts the conclusion that he breached a duty of ordinary care or caused Todd's injuries in that it does not appear that he acted in a manner that would create a risk that Wilks and Montoya would discover information about Todd's criminal history.  While Wilks and Armijo may have discovered, through means unrelated to Montoya, that Todd had some criminal history related to sex offenses, Montoya has met his burden of production to show that he acted reasonably and that his conduct did not proximately cause Todd's harm.  The computer screen where Montoya could have accessed the records was approximately six feet off the ground, and Wilks was unable, even after trying, to read anything regarding Todd on the computer screen.  Furthermore, when Wilks asked Montoya if Todd was a chester -- a child molester -- Montoya responded that he did not know.  On the facts presented, it is not sound to characterize Montoya's conduct as rising to the level of negligence.

In light of this evidence, Todd has the burden to come forward with evidence showing the existence of a genuine issue of material fact whether Montoya breached his duty to Todd and that his conduct was a proximate cause of Todd's injuries.  "[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  Otteson v. United States, 622 F.2d at 519.  Todd has not met this burden.  It is worth mentioning again that much of the evidence upon which Todd relies is hearsay evidence, such as the handwritten statement allegedly attributable to Wilks in the Voluntary Statement, which Wilks has denied ever making.  See Voluntary Statement at 1.  Todd also tries to present, in various forms, hearsay statements relating that Montoya showed Wilks information regarding Todd's criminal history.  For instance, in the Jan. 13, 2008 Letter, Sanchez states: "Inmate Todd made a statement

-85-

in which he accused CO Montoya of abusing the pod radio and showing his charges to inmate Wilks." Jan. 13, 2008 Letter at 2. Gallardo relates in the Jan. 15, 2008 Letter that "Inmate Todd stated 'that Officer Montoya had gotten in the Internet in the unit pod computer on Sunday and shown all the Inmates in the pod his past charges.'" Jan. 15, 2008 Letter at 1. Likewise, Todd relies on his own affidavit wherein he states that, after the altercation, Wilks related "that Defendant Montoya showed him my criminal history on the computer." Todd Aff. ¶ 15, at 2. Todd makes other similar statements in his affidavit: (i) "Officer Gallardo told me that in Mr. Wilks['] statement he admitted that Defendant Montoya showed him my criminal history"; and (ii) "Officer Gallardo also informed me that he spoke to Officer Montoya, who admitted to either showing or telling Mr. Wilks my criminal history." Todd Aff. ¶¶ 18-19, at 2.

Todd relies heavily on Montoya's acknowledgment that he resigned because of this incident, given that he was about to face termination. While this evidence is not irrelevant in the sense that it has no relevance under rule 401, this piece of evidence is not enough, by itself, to satisfy Todd's burden of production. Notably, this evidence would be excludable under rule 407 as a subsequent remedial measure, although Montoya has not objected to the evidence on this basis. See Nolan v. Memphis City Sch., 589 F.3d at 274 ("Evidence that an employer subsequently discharged an employee accused of causing a plaintiff's injury may be properly excluded as a subsequent remedial measure under Rule 407." (citing Hull v. Chevron USA, Inc., 812 F.2d at 586-87). He, in fact, presented this evidence himself. The MDC and Montoya both took the remedial actions, with the MDC recommending that Montoya resign instead of face termination and Montoya deciding to resign. Whether Montoya engaged in inappropriate conduct and the appropriateness of his employment in light of his potential involvement in Todd's beating are "the subject[s] of this lawsuit, and as a result, [his termination] is a measure that 'if taken previously, would have made

-86-

the injury or harm less likely to occur'" within the meaning of rule 407. Stahl v. Bd. of Cnty.
Comm'rs of the Unified Gov't of Wynandotte Cnty/Kan., 101 F.App'x at 321. Furthermore, both
the MDC and Montoya are defendants in this lawsuit, so their actions fall within rule 407's
contemplation. See Mehoja v. Drummond, 56 F.3d at 1215 ("We reject the rule crafted by the
dissent, as unsupported by the cases and unworkable, that Rule 407 applies not only to actual
defendants, but also to obvious potential defendants." (emphasis in original)). Todd is offering the
evidence to establish Montoya's wrongful conduct, so none of the exceptions to rule 407 applies.

To evaluate whether this evidence satisfies Todd's burden of production to raise a genuine
issue of material fact, rule 407's considerations are still relevant to assess the relative probative
value of this evidence. As the advisory committee's note to rule 407 relates, the inference one draws
from a subsequent remedial measure as proof of an admission of fault is relatively weak:

> The rule incorporates conventional doctrine which excludes evidence of
> subsequent remedial measures as proof of an admission of fault. The rule rests on
> two grounds. (1) The conduct is not in fact an admission, since the conduct is
> equally consistent with injury by mere accident or through contributory negligence.
> Or, as Baron Bramwell put it, the rule rejects the notion that "because the world gets
> wiser as it gets older, therefore it was foolish before." Hart v. Lancashire &
> Yorkshire Ry. Co., 21 L.T.R. N.S. 261, 263 (1869). Under a liberal theory of
> relevancy this ground alone would not support exclusion as the inference is still a
> possible one.

Fed. R. Evid. 407 advisory committee's note to 1972 proposed rules. The Tenth Circuit, relying on
this advisory committee's note, has similarly stated: "First, as an admission of fault, the probative
value of subsequent remedial measures is limited." Hull v. Chevron USA, Inc., 812 F.2d at 586-87
(citing Fed. R. Evid. 407 advisory committee's note to 1972 proposed rules)(noting that the district
court properly excluded testimony from a former employee who had been fired as a result of the
incident underlying the lawsuit). While this evidence may create a weak inference of wrongdoing,
it is not probative enough to meet Todd's burden of production that Montoya acted in a negligent

manner or that Montoya proximately caused his injury.  See In re Air Crash Disaster, 86 F.3d at 528-29 ("Northwest's rewiring of the CAWS is circumstantial evidence, if only of a weak and suspect sort, that the CAWS as it existed at the time of the accident was not foolproof.").  Even if the evidence is not technically within rule 407's scope: (i) rule 407's underlying concerns are persuasive when evaluating the probative value of the evidence; and (ii) the circumstances of Montoya's resignation in light of the other evidence in the record make the inference of wrongdoing one can draw from his resignation a weak one.  See Gray v. Hoffman-La Roche, Inc., 82 F.App'x at 646-47 (recognizing that, while the evidence at issue was "admissible under Rule 407," its "probative value was minimal").  It is the proverbial scintilla of evidence that cannot properly prevent entry of summary judgment.

While the Bernalillo County Personnel Action Form refers to Montoya resigning based on fraternization issues, that statement is relatively ambiguous as the document provides no elaboration on what those fraternization issues are.  See Bernalillo County Personnel Action Form at 1. Montoya explained at the April 5, 2012 hearing that the fraternization refers to his interactions with his brother -- who was incarcerated at MDC at the time of Montoya's employment.  See Apr. 5, 2012 Tr. at 12:5-13:9 (Quinones).  In his Reply to Response to Jan. 30, 2012 MSJ, Montoya attaches a portion of an interview Todd's counsel, Ryan Villa, conducted with him, in which Montoya relates that the statement regarding fraternization relates to this incident with his brother.  See Second Copy of Montoya Interview at 5:10-6:1.  Todd has presented a few pages from this same interview in his Response to Apr. 13, 2011 MSJ, see Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time."), and has not objected to its admissibility.  Montoya's statements in this interview undercut

an inference that the reference to fraternization implicate Montoya's interactions with Wilks or Armijo. The evidence of his resignation alone, particularly when taking into account the various pieces of evidence Montoya has presented that undercut inferences of wrongdoing, is not sufficiently probative to meet this burden of production.

Any other disputed facts are not material such that they change the appropriate disposition of this negligence issue. For instance, Todd created a dispute regarding Wilks' and Armijo's motivation to attack Todd -- whether he had made statements that provoked them or whether they had attacked him without provocation. Under either scenario, however, Montoya still has no involvement in Todd's beating absent additional evidence making such a connection. Todd successfully controverts evidence that the guards came immediately to break to break up the fight between Todd and Wilks, presenting evidence that there may have been two to three minutes that passed before guards arrived. It is not disputed, however, that Montoya almost immediately called for the assistance of other guards when the altercation between Todd and Wilks began -- conduct which does not support a finding of negligence. More importantly, as the Court has already noted, Todd has not alleged that Montoya acted improperly after the beating began -- such as Montoya failing to intervene in the beating. See Complaint ¶¶ 59-64, at 9. Accordingly, Todd has failed to meet his burden to show the existence of a genuine issue of material fact regarding Montoya's negligence.

**B. TODD HAS NOT SHOWN THE EXISTENCE OF A GENUINE ISSUE OF MATERIAL FACT WHETHER MONTOYA ACTED IN A GROSSLY NEGLIGENT OR RECKLESS MANNER.**

Quoting from Prosser & Keeton on the Law of Torts, the Supreme Court of New Mexico has stated with regard to gross negligence: "[M]ost courts consider that 'gross negligence' falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree,

and not in kind."  Paiz v. State Farm Fire and Cas. Co., 118 N.M. 203, 212, 880 P.2d 300, 308

(1994)(quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 34, at 212 (5th ed.

1984)).  Furthermore, the Supreme Court of New Mexico has stated that it has "formally abolished

the distinction between ordinary and gross negligence when it adopted the doctrine of comparative

negligence."  Paiz v. State Farm Fire and Cas. Co., 118 N.M. at 211, 880 P.2d at 309 (citing Scott

v. Rizzo, 96 N.M. 682, 687, 634 P.2d 1234, 1239 (1981)).  Thus, given that New Mexico law does

not recognize a separate concept of gross negligence, there is no separate analysis for the Court to

conduct regarding gross negligence.  The two are the same under New Mexico law.

Regarding recklessness, the Court of Appeals of New Mexico has stated, relying on a

uniform jury instruction:[61] "'Reckless conduct,' by contrast, is defined as 'the intentional doing of

an act with utter indifference to the consequences.'"  Pub. Serv. Co. of N.M. v. Diamond D. Constr.

Co., Inc., 131 N.M. 100, 117, 33 P.3d 651, 668 (Ct. App. 2001).[62]  For the purpose of Eighth

---

[61]The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law.  See State v. Wilson, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994).

[62]Federal courts must determine what a state's highest court would do if confronted with the same issue.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Tompkins . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently."  311 U.S. at 467.  "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review."  Stoner v. N.Y. Life Insurance Co., 311 U.S. at 467.  See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case.").  As the Tenth Circuit explained in Wade v. EMCASCO Insurance Co., 483 F.3d 657 (10th Cir. 2007):

In cases arising under diversity jurisdiction, the federal court's task is not to reach

Amendment analysis, the Tenth Circuit has equated deliberate indifference with recklessness.  See

Belcher v. United States, 216 F.App'x at 823-24.  Todd could not show the existence of a genuine

issue of material fact regarding Montoya's deliberate indifference or his negligence, so it follows

that Todd can similarly not show the existence of a genuine issue of material fact regarding

Montoya's recklessness.  Thus, Todd has not raised a genuine issue of material fact on his NMTCA

claims.

## IV.    TODD HAS NOT MET THE STANDARD FOR DELAYING OR DEFERRING ENTRY OF SUMMARY JUDGMENT UNDER RULE 56(d).

Because qualified immunity does not apply to Todd's claims under the NMTCA, the Court

will separately address his rule 56(d) affidavits in regards to his NMTCA claims.  Rule 56(d) of the

Federal Rules of Civil Procedure states:

> (d)    **When Facts Are Unavailable to the Nonmovant.**  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
>> (1)    defer considering the motion or deny it;
>>
>> (2)    allow time to obtain affidavits or declarations or to take discovery; or
>>
>> (3)    issue any other appropriate order.

--------

its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. . . . The federal court must follow the most recent decisions of the state's highest court. . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. . . .  In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state . . . . appellate decisions in other states with similar legal principles . . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law. . . .  Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (citations omitted)(internal quotation marks omitted).

Fed. R. Civ. P. 56(d).  "The general principle of Rule 56[d] is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."  Price v. W. Res., Inc., 232 F.3d at 783 (internal quotation marks omitted).  "Rule 56[d] does not require, however, that summary judgment not be entered until discovery is complete."  Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 2007 WL 2461629, at *3.  To invoke the shelter that rule 56(d) provides, a party must (i) file an affidavit, see Pasternak v. Lear Petroleum Exploration Inc., 790 F.2d at 832-33; (ii) identify the probable facts not available, their relevance, and what steps have been taken to obtain those facts, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522; (iii) explain why facts precluding summary judgment cannot be presented, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522; and (iv) state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522.

Notably, the Court has already permitted Todd to have some discovery in that Todd has now taken Wilks' and Armijo's depositions.  Todd requests additional discovery under rule 56(d).  See Plaintiff's Supplemental Rule 56(d) Affidavit ¶¶ 2-3, at 1.  Specifically, he requests the following evidence:

> 2.     In order to fully respond to paragraph 12 through 14 of Defendant's Motion for Summary Judgment Renewed [Doc. No. 94] I need to depose corrections officer Abraham Gallardo, who it is believed took the statement from Mr. Wilks.  Mr. Gallardo's testimony in this regard could rebut Mr. Wilks['] testimony that he did not make that statement, that the statement, which is Exhibit 3 [Doc. No. 67-3], does not contain his handwriting, and that the statement is not true.

> 3.     I also need to depose Sgt. Chris Sanchez, who was involved in the investigation which ultimately culminated in the resignation of Defendant Montoya.  His testimony would provide insight into the reasons why Defendant Montoya resigned.

Plaintiff's Supplemental Rule 56(d) Affidavit ¶¶ 2-3, at 1.  Todd also relates, in his first rule 56 affidavit,  that he needs some discovery regarding "the policies and procedures and any training that Montoya has received" about certain procedures in F-7, such as where inmates may go, how much discretion Montoya had to classify inmates.  See Plaintiff's Rule 56(f) Affidavit ¶¶ 8-9, at 2-3.  Todd asserts that he still needs additional discovery to controvert some of Montoya's asserted facts regarding the layout of the F-7 area and the staff station.  See Plaintiff's Rule 56(f) Affidavit ¶ 11, at 3.  Todd represents that he needs additional discovery to confirm whether a similar incident had ever occurred where an inmate looked at a computer screen.  See Plaintiff's Rule 56(f) Affidavit ¶ 13, at 4.  Todd contends that he needs additional discovery regarding how long it took Montoya to call for additional guards to come to the area where the fight occurred.  See Plaintiff's Rule 56(f) Affidavit ¶ 15, at 4.  Todd also asserts that he "intends to hire an expert, who will opine that it is common knowledge in the corrections business that some inmates will attack other inmates who they know have been convicted of sexual offenses and that officers should be trained to this effect." Plaintiff's Rule 56(f) Affidavit ¶ 16, at 4.

        To invoke the shelter that rule 56(d) provides, a party must (i) file an affidavit; (ii) identify the probable facts not available, their relevance, and what steps have been taken to obtain those facts; (iii) explain why facts precluding summary judgment cannot be presented; and (iv) state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment.  Compared to its analysis regarding qualified immunity, the Court is conscious that courts are less willing to permit early summary judgment motions in other contexts outside of the qualified-immunity context given the unique nature of qualified immunity.  "Unless dilatory or lacking in merit," a party's rule 56(d) application "should be liberally treated."  Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1553-54.  "Rule 56(f) does not require, however,

that summary judgment not be entered until discovery is complete." Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs.,  2007 WL 2461629, at *3.

Todd's ultimate problem is that his rule 56(d) application is not sound.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1553-54.  Regarding a deposition of Gallardo, while there is a possibility that Todd will discover additional information from Gallardo regarding his interview with Wilks, both Wilks and Armijo have denied that Montoya had any involvement in Todd's beating.  More importantly, Todd does not explain how he will be able to present any evidence he obtains from Gallardo in a competent form to fend off summary judgment given that: (i) any statements Gallardo relates that Wilks made will be hearsay; and (ii) the most Todd could do with those statements is impeach Wilks given that those prior statements were not made under oath.  See Fed. R. Evid. 801(d)(1)(A) (defining as non-hearsay a statement that "is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition").  Todd does not explain how this evidence would help him defend against summary judgment given that the Court cannot decide issues of credibility on summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

Regarding Sanchez' testimony, Todd relates that Sanchez' deposition will provide "insight into the reasons why Defendant Montoya resigned."  Plaintiff's Supplemental Rule 56(d) Affidavit ¶ 3, at 1.  That is largely a conclusory assertion, and Todd does not explain what facts he would obtain from Sanchez that would show the existence of a genuine issue of material fact or what he would do with those facts.  See Garcia v. U.S. Air Force, 533 F.3d at 1179-80.  Montoya has also already conceded that he resigned as a result of the altercation.  Both Wilks' and Armijo's depositions are available, and each inmate unambiguously testified that Montoya had no involvement in the altercation.

-94-

Given that Todd is not alleging that Montoya acted improperly after the altercation occurred in terms of acting with delay in calling guards to arrive, evidence to that effect is not relevant. Todd does not explain why this factual issue will help him defeat summary judgment, or what evidence is not already available to him given that Armijo has testified that there was a two to three minute delay in guards arriving to break up the fight. See Comm. for the First Amendment v. Campbell, 962 F.2d at 1522 (requiring a party under rule 56(d) to identify the probable facts not available, their relevance, and what steps have been taken to obtain those facts). Additionally, while information about some of Montoya's work responsibilities, training, and prior knowledge may be helpful as background, those issues are only loosely related to Montoya's liability given that Todd has not identified any evidence that raises fact issues regarding whether Montoya breached a duty to him and that the breach caused his injuries.[63] Even if a prisoner has tried to view the computer screen at the staff station on a past occasion, Todd has not provided an explanation for how he will obtain evidence raising a fact issue whether Wilks looked at the screen on this occasion. The same rationale applies to Todd's proposed expert; that evidence may be helpful, but it does not explain

---

[63]In the Apr. 13, 2011 MSJ, Montoya refers to a potential theory that Todd might argue that Montoya misclassified him as appropriate to be in the general-prison population. See Apr. 13, 2011 MSJ at 14. Montoya correctly notes that "Plaintiff makes no allegations in his Complaint of ever being wrongly classified into the general population, nor does he allege that inmates Wilkes [sic] or Armijo were erroneously classified." Apr. 13, 2011 MSJ at 14. Todd has not argued any such theory in his responses to the motions for summary judgment and has not made any allegations to this effect in his Complaint. Because such a misclassification claim raises serious questions of sovereign immunity, see Trujillo v. Salazar, No. Civ-04-0689, 2006 WL 1228827, at *5 (D.N.M. Mar. 1, 2006)(Browning, J.)("Section 41-4-6's waiver of immunity is not unlimited, for it does not allow liability for negligent supervision, negligent design, negligent inspection, or negligent classification of a prison inmate."), the Court should not otherwise delay entry of summary judgment on these claims when Montoya has not had an opportunity to raise waiver of sovereign immunity. If Todd wants to allege misclassification as a state law claim, the Court can decide the appropriate bounds of discover at that time rather than now, when the misclassification claim is not part of the case.

how Montoya engaged in any actionable conduct on this occasion.  Nothing has prevented Todd from hiring his proposed expert and presenting that testimony -- through an affidavit or other means. Furthermore, while evidence of the layout of the F-7 area and the desk arrangement of the staff station there might be helpful to Todd, he does not explain what evidence he would discover regarding those matter that would help him oppose summary judgment.  Todd also does not explain why he himself could not provide much of that information to his attorney given that Todd was housed in this prison area.  Todd does not relate what prevents him from providing some of this information or what steps he has taken to obtain this information, or why Wilks and Armijo could not have provided this information.

While Todd might obtain some useful information from Montoya if he took Montoya's deposition, Todd does not explain what he would find and why it would help him show the existence of a genuine issue of material fact regarding Montoya's liability.  He also does not explain why the interview he already conducted with Montoya was insufficient.  Todd makes various arguments about Montoya's credibility given that Wilks and Montoya made slightly different statements regarding whether Wilks was able to look at the computer screen on the staff station desk -- although both men agree that Wilks was not able to see anything on the screen.  See Response to Jan. 30, 2012 MSJ at 14-15.  None of these arguments appear in Todd's rule 56(d) affidavits.  Beyond the inability of the Court to consider evidence regarding credibility on summary judgment, see Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 -- such that it is doubtful whether Todd could obtain any evidence to overcome qualified immunity in light of his arguments that he intends to attack credibility -- Todd does not explain why additional discovery would uncover, in the face of Montoya and Wilks both denying that Wilks could see anything on the computer, beyond speculative assertions that he will find something helpful.  Also, given that Montoya has filed an

affidavit, the Court and the parties have before them his likely deposition testimony. Todd asserts in his filings, but not in any of his rule 56(d) affidavits, that he may be able to find out more information about the fraternization issue that the Bernalillo County Personnel Action Form mentions as grounds for Montoya's resignation. While none of this information appears in Montoya's affidavit, Montoya explained at the April 5, 2012 hearing that the fraternization refers to his interactions with his brother -- who was incarcerated at MDC at the time of Montoya's employment. See Apr. 5, 2012 Tr. at 12:5-13:9 (Quinones). In his Reply to Response to Jan. 30, 2012 MSJ, Montoya attaches a portion of an interview Todd's counsel, Ryan Villa, conducted with him, in which Montoya relates that the statement regarding fraternization relates to this incident with his brother. See Second Copy of Montoya Interview at 5:10-6:1. Todd has presented a few pages from this same interview in his Response to Apr. 13, 2011 MSJ, see Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time."), and has not objected to its admissibility. Montoya's statements in this interview undercut an inference that the reference to fraternization implicate Montoya's interactions with Wilks or Armijo. The Court found that statement regarding fraternization more troubling before it had Wilks and Armijo's deposition before it. It also has Montoya's explanation for that statement before it. Montoya, Wilks, and Armijo have, under oath, all denied that Montoya communicated to Wilks and Armijo any information about Todd's charges, or otherwise had anything to do with the fight that occurred. Todd has not explained what an additional deposition for Montoya would reveal that is not already available.

The Court would be much more concerned about entering summary judgment if Todd had not had an opportunity to take Wilks' or Armijo's depositions. Their depositions clarified many of

the otherwise ambiguous circumstances regarding what occurred.  Todd did not uncover what he hoped he would when he took their depositions.  He has not identified why another potential discovery source would help him show the existence of a genuine issue of material fact regarding Montoya's liability.  Furthermore, this case is not the kind where additional discovery would yield as much regarding the facts of the case as discovery in a document-intensive case, in a case involving a highly complex set of facts, or in a case that required a great deal of expert testimony.  Thus, the Court concludes that entering summary judgment on Count III -- Todd's NMTCA claim -- in favor of Montoya is appropriate.  Again, the Court is not yet entering judgment on the entire case.  If Todd uncovers something more about Montoya's conduct -- either in formal discovery or informal discovery -- he can approach the Court to reconsider the issue of Montoya's liability.  On the rather robust record before the Court, and on which was able to obtain some significant formal discovery, Todd has not presented persuasive arguments for additional discovery or presented evidence sufficient to overcome Montoya's qualified-immunity defense.

**IT IS ORDERED** that Defendant Tomas Montoya's Renewed Motion for Summary Judgment Based upon Qualified Immunity and Other Grounds, filed January 30, 2012 (Doc. 94), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

-- and --

Ryan J. Villa
The Law Offices of Robert R. Cooper
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

Carlos M. Quinones
Quinones Law Firm
Santa Fe, New Mexico

 *Attorneys for Defendant Tomas Montoya*

Jeffrey L. Baker
Renni Zifferblatt
Jeffrey L. Baker & Associates
Albuquerque, New Mexico

 *Attorneys for Defendants Ron Torres and the Board of County Commissioners of*
  *Bernalillo County*